# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KYOCERA DOCUMENT SOLUTIONS AMERICA, INC., | Civil Action No.: |
| Plaintiff, | |
| v. | (Document Hand Delivered) |
| DIVISION OF ADMINISTRATION, NEW JERSEY DEPARTMENT OF THE TREASURY; AMANDA TRUPPA, in her Official Capacity as Director of the Division of Administration; DIVISION OF PURCHASE AND PROPERTY, NEW JERSEY DEPARTMENT OF THE TREASURY; and AMY F. DAVIS, in her Official Capacity as Acting Director of the Division of Purchase and Property, | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

Christopher S. Porrino, Esq.
Barry T. Albin, Esq.
Kent D. Anderson, Esq.
Wayne W. Fang, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500
*Attorneys for Plaintiff Kyocera*
*Document Solutions America, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT .......................................................... 1

STATEMENT OF FACTS ................................................................. 4

    A.    The Russian Invasion and the Federal Response ................................. 4

    B.    New Jersey's Russia Sanctions Act .................................................... 7

    C.    The New Jersey Act's Impact on Kyocera America ........................... 10

ARGUMENT ................................................................................. 15

THE COURT SHOULD ENTER A TEMPORARY RESTRAINING
ORDER AND INJUNCTION BARRING DEFENDANTS FROM
UNCONSTITUTIONALLY ENFORCING THE ACT ......................................... 15

    A.    Kyocera America is Likely to Succeed on the Merits ........................ 16

        1.    The New Jersey Act as applied to Kyocera America is
            preempted by the federal scheme governing Russian
            sanctions ................................................................................. 16

            a.    The field of foreign affairs is exclusively reserved
                to the Federal Government ............................................. 17

            b.    Enforcement of the New Jersey Act against
                Kyocera America directly conflicts with the
                federal sanctions scheme .............................................. 20

        2.    Elements of the New Jersey Act violate the Foreign
            Commerce Clause as applied to Kyocera America ................. 27

            a.    The New Jersey Act, as applied to Kyocera
                America, discriminates against foreign commerce ........ 29

b. The New Jersey Act denies the Federal
Government the ability to speak with one voice on
foreign commerce ........................................................ 31

B. Kyocera America Will Suffer Irreparable Harm if it Does Not
Obtain Injunctive Relief .................................................... 33

C. There Will be No Undue Hardship Placed on Defendants if the
Court Maintains the Status Quo ......................................... 37

D. The Issuance of an Injunction is Supported by the Public
Interest ........................................................................... 38

E. Any Requirement For A Bond Should Be Waived .......................... 39

CONCLUSION ................................................................ 41

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLU v. Ashcroft,*
   322 F.3d 240 (3d Cir. 2003)................................................................ 38

*Am. Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003)............................................................................ 20

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.,*
   39 F.4th 95 (3d Cir. 2022) ................................................................. 15

*Ams. for Prosperity v. Grewal,*
   No. 19 -14228, 2019 U.S. Dist. LEXIS 170793 (D.N.J. Oct. 2, 2019) ............. 37

*AT&T v. Winback & Conserve Program,*
   42 F.3d 1421 (3d Cir. 1994)............................................................... 15

*Barclays Bank PLC v. Franchise Tax Bd.,*
   512 U.S. 298 (1994)....................................................................... 28, 30

*Bd. of Trustees of Univ. of Illinois v. United States,*
   289 U.S. 48 (1933)............................................................................. 28

*Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP,*
   528 F.3d 176 (3d Cir. 2008)............................................................... 34

*Boyle v. United Techs. Corp.,*
   487 U.S. 500 (1988)........................................................................... 20

*Chy Lung v. Freeman,*
   92 U.S. 275 (1875)............................................................................. 19

*Container Corp. of Am. v. Franchise Tax Bd.,*
   463 U.S. 159 (1983)........................................................................... 28

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000)................................................................... passim

*Donn v. A.W. Chesterton Co., Inc.,*
   842 F. Supp. 2d 803 (E.D. Pa. 2012)................................................. 18

*Durel B. v. Decker*,
   455 F. Supp. 3d 99 (D.N.J. 2020) ........................................................ 16

*Everett Lab'ys, Inc. v. Breckenridge Pharm., Inc.*,
   573 F. Supp. 2d 855 (D.N.J. 2008) ...................................................... 34

*Farina v. Nokia Inc.*,
   625 F.3d 97 (3d Cir. 2010) ................................................................. 21

*Fellner v. Tri-Union Seafoods, L.L.C.*,
   539 F.3d 237 (3d Cir. 2008) ............................................................... 17

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982) ........................................................................... 17

*Fitzgerald v. Mountain Laurel Racing, Inc.*,
   607 F.2d 589 (3d Cir. 1979) ............................................................... 36

*Gibbons v. Ogden*,
   22 U.S. 1 (1824) ................................................................................. 17

*Golden Fortune Imp. & Exp. Corp. v. Mei-Xin Ltd.*,
   Nos. 22-1710, 22-1885, 2022 U.S. App. LEXIS 23007 (3d Cir.
   Aug. 5, 2022) .................................................................................... 33

*Hillsborough Cnty. v. Automated Med. Lab'ys., Inc.*,
   471 U.S. 707 (1985) ...................................................................... 18, 21

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ............................................................................. 19

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
   882 F.2d 797 (3d Cir. 1989) ............................................................... 32

*Japan Line, Ltd. v. Los Angeles Cnty.*,
   441 U.S. 434 (1979) .............................................................. 28, 29, 31

*Kansas Health Care Ass'n v. Kansas Dep't of Soc. & Rehab. Servs.*,
   31 F.3d 1536 (10th Cir. 1994) ........................................................... 33

*Kershner v. Mazurkiewicz*,
   670 F.2d 440 (3d Cir. 1982) ............................................................... 15

*Koons v. Reynolds*,
  No. 22-7464, 2023 U.S. Dist. LEXIS 3293 (D.N.J. Jan. 9, 2023)...................... 15

*Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin.*,
  505 U.S. 71 (1992) ................................................................................. 28

*LCN Enterprises, Inc. v. City of Asbury Park*,
  197 F. Supp. 2d 141 (D.N.J. 2002) ..................................................... 39

*Merch. & Evans, Inc. v. Roosevelt Bldg. Prod. Co.*,
  963 F.2d 628 (3d Cir. 1992)................................................................. 15

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l
  Foreign Trade Council*, 530 U.S. 363 (2000)................................. 19, 20, 30, 31

*Nat'l Shooting Sports Found. v. Platkin*,
  No. 22-6646, 2023 U.S. Dist. LEXIS 16459 (D.N.J. Jan. 31, 2023)................. 33

*New Jersey Retail Merchs. Ass'n v. Sidamon-Eristoff*,
  669 F.3d 374 (3d Cir. 2012)......................................................... 33, 37, 38

*NLMK Pa., LLC v. United States Steel Corp.*,
  592 F. Supp. 3d 432 (W.D. Pa. 2022)............................................... 18

*Norfolk S. Corp. v. Oberly*,
  822 F.2d 388 (3d Cir. 1987)................................................................. 28

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
  715 F.3d 1268 (11th Cir. 2013) ......................................... 25, 32, 36

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
  920 F.2d 187 (3d Cir. 1990)........................................................ 16, 34, 38

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
  143 F.3d 800 (3d Cir. 1998)............................................................. 34, 36

*Perpich v. Dep't of Def.*,
  496 U.S. 334 (1990).............................................................................. 18

*Pullmans Palace Car Co. v. Pennsylvania*,
  141 U.S. 18 (1891).............................................................................. 31

*Reilly v. City of Harrisburg,*
   858 F.3d 173 (3d Cir. 2017)................................................................. 16

*Rice v. Santa Fe Elevator Corp.,*
   331 U.S. 218 (1947)........................................................................... 18

*S. Pac. Co. v. Arizona ex rel. Sullivan,*
   325 U.S. 761 (1945)........................................................................... 28

*S.-Cent. Timber Dev., Inc. v. Wunnicke,*
   467 U.S. 82 (1984)............................................................................. 28

*Sikkelee v. Precision Airmotive Corp.,*
   822 F.3d 680 (3d Cir. 2016)......................................................... 17, 21

*Temple Univ. v. White,*
   941 F.2d 201 (3d Cir. 1991)............................................................... 33

*United States v. Curtiss-Wright Exp. Corp.,*
   299 U.S. 304 (1936)........................................................................... 19

*United States v. Pink,*
   315 U.S. 203 (1942)...................................................................... 18, 27

*Video Gaming Techs., Inc. v. Bureau of Gambling Control,*
   356 Fed. Appx. 89 (9th Cir. 2009)..................................................... 33

*W S Int'l, LLC v. M. Simon Zook, Co.,*
   566 Fed. App'x. 192 (3d Cir. 2014)................................................... 39

*Zambelli Fireworks Mfg. Co. v. Wood,*
   592 F.3d 412 (3d Cir. 2010)............................................................... 39

*Zschernig v. Miller,*
   389 U.S. 429 (1968)...................................................................... 18, 19

**STATUTES**

50 U.S.C. §§ 1701–09...................................................................... 5, 23

N.J.S.A. 52:32-60.1..................................................................... passim

Pub. L. No. 117-109, 136 Stat. 1154.................................................. 6, 22

Pub. L. No. 117-110, 136 Stat. 1159................................................................ 6, 22

**RULES**

Federal Rules of Civil Procedure Rule 65 ......................................................... 15, 39

**REGULATIONS**

31 C.F.R. part 587 .......................................................................................... 5, 7, 22

31 C.F.R. part 589 .......................................................................................... 5, 6, 22

**OTHER AUTHORITIES**

Exec. Order No. 14,065, 87 Fed. Reg. 36 (2022) ........................................................5

Exec. Order No. 14,071, 87 Fed. Reg. 68 (2022) ........................................................5

U.S. Const. art. I, § 8, cl. 3 ............................................................................... 27

U.S. Const. art. VI, cl. 2 ................................................................................... 16

## PRELIMINARY STATEMENT

Plaintiff Kyocera Document Solutions America, Inc. ("Kyocera America") is a United States corporation headquartered in New Jersey, which provides copying-related equipment and copying services to agencies and entities of the State of New Jersey. Kyocera America's corporate parent, Kyocera Document Solutions Inc. ("Kyocera Japan"), is a Japanese multinational company which co-owns a Russia-based subsidiary with Kyocera Document Solutions Europe, B.V. ("Kyocera Europe"). Kyocera America has no interest in or business relationships with that distant Russian subsidiary and does no business in Russia or Belarus.

Since the Russian occupation of Crimea in 2014 and through Russia's full-scale and unprovoked invasion of Ukraine in February 2022, Congress has enacted and the President has implemented a series of escalating economic sanctions against Russia and Belarus. Those highly detailed and carefully tailored federal sanctions do not extend to Kyocera America – or to any similarly situated United States company which has a multinational corporate parent with a distant subsidiary in Russia. Kyocera America is in full compliance with the federal sanctions scheme and condemns Russia's war of aggression against Ukraine.

In the wake of Russia's 2022 invasion of Ukraine, the New Jersey Legislature passed N.J.S.A. 52:32-60.1 (the "New Jersey Act" or "Act") – an act that imposes economic sanctions more far-reaching than the federal sanctions. The New Jersey

Act prohibits "any entity," such as Kyocera America, "under common ownership and control" of a parent company that has a subsidiary based in Russia from "enter[ing] into or renew[ing] a contract with a State agency for the provision of goods or services." N.J.S.A. 52:32-60.1a(1), -60.1e. In short, the New Jersey sanctions prohibit what the federal sanctions permit: Kyocera America from doing business with state agencies and entities.

Defendants, Division of Administration, New Jersey Department of the Treasury ("Defendant Division of Administration"), Amanda Truppa, in her official capacity as Director of the Division of Administration ("Defendant Truppa"), Division of Purchase and Property, New Jersey Department of the Treasury ("Defendant DPP"), and Amy F. Davis, in her official capacity as Acting Director of the Division of Purchase and Property ("Defendant Davis") (collectively, "Defendants"), are now taking actions to (1) cancel (or not renew) Kyocera America's existing State contract; (2) bar Kyocera America from future State contracting; and (3) add Kyocera America to a public list of entities engaging in "prohibited activities" in Russia or Belarus. The New Jersey Act, as applied to Kyocera America, and Defendants' actions transgress several provisions of the United States Constitution.

The overbroad portion of the Act violates Congress' preeminent authority to regulate commerce with foreign nations and the Federal Government's exclusive

jurisdiction over foreign affairs. It usurps the President's executive role as the nation's chief international diplomat and trade coordinator; interferes with the Federal Government's ability to speak with one voice on behalf of our nation and in coordination with our allies; and stands as an obstacle to the foreign policy of the Federal Government, which must decide the number and degree of sanctions to impose to accomplish its overall objectives in managing relations with Russia. And, therefore, the Act, is preempted by the Supremacy Clause.

Kyocera America seeks a judgment declaring the overbroad portion of the New Jersey Act unconstitutional as applied, and an order enjoining Defendants Truppa and Davis from enforcing the Act. First, Kyocera America has a substantial likelihood of success because the overbroad portion of the Act violates Supreme Court precedent, which struck down an almost identical state sanctions statute. The Constitution empowers the Federal Government – not the fifty states – to regulate foreign commerce and foreign policy. Second, without a grant of relief, Kyocera America faces imminent and irreparable harm. It will be barred from doing business with government agencies not only in New Jersey, but also, in all likelihood, with government entities across the nation – and it will have no ability to secure financial reparations because of sovereign immunity. It will be placed on a list falsely branding it as complicit in Russia's illegal war and permanently tarnishing its reputation and ability to secure non-public contracts.

Enjoining enforcement of the Act's offending section is in the public interest and will do no harm to the State, which is required to conform to the Constitution. Accordingly, Kyocera America respectfully requests that the Court issue an order enjoining the unconstitutional application of the Act against it.

## STATEMENT OF FACTS

**A.    The Russian Invasion and the Federal Response.**

On February 24, 2022, the Russian Federation launched an illegal invasion of the sovereign state of Ukraine. This invasion was the culmination of a yearslong Russian effort to undermine the territorial integrity of Ukraine that began with the 2014 annexation of Crimea.

The President of the United States condemned Russia's illegal invasion – as did federal and state elected officials and the people of this country.[1] Through extensive diplomacy, President Biden organized a multilateral response to the Russian aggression by "building a coalition of partners representing well more than half of the global economy," including twenty-seven members of the European

---

[1] *See Statement by President Biden on Russia's Unprovoked and Unjustified Invasion of Ukraine*, The White House (Feb. 23, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/23/statement-by-president-biden-on-russias-unprovoked-and-unjustified-attack-on-ukraine/.

Union as well as such countries as the United Kingdom, Canada, Japan, Australia, and New Zealand.[2]

In 2014 and 2021, Congress imposed federal sanctions against Russia pursuant to the International Emergency Economic Powers Act. *See* 50 U.S.C. §§ 1701–09. To implement the International Emergency Economic Powers Act, Congress delegated power to the Executive Branch, which established a web of regulations to govern commerce with Russia. *See* 31 C.F.R. pts. 587, 589. Those regulations are enforced by the Office of Foreign Assets Control ("OFAC"), a branch of the United States Department of the Treasury.[3]

Working closely with our allies, in 2022, President Biden, relying on pre-existing statutory powers, Executive Orders, and the OFAC regulatory scheme, imposed a new set of comprehensive sanctions, targeting individuals, entities, and sectors of the Russian economy that aided the war effort in Ukraine.[4] Similarly,

---

[2] *Remarks by President Biden on Russia's Unprovoked and Unjustified Attack on Ukraine*, The White House (Feb. 24, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/02/24/remarks-by-president-biden-on-russias-unprovoked-and-unjustified-attack-on-ukraine/.

[3] *See* Office of Foreign Assets Control, *Sanctions Programs and Information*, U.S. Dep't of the Treasury, https://home.treasury.gov/policy-issues/office-of-foreign-assets-control-sanctions-programs-and-information.

[4] *See, e.g.*, Exec. Order No. 14,065, 87 Fed. Reg. 36 (2022) (barring economic activity with the illegally occupied Ukrainian territory); Exec. Order No. 14,071, 87 Fed. Reg. 68 (2022) (barring new investment in the Russian Federation by "a United States Person" and delegating to the Secretaries of State and United States Department of the Treasury the power to designate certain sectors of the Russian economy as off limits for U.S. commerce).

Congress banned the importation of Russian oil and suspended Russia and Belarus'

"Most-Favored Nation" trading status.[5] Notably, neither Congress nor the President

issued any orders banning all trade with Russian or Belarusian entities.

OFAC provides detailed guidance on the sanctions scheme, relied upon by

responsible multinational businesses throughout the world.[6] The OFAC-

administered regulations are aimed at entities and persons that support the Russian

war effort. *See, e.g.*, 31 C.F.R. § 589.201(a)(1)(i)–(v). They also target war-related

sectors such as the defense industry, the energy sector, and the financial services

sector. *See, e.g., id.* § 589.201(a)(4)(i)–(viii). However, they are not a blanket ban

on all commerce with Russia or Belarus.[7] Kyocera America does not operate in the

prohibited sectors – or any other sectors – in Russia.

---

[5] *See* Ending Importation of Russian Oil Act, Pub. L. No. 117-109, 136 Stat. 1154; Suspending Normal Trade Relations with Russia and Belarus Act, Pub. L. No. 117-110, 136 Stat. 1159.

[6] *See* Office of Foreign Assets Control, *Russia-related Sanctions*, U.S. Dep't of the Treasury,                      https://ofac.treasury.gov/sanctions-programs-and-country information/russia-related-sanctions.

[7] The OFAC guidance regarding the prohibition on "new investment" in Russia by U.S. Persons expressly states that certain business activities remain permissible, including: "[e]ntry into, performance of, or financing of a contract, pursuant to ordinary commercial sales terms, to sell or purchase goods, services, or technology to or from an entity in the Russian Federation (e.g., a payment of an invoice for goods, where payment is made within the contracted time period and such payment does not involve participation in royalties or ongoing profits); [m]aintenance of an investment in the Russian Federation [made prior to the prohibitions] . . . including maintenance of pre-existing entities, projects, or operations, including associated tangible property, in the Russian Federation . . . ; and [w]ind down or divestment of

Moreover, the OFAC sanctions are narrowly tailored to apply to "United States person[s]," defined as: "any United States citizen, lawful permanent resident, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States." 31 C.F.R. § 587.314.

**B.    New Jersey's Russia Sanctions Act.**

On March 9, 2022, the New Jersey Legislature enacted its own set of far-reaching sanctions against Russia and Belarus – sanctions at odds with the Federal Government's scheme. *See* N.J.S.A. 52:32-60.1a. United States companies operating in New Jersey, which are in full compliance with federal law, can nonetheless be subject to this State's sanctions. The New Jersey Act bans state agencies and governmental entities from contracting with any person or entity engaging in "prohibited activities" in Russia or Belarus. *Id.*

Under the Act, a "person or entity" is defined as "[a]ny parent, successor, subunit, direct or indirect subsidiary, or *any entity under common ownership or control with, any* [natural person, corporation, *company*, limited liability company,

---

a pre-existing investment, such as a pre-existing investment in an entity, project, or operation, including any associated tangible property, located in the Russian Federation." *See* Office of Foreign Assets Control, *FAQ 1049: For the purposes of Russia-related Executive Order (E.O.) 14066, E.O. 14068, or E.O. 14071 (collectively, "the respective E.O.s"), what is meant by the term "new investment"?,* U.S. Dep't of the Treasury (June 6, 2022), https://ofac.treasury.gov/faqs/1049.

or business association]." *Id.* §§ 52:32-60.1e(1), -60.1e(3) (emphases added). Kyocera America is a subsidiary of Kyocera Japan, a multinational corporation headquartered in Japan that does business throughout the world. (Compl. ¶ 74.) Kyocera Japan has a separate wholly owned subsidiary – Kyocera Europe – which, in turn, has a subsidiary in Russia called Kyocera Document Solutions Russia LLC ("Kyocera Russia"). (*Id.* ¶¶ 77–78.) Kyocera Russia is owned 99% by Kyocera Europe and 1% by Kyocera Japan. (*Id.* ¶ 78.)

Under the Act, "prohibited activities" includes a company "being headquartered in Russia or having its principal place of business in Russia or Belarus." N.J.S.A. 52:32-60.1e. The New Jersey Act's overbroad jurisdictional bounds make Kyocera America subject to New Jersey sanctions because it has a distant and tenuous relationship with a company owned by its parent company. The Federal Government has crafted a wide array of Russian sanctions, but none apply to Kyocera America, or any similarly situated company. Thus, the reach of the Act exceeds the federal policy toward businesses that operate solely in America.

Under the Act, a person who Defendants determine has "engage[d] in prohibited activities in Russia or Belarus shall be ineligible to and shall not":

> (1) enter into or renew a contract with a State agency for
> the provision of goods or services or the purchase of bonds
> or other obligations;

(2) file or renew a Public Works Contractor Registration with the Department of Labor and Workforce Development;

(3) be approved for or continue to receive an economic development subsidy from the Economic Development Authority in but not of the Department of the Treasury, be awarded a municipal property tax abatement, or make or enter into a payment in lieu of property tax agreement;

(4) apply for or receive a tax clearance certificate from the Director of the Division of Taxation in the Department of the Treasury;

(5) be certified by the Department of Community Affairs as an urban renewal entity for purposes of the 'Long Term Tax Exemption Law,' P.L.1991, c. 431 (C.40A:20-1 *et seq.*); and

(6) be designated as a redeveloper by a public agency for the purpose of planning, replanning, construction, or undertaking of any project or redevelopment work in accordance with the 'Local Redevelopment and Housing Law,' P.L.1992, c. 79 (C.40A:12A-1, *et seq.*).

N.J.S.A. 52:32-60.1a(1)–(6).

The Act makes the mere presence of a corporate entity's headquarters or a principal place of business in Russia or Belarus a "prohibited activity." Unlike the federal sanction regulations, New Jersey's sanctions are not limited to "U.S. Persons" trading with specifically prohibited individuals, entities, or sectors aiding the Russian war effort in Ukraine. Because of its sweeping reach, the Act, at least as applied to Kyocera America, conflicts with the specifically targeted federal

sanctions. The Supremacy Clause does not permit New Jersey to exceed the limits set by federal law.

### C.   The New Jersey Act's Impact on Kyocera America.

Kyocera America is a leading supplier of computer-connectable document imaging and document management systems, including multifunction printers, digital laser facsimiles, wide format imaging products, and applications and networking solutions throughout the United States. (Compl. ¶¶ 15, 61.) It services several sectors of the United States economy. (*Id.*) In particular, because of its state contracts, Kyocera America's devices appear in government buildings. (*Id.* ¶ 64.)

Kyocera America is incorporated in the United States; has its principal place of business in the United States; and operates only in the Americas. (*Id.* ¶¶ 13–15, 61.) For over forty years, Kyocera America's corporate headquarters have been located in New Jersey. (*Id.* ¶ 62.) Kyocera America has no business dealings in Ukraine, Russia, or Belarus. It does not share personnel or do business with Kyocera Russia. It merely shares a corporate parent with Kyocera Russia through Kyocera Japan. (*Id.* ¶¶ 74–82.)

Kyocera America and its subsidiaries employ over 200 employees in this state and more than 1,000 employees overall throughout the United States. (*Id.* ¶ 63.)[8]

---

[8] Kyocera America also does business with approximately 500 independent dealers, more than 80% of which are independently owned small businesses. (Compl. ¶ 63.)

Kyocera America engages in substantial business with both public and private entities and does a significant amount of business with government entities. (*Id.* ¶¶ 64–66.) In order to do business with government entities, Kyocera America must be able to engage in the competitive government contract bidding process. (*See id.*)

Kyocera America has contracted with the State of New Jersey for at least twelve years. (*Id.* ¶ 67.) It has held a Master Blanket Purchase Order contract through the State of New Jersey (through Defendant DPP) since at least January 12, 2016 (the "Contract"). (*Id.* ¶ 68.) The Contract permits New Jersey state agencies and political subdivisions to purchase or lease copiers and multifunction devices from Kyocera America, as well as to purchase supplies and cost per copy, maintenance, and managed print services. (*Id.* ¶ 70.) Although the Contract's original term was from January 12, 2016 to January 11, 2018, Defendant DPP has continuously extended the Contract in the normal course of business. (*Id.* ¶ 71.) In all, the Contract has been extended eight times and the current term ends on August 11, 2023. (*Id.* ¶ 72.)

The New Jersey Act requires contractors to certify that they are not engaging in any of the broadly defined "prohibited activities" in Russia or Belarus. These certifications must be executed when submitting any bid for a public project and before a state contract is "awarded, renewed, amended, or extended." N.J.S.A. 52:32-60.1c. Contractors unable to certify that they are not engaging in "prohibited

-11-

activities" may not "enter into or renew a contract with" the State. *Id.* 52:32-60.1a(1). To aid New Jersey's enforcement of the Act, Defendant Truppa, on behalf of Defendant Division of Administration, publishes a "Prohibited Entities List" containing commercial entities who may not contract with the State.[9]

In September 2022, when its Contract was up for renewal, Kyocera America was required to certify compliance with the Act – certify it did not participate in "prohibited activities" in Russia or Belarus. Because of unconstitutionally overbroad features of the Act, it could not do so since its parent company, predominantly through its European subsidiary, owns a Russian company. (*Id.* ¶ 89.)

Defendants are now enforcing the Act to prohibit any State agency or entity from contracting with Kyocera America, or any other company that has a remote and tenuous connection with a business domiciled in Russia or Belarus. In response to Kyocera America's disclosure of its distant relationship to Kyocera Russia only through its corporate parent, on October 19, 2022, Defendant Division of Administration notified Kyocera America that it had made a preliminary determination that Kyocera America was engaged in prohibited conduct in Russia. (*Id.* ¶ 91.) Defendant Division of Administration's letter stated one reason for this

---

[9] *See* Memorandum from Amanda Truppa, N.J. Dep't of Treasury, Entities Engaged in Prohibited Activities Under C.52:32-60.1, Updated as of: May 8, 2023 (May 8, 2023), https://www.nj.gov/treasury/administration/pdf/RussiaBelarusEntityList.pdf.

determination – that "the Company is under common ownership or authority with a company that engages in 'prohibited activities,' as defined in the Act, specifically: The company is headquartered in Russia, or has its principal place of business in Russia and/or Belarus." (*Id.* ¶ 92.) Defendant Division of Administration did not suggest that Kyocera was in violation of federal sanctions or any other provision of the Act. Kyocera America's Contract was placed into "Pay Only" status. (*Id.* ¶ 93.)

On November 9, 2022, Kyocera America sent Defendant Division of Administration a letter explaining that the Act is unconstitutional as applied to it because the Act violates the Foreign Commerce Clause, infringes on the Federal Government's foreign affairs power, and is preempted by federal law. Kyocera America demanded, among other things, that Defendant Division of Administration rescind the Contract amendment placing Kyocera America into "Pay Only" status. (*Id.* ¶ 94.) Kyocera America also explained that it "opposes the war in Ukraine and is in compliance with U.S. sanctions and restrictions on business activities related to Russia, Belarus, and Ukraine. The Company's only connection to Russia and Belarus is through a distant affiliate owned by the Company's parent organization." (*Id.* ¶ 95.)

Defendants relented and removed Kyocera America from "Pay Only" status and extended the Contract until January 11, 2023. (*Id.* ¶ 96.) Kyocera America continued to engage in discussions with Defendants, stressing that it was fully

-13-

compliant with federal law. (*Id.* ¶¶ 97–99.) Those discussions resulted in two more extensions of the Contract. (*Id.* ¶¶ 100–01.) Currently, the Contract extends through August 11, 2023, and there are no restrictions on Kyocera America's ability to provide equipment or services under the Contract. (*Id.* ¶ 103.)

However, after a lengthy period of discussions, on July 21, 2023, Defendant Division of Administration made clear that it will cancel (or refuse to renew) the Contract, bar Kyocera America from entering into new contracts with the State, and add Kyocera America to the Prohibited Entities List. (*Id.* ¶ 107.) This determination will permanently bar Kyocera America from contracting with the State and will destroy a portion of its business. (*Id.* ¶ 109.) Moreover, Kyocera America may be unable to contract with other state and federal agencies, as those contracts typically require an entity to certify that it is not barred from doing business with any other state. (*Id.* ¶¶ 112–14.)

Even more damaging, Defendants' actions will brand Kyocera America as complicit in Russia's illegal invasion of Ukraine even though it complies with federal sanctions and condemns Russia' war of aggression. (*Id.* ¶¶ 113, 116–17.) The imminent and irreparable harm facing Kyocera America has compelled it to commence this action for immediate and permanent relief.

## ARGUMENT

### THE COURT SHOULD ENTER A TEMPORARY RESTRAINING ORDER AND INJUNCTION BARRING DEFENDANTS FROM UNCONSTITUTIONALLY ENFORCING THE ACT

Under Federal Rule of Civil Procedure 65(b), a court may issue a temporary restraining order when there is a possibility that irreparable injury will occur before a Rule 65(a) preliminary injunction hearing. A party seeking a temporary restraining order must show that: (1) "the movant has a reasonable probability of success on the merits;" (2) "irreparable harm would result if the relief sought is not granted;" (3) "the relief would [not] result in greater harm to the non-moving party;" and (4) "the relief is in the public interest." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 102–03 (3d Cir. 2022) (internal quotation marks omitted); *see also Koons v. Reynolds,* No. 22-7464, 2023 U.S. Dist. LEXIS 3293, at *13–14 (D.N.J. Jan. 9, 2023) (noting the standards for a preliminary injunction and a temporary restraining order are the same).

"[I]if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief," an injunction should be issued. *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 (3d Cir. 1994) (quoting *Merch. & Evans, Inc. v. Roosevelt Bldg. Prod. Co.*, 963 F.2d 628, 632–33 (3d Cir. 1992). It is within "the sound discretion of the district judge" to balance these factors. *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982). Moreover, one of the

purposes of issuing a preliminary injunction "is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (internal quotation marks omitted) (citation omitted).

Kyocera America satisfies all four requirements, and the Court should issue a temporary restraining order and preliminary injunction to maintain the status quo and thus prevent Defendants Truppa and Davis from enforcing any unconstitutional portion of the Act.

### A.   Kyocera America is Likely to Succeed on the Merits.

Kyocera America is likely to succeed on the merits of both its preemption and Foreign Commerce Clause claims. "A likelihood of success on the merits requires 'a showing significantly better than negligible but not necessarily more likely than not.'" *Durel B. v. Decker*, 455 F. Supp. 3d 99, 106 (D.N.J. 2020) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). As detailed below, Kyocera America more than satisfies this standard.

#### 1.   The New Jersey Act as applied to Kyocera America is preempted by the federal scheme governing Russian sanctions.

The Supremacy Clause provides that federal law "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution of laws of any State to the contrary notwithstanding." U.S. Const. art.

VI, cl. 2. State laws in conflict with federal laws cannot survive constitutional challenge, so long as the federal laws are lawfully promulgated in a sphere of appropriate federal power. *See, e.g., Gibbons v. Ogden,* 22 U.S. 1, 37–39 (1824).

Congress may preempt state law in three ways. First, Congress may expressly state its intent to preempt state law. *See Sikkelee v. Precision Airmotive Corp.,* 822 F.3d 680, 687–88 (3d Cir. 2016). Second, Congress may "occupy an entire field" by evidencing an intent to legislate over an area of federal concern. *Id.* Finally, conflict preemption applies "when a challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law.'"[10] *Id.* at 688 (citations omitted). Here, the enforcement of the New Jersey Act against Kyocera America violates principles of field and conflict preemption.

### a.   The field of foreign affairs is exclusively reserved to the Federal Government.

Field preemption applies where "the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation" or where "the field is one in which 'the

---

[10] Federal regulations preempt state laws in the same fashion as congressional statutes. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153 (1982); *Fellner v. Tri-Union Seafoods, L.L.C.,* 539 F.3d 237, 243 (3d Cir. 2008) ("Where Congress has delegated the authority to regulate a particular field to an administrative agency, the agency's regulations issued pursuant to that authority have no less preemptive effect than federal statutes, assuming those regulations are a valid exercise of the agency's delegated authority.").

federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Hillsborough Cnty. v. Automated Med. Lab'ys., Inc.,* 471 U.S. 707, 731 (1985) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)). Put simply, field preemption will apply where "the federal regulation is so sweeping that no state law can occupy that field." *Donn v. A.W. Chesterton Co., Inc.,* 842 F. Supp. 2d 803, 807 (E.D. Pa. 2012); *NLMK Pa., LLC v. United States Steel Corp.,* 592 F. Supp. 3d 432, 447 (W.D. Pa. 2022).

The first task in determining whether field preemption applies is ascertaining the intent underlying the federal scheme. *Hillsborough Cnty,* 471 U.S. at 714. "When Congress intends federal law to 'occupy the field,' state law in that area is preempted." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372 (2000). The Supreme Court has consistently recognized that the Federal Government exercises exclusive power in making foreign policy. *See Zschernig v. Miller,* 389 U.S. 429, 436 (1968) ("[F]oreign affairs and international relations [are] matters which the Constitution entrusts solely to the Federal Government . . . ."); *United States v. Pink,* 315 U.S. 203, 233 (1942) (holding that "power over external affairs is not shared by the States; it is vested in the national government exclusively"); *see also Perpich v. Dep't of Def.,* 496 U.S. 334, 353 (1990).

The rule espoused in *Zschernig* – also known as foreign affairs field preemption – has been invoked to invalidate state sanctions statutes that interfere

with federal regulations, as the New Jersey Act does here. *See Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 55 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).[11] Just like the Massachusetts law invalidated in *Natsios*, the New Jersey Act goes far beyond the federal sanctions and is "aimed at a specific foreign state and has more than incidental effects." *See id.* at 56. Because the Act impermissibly encroaches on the Federal Government's foreign affairs power, it "must give way [as it] impair[s] the effective exercise of the Nation's foreign policy." *Zschernig*, 389 U.S. at 440.

Indeed, the power to steer this nation's foreign policy and national security is held by both Congress and the President. The President's power in the area of foreign affairs places foreign-affairs-related preemption in a special category. *See, e.g., Hines v. Davidowitz*, 312 U.S. 52, 62–64 (1941); *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("If that government [of California] should get into a difficulty which would lead to war, or to suspension of intercourse, would California alone suffer, or all the Union?"). For this reason, the Supreme Court has given special consideration to the President's, and not just Congress', power to occupy the field of foreign relations. *See, e.g., United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–

---

[11] The Supreme Court affirmed *Natsios* on the basis of conflict preemption and did not find it necessary to discuss *Zschernig* or field preemption. *Crosby*, 530 U.S. at 374 n.8. A detailed discussion of the Supreme Court's decision, and the Massachusetts statute, is included below.

20 (1936) (upholding President's Congressionally delegated power to embargo the sale of arms to war zones); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413, 427 (2003) (stating that California "must yield to the National Government's policy," that is, California cannot "use an iron fist where the President has consistently chosen kid gloves.").

Under *"Hines* and its progeny," when the Federal Government acts "in an area of foreign relations, there is a strong presumption that it intended to preempt the field." *Natsios*, 181 F.3d at 76. Here, Congress and the President (based on authority delegated by Congress) have imposed extensive sanctions on Russia. New Jersey may support this nation's Russia-sanctions policy, but it may not enact legislation that interferes with that policy.[12] The Federal Government's sanctions preempt the field currently occupied by the overbroad portion of the New Jersey Act. *See id.*

> **b.    Enforcement of the New Jersey Act against Kyocera America directly conflicts with the federal sanctions scheme.**

State laws that thwart the objective of federal law are preempted by the

---

[12] Where a state law implicates the Federal Government's foreign affairs powers, the "conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the States have traditionally occupied." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (internal quotation marks omitted). Specifically, state law may not interfere with "the intended purpose and 'natural effect'" of a federal sanctions scheme. *See Crosby*, 530 U.S. at 373. This principle applies even when state sanctions and federal sanctions share common ends: as the Supreme Court noted in *Crosby*, the "fact of a common end hardly neutralizes conflicting means." *Id.* at 379.

Supremacy Clause. *Sikkelee*, 822 F.3d at 687–88. In other words, "[c]onflict preemption nullifies state law . . . where state law erects an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (quoting *Hillsborough Cnty.*, 471 U.S. at 713).

In *Crosby*, the Supreme Court invalidated a state law imposing economic sanctions, similar to those in the New Jersey Act, on conflict preemption grounds. There, Massachusetts attempted to sanction the military regime in Myanmar by forbidding any entity "doing business" in that country from serving as a government contractor in Massachusetts. *Id.* at 367–68. Massachusetts' "Burma Law" violated principles of preemption in three different ways: (1) the Burma Law undermined Congress' decision to grant the President the flexible power to determine federal sanctions on Myanmar; (2) the Burma Law undermined Congress' intent to limit sanctions, including solely to "U.S. Persons;" and (3) the Burma Law undermined Congress' decision that the President should implement a multilateral diplomatic strategy toward Burma. *Id.* at 373–74. The *Crosby* Court's rationale, which forbids a state law from undercutting a federal-designed sanctions scheme, informs the analysis here.

Congress and the President have spoken with one voice in imposing federal sanctions against Russia. Congress embargoed the sale of Russian oil in the United

States, *see* Ending Importation of Russian Oil Act, Pub. L. No. 117-109, 136 Stat. 1154, and suspended both Russia's and Belarus' "Most-Favored Nation" status – leading to the implementation of extensive tariffs on all imports from Russia and Belarus, *see* Suspending Normal Trade Relations with Russia and Belarus Act, Pub. L. No. 117-110, 136 Stat. 1159. President Biden, as did his predecessor, issued numerous Executive Orders, and Executive Branch Departments promulgated regulations, establishing an intricate system of federal sanctions, including those set forth at 31 C.F.R. parts 587 and 589.

Regulations promulgated by the Secretary of the Treasury and the Secretary of State, in many cases, ban trade with various sanctioned Russian parties. The sanctions are directed at individuals and entities supporting the Russian war effort in Ukraine, *see, e.g.*, 31 C.F.R. § 589.201(a)(1)(i)–(v), and also target certain sectors of the Russian economy essential to the war effort, *see, e.g.*, 31 C.F.R. § 589.201(a)(4)(i)–(viii). The federal sanctions specifically target "U.S. Persons" engaging in economic activity with certain designated individuals and entities who bear culpability for Russian aggression. Those entities and persons on the federal sanctions list are actively engaged in the Russian war effort or are involved in sectors that promote and support the war. The federal sanctions do not bar a government agency from contracting with a company like Kyocera America that does no business in Russia but has a distant cousin company there.

The New Jersey Act's definition of "prohibited activities" thwarts the purpose and effect of the federal sanctions scheme, just as the Massachusetts' statute did in *Crosby*. *First*, defining "prohibited activities" to encompass a United States company, whose multinational corporate parent has a subsidiary domiciled in Russia, goes far beyond the elaborate scheme of federal sanctions and undermines Congress' delegation of significant flexibility to the President in calibrating appropriate sanctions. *Second*, the definition fails to conform to the Federal Government's choice to limit sanctions to entities with culpable involvement in the Russian war effort and therefore sweeps in innocent parties, like Kyocera America, that do not conduct any business in Russia or provide support to Russia's illegal war. *Third*, the Act undercuts the federal policy of close coordination of sanctions with allies.

In passing the International Emergency Economic Powers Act, *see* 50 U.S.C. §§ 1701–09, Congress delegated to the President significant flexibility and discretion in determining how and when to impose sanctions on foreign states.[13] Two recent pieces of Congressional economic legislation in response to the Russian war of aggression – the oil embargo and the re-imposition of heightened tariffs –

---

[13] The Statute grants the President the power to issue regulations barring nearly all forms of commerce between United States persons and designated foreign entities. *See* 50 U.S.C. § 1701(a)(1)(A)–(B). Additionally, in times of actual armed conflict, the Statute grants the President sweeping discretion to confiscate and dispose of the property of hostile foreign nationals. *See* 50 U.S.C. § 1701(a)(1)(C).

authorize the President to take action against Russia and Belarus. They also authorize the President to determine when the national emergency justifying the acts has come to an end.

New Jersey has arrogated to itself the power to define "prohibited activities" in an area where Congress has conferred on the President flexibility and discretion in calibrating appropriate sanctions. *See Crosby*, 530 U.S. at 374–77. In the field of sanctions, the activities "prohibited" by New Jersey do not align with the activities proscribed by the Federal Government. Federal sanctions do not apply to a United States company merely because it belongs to a transnational corporate family that includes an entity domiciled in Russia or Belarus. New Jersey's "prohibited activities" go beyond the federal-sanctions ceiling set by the President based on powers delegated to him by Congress.

Furthermore, as in *Crosby*, Congress and the President explicitly chose to limit sanctions to targeted foreign entities or persons and entities actively engaged in supporting the Russian war effort and sectors important to the war effort. New Jersey has gone beyond the Federal Government's culpability-based model in imposing sanctions. The New Jersey Act sanctions any entity that has a corporate relationship, however incidental and remote, with entities domiciled in Russia or Belarus. *See* N.J.S.A. 52:32-60.1e. Such sanctions, if imposed by the President, would be permissible under his authority as delegated by Congress. However, when

imposed by New Jersey, and when in conflict with measures taken by Congress and the President, such sanctions violate United States foreign policy. In short, the New Jersey Act "conflicts with federal law" by "penalizing individuals and conduct" that are "exempted or excluded from sanctions."[14] *Crosby*, 530 U.S. at 378; *see Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1276 (11th Cir. 2013) (finding that Florida's Cuba Amendment conflicted directly with the extensive and finely tuned federal regime of sanctions against Cuba by, among others things, extending state sanctions to a "U.S. Company like [plaintiff] for the business activities of its foreign parent company or of a distant foreign affiliate that shares a common parent company").

Finally, the New Jersey Act's category of "prohibited activities" undermines the Federal Government's ability to direct an intricate diplomatic strategy related to Ukraine. This country's allies must understand the United States policy on sanctions.

---

[14] As another example, the federal sanctions prohibit United States persons from engaging in "new investment" in the Russian Federation. However, OFAC expressly excluded certain transactions from this prohibition, including entering into agreements to sell or purchase goods, services, or technology to or from an entity in Russia, and the maintenance of entities, projects or operations that preexisted the prohibition on new investment. *See* Office of Foreign Assets Control, *FAQ 1049: For the purposes of Russia-related Executive Order (E.O.) 14066, E.O. 14068, or E.O. 14071 (collectively, "the respective E.O.s"), what is meant by the term "new investment"?*, U.S. Dep't of the Treasury (June 6, 2022), https://ofac.treasury.gov/faqs/1049. Here, Defendants' efforts to sanction Kyocera America based on its attenuated relationship to its distant Russian affiliate directly conflict with those exclusions.

The New Jersey Act interferes with a unified approach to foreign policy and complicates international diplomacy. It also may leave our allies wondering whether the United States speaks with one voice when discordant pronouncements come from state governments. That may undermine our allies' willingness to follow the United States' lead on sanctions. *See Crosby*, 530 U.S. at 380–82 (holding state sanctions that differ from federal sanctions "compromise the very capacity of the President to speak for the Nation with one voice in dealing with other governments").

Kyocera America stands at the center of a conflict between the sanction policies of New Jersey and the Federal Government. *First*, Kyocera America does business solely in the Americas and is in compliance with the federal sanctions scheme. It does not transact business with entities engaged in prohibited conduct under federal law. It does not sell any products or software or provide any services to any parties in Russia or Belarus. It does not import items or products from Russia or Belarus. It is not doing business with either the Russian or Belarusian government and is not facilitating or aiding the brutal invasion of Ukraine. It does not engage in prohibited financial transactions or provide products or services to any prohibited customers. (Compl. ¶¶ 82–83 .)[15]

---

[15] Kyocera Europe, the parent of Kyocera Russia, has a comprehensive Export Control Compliance Program to comply with applicable export control rules and

*Second*, Kyocera America is compliant with all aspects of the New Jersey Act that comport with the federal sanctions scheme. Kyocera America is in violation of the "prohibited activities" provision of the New Jersey Act, N.J.S.A. 52:32-60.1e, only because it has the same corporate parent as a distant Russian entity. (Compl. ¶¶ 82, 109.)

Kyocera America is likely to succeed on the merits of its claim because the New Jersey Act's sanctions scheme conflicts with the Federal Government's approach and therefore, as applied to Kyocera, is preempted and must be enjoined.

### 2.   Elements of the New Jersey Act violate the Foreign Commerce Clause as applied to Kyocera America.

Kyocera America is also likely to succeed on the merits of its Foreign Commerce Clause claim. That Clause states that "Congress shall have the power . . . [t]o regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Thus, responsibility for foreign commercial and political affairs is vested "in the national government exclusively." *Pink*, 315 U.S. at 233. The Commerce Clause "provide[s] 'protection from state legislation inimical to the national commerce [even] where Congress has not acted.'"

---

sanctions, including sanctions on Russia. Kyocera Europe suspended deliveries of all devices to Russia in response to the invasion of Ukraine. Neither Kyocera Europe nor Kyocera Russia have any current or future planned investment activities involving the governments of Russia or Belarus, nor do they have any direct business with the Russian or Belarusian governments. (Compl. ¶¶ 79–81.)

*Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 310 (1994) (alteration in original) (quoting *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 769 (1945)). A state action that prevents the Federal Government from speaking with one voice in matters of foreign commerce offends the foreign commerce clause. *See Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 453–54 (1979); *Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 404 (3d Cir. 1987) ("[S]tate restrictions burdening foreign commerce are subjected to a more rigorous and searching scrutiny." (quoting *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 100 (1984))).

State laws may violate the Foreign Commerce Clause in two ways. First, a state law may facially discriminate against foreign commerce. *See Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 81 (1992). Facial discrimination against foreign commerce presents a risk that retaliatory measures will fall not only on the discriminating state, but on the United States as a whole. *Id.* at 79. Second, much like in the preemption context, a state law is invalid if the law impedes the Federal Government's ability to speak with one voice on issues of trade. *See Japan Line*, 441 U.S. at 448–49. Fundamentally, in "international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." *Bd. of Trustees of Univ. of Illinois v. United States*, 289 U.S. 48, 59 (1933); *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 194 (1983) (advising that a state law "at variance

with federal policy" will thus violate the "one voice" standard articulated in *Japan Line* if it "*either* implicates foreign policy issues which must be left to the Federal Government *or* violates a clear federal directive"). Portions of New Jersey's Act violate the Foreign Commerce Clause under both of those scenarios.

### a.   The New Jersey Act, as applied to Kyocera America, discriminates against foreign commerce.

Defendants' application of the New Jersey Act to all entities of a corporate family – instead of just "U.S. Persons" trading with specifically prohibited individuals, entities, and industries (like the federal sanctions) – facially discriminates against foreign commerce.

*First*, the Act blurs the line between entities engaged in domestic commerce and distant foreign sister entities that share a corporate parent. *See* N.J.S.A. 52:32-60.1e. The New Jersey Act penalizes Kyocera America merely for having the same corporate parent as a Russian entity. (*See* Compl. ¶¶ 107–09.) Kyocera America will be placed on New Jersey's Prohibited Entity List, despite having no direct relationship with its parent company's Russian subsidiary. (*See id.*) In so doing, the Act punishes Kyocera America, which has no direct link to Russia or Belarus, because of a parent company's subsidiary that is not even remotely linked to New Jersey.

*Second*, the New Jersey Act's "any entity under common ownership or control with, any entity" sweeps in a host of foreign corporations and imposes costly

compliance obligations on those companies. *See* N.J.S.A. 52:32-60.1e. As the *Barclays* Court noted, "[c]ompliance burdens, if disproportionately imposed on out-of-jurisdiction enterprises, may indeed be inconsonant with the Commerce Clause." 512 U.S. at 314. The New Jersey Act discriminates against foreign entities domiciled in other friendly nations (like Kyocera Japan), which have in their corporate tree Russian or Belarusian entities and a United States subsidiary (like Kyocera America) doing business in New Jersey. Under the Act, Kyocera America must totally separate itself from a distant sister company with which it has no business relationship or it will be precluded from receiving a government contract in this State (and elsewhere). That is an impermissible "direct attempt to regulate the flow of foreign commerce." *See Natsios*, 181 F.3d at 68.

Kyocera America is owned by a large multinational corporation with entities all over the world. Despite Kyocera America and its parent company's denunciation of the Russian invasion, and their compliance with federal law, they will be barred from doing business with New Jersey simply because of their corporate structure. This would be true even if the Russian sister company were a shell existing only on paper, retained in the hope that trade relations may normalize. The New Jersey Act ignores the culpability component of the federal sanctions scheme and is directly at odds with the Federal Government's foreign trade policy. The Foreign Commerce

Clause delegates to Congress, not the individual states, the regulation of foreign commerce.

"Supreme Court decisions under the Foreign Commerce Clause have made it clear that state laws that are designed to limit trade with a specific foreign nation are precisely one type of law that the Foreign Commerce Clause is designed to prevent." *Id.* at 67. The New Jersey Act falls into that forbidden category.

> **b.     The New Jersey Act denies the Federal Government the ability to speak with one voice on foreign commerce.**

In the foreign commerce context, the concern for uniformity of national policy is heightened. *See, e.g., Japan Line*, 441 U.S. at 448–49; *Pullmans Palace Car Co. v. Pennsylvania*, 141 U.S. 18, 24 (1891) (mechanisms of foreign commerce fall in the federal regulatory sphere).

Here, the New Jersey Act impedes the Federal Government's ability to speak with one voice on issues of foreign commerce. *See Natsios*, 181 F.3d at 67–69 (finding Burma-sanctions statute similar to the Act impeded Federal Government's ability to speak with one voice). The Federal Government has carefully crafted and calibrated its sanctions policy to target individuals, entities, and industries that are most pertinent to the Russian war effort. New Jersey's sanctions exceed those of the Federal Government, and therefore New Jersey regulates foreign commerce in its

own way by penalizing a blameless United States company, which does no business in Russia, merely because of a distant corporate affiliate in Russia.

If each of the fifty states could enact its own patchwork set of sanctions regulating foreign commerce, in conflict with the policy of the Federal Government, our allies and trading partners would be left confused and foreign corporations would be left to the caprice of fifty different masters. For that reason, the Constitution presciently conferred on Congress the authority to enact laws promoting a uniform national policy in regulating foreign commerce. With regard to sanctions related to Russia's war against Ukraine, the Federal Government has spoken.

No state, including New Jersey, may enforce a different set of sanctions, interfering with foreign commerce and at odds with the scheme adopted by the Federal Government. *Odebrecht*, 715 F.3d at 1283 (holding that Florida's "Cuba Amendment plainly imposes additional penalties above and beyond the federal regime. Prohibiting a company from bidding on state or local contracts in Florida is a substantial punishment, especially when applied to companies that may not even be in violation of the federal regime").

Accordingly, Kyocera America is likely to succeed in showing that the New Jersey Act violates the Foreign Commerce Clause.

**B. Kyocera America Will Suffer Irreparable Harm if it Does Not Obtain Injunctive Relief.**

Defendants' enforcement of the unconstitutional elements of the Act will cause Kyocera America irreparable harm. Irreparable harm is "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). The enforcement of an unconstitutional state statute presents a real risk of irreparable harm. *See New Jersey Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 388–89 (3d Cir. 2012) (finding irreparable harm posed by New Jersey Treasurer's enforcement of potentially unconstitutional statute); *Nat'l Shooting Sports Found. v. Platkin,* No. 22-6646, 2023 U.S. Dist. LEXIS 16459, at *25-26 (D.N.J. Jan. 31, 2023); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (3d ed. 2013) (collecting cases). Injunctive relief is particularly appropriate when the Eleventh Amendment bars recovery of retroactive monetary damages from state entities. *Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991); *Kansas Health Care Ass'n v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) (the "Eleventh Amendment bars retrospective monetary relief against a state" thus making a monetary injury irreparable); *Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 Fed. Appx. 89, 93 (9th Cir. 2009) (explaining that "in some circumstances, monetary injuries may be irreparable if

Eleventh Amendment sovereign immunity will bar a party from ever recovering those damages in federal court").

Additionally, the Third Circuit has recognized that the loss "of reputation, loss of trade, and loss of goodwill" may constitute irreparable harm in certain contexts. *Golden Fortune Imp. & Exp. Corp. v. Mei-Xin Ltd.*, Nos. 22-1710, 22-1885, 2022 U.S. App. LEXIS 23007, at *18-19 (3d Cir. Aug. 5, 2022); *see, e.g., Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) (citing *Opticians Ass'n of Am.*, 920 F.2d at 195); *Everett Lab'ys, Inc. v. Breckenridge Pharm., Inc.*, 573 F. Supp. 2d 855, 869 (D.N.J. 2008). To the extent that a plaintiff alleges reputational harm, it must demonstrate that its business "is different from other types of commerce in such a way that normal breach of contract remedies could not provide a remedy." *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008). "Where the alleged harms stem from the termination of a business agreement," the moving party may meet its burden by showing that it "has not been able to perform on contracts with third parties because of the loss, or for it to point to a loss of goodwill or reputation with specific customers." *Golden Fortune*, 2022 U.S. App. LEXIS 23007, at *18 (citing *Bennington Foods*, 528 F.3d at 179). The harm caused must be direct. *Id.*

Here, Kyocera America faces immediate irreparable harm on both fronts. *First*, the threat of government enforcement of the Act against Kyocera America is

neither remote nor speculative. Defendant Division of Administration has informed Kyocera America that it will convert its preliminary determination that the company engages in "prohibited activities" to a final determination on August 11, 2023. (Compl. ¶ 107.) Indeed, the Company has already suffered the effects of this statute – it has twice been put into "Pay Only" status by Defendants (only for that status to be rescinded). (*Id.* ¶¶ 94, 96, 101–02.) While the loss of the state contract may appear to be monetary in nature, the harm is irreparable. Should the Court find the Act unconstitutional as applied against Kyocera America, legal remedies will not later be available to the Company because sovereign immunity will preclude Defendants from being sued in state or federal courts for money damages. In other words, Kyocera America will face irreparable injury in the loss of revenue from the nonrenewal of its state contract with New Jersey, and elsewhere, that it could not later recover due to the Eleventh Amendment. This harm will have cascading and deleterious effects on Kyocera America's United States operations. (*Id.* ¶¶ 110–17.)

*Second*, by placing Kyocera America on the New Jersey Prohibited Entities List, Defendants, in effect, will falsely brand it as complicit in the Russian invasion of Ukraine. Already on the Prohibited Entities List are known war criminals, Russian defense contractors, and other unsavory characters.[16] American public opinion is

---

[16] *See* Memorandum from Amanda Truppa, N.J. Dep't of the Treasury, Entities Engaged in Prohibited Activities Under C.52:32-60.1, Updated as of: May 8, 2023

strongly opposed to Russia's invasion and supportive of the Ukrainian people as they fight for their freedom.[17] Listing Kyocera America with aiders-and-abettors in Russia's illicit war and suggesting that is in league with the criminal regimes in Russia and Belarus will permanently impair Kyocera America's reputation, both in New Jersey and nationally. *See Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 601 (3d Cir. 1979) (finding irreparable injury to business and reputation would result from unlawful suspension of license); *Pappan Enters.*, 143 F.3d at 805 (holding "loss of control of reputation, loss of trade, and loss of goodwill" are grounds for irreparable injury).

Moreover, if Defendants place Kyocera America on the Prohibited Entities List, not only will Kyocera America be unable to access the government market for its products and services, but the indelible stain on its reputation will also cause it to lose private clients as well. The harm described is not hypothetical in nature. When Kyocera America applies for a contract with a government agency, typically, it must certify that it has not been prohibited from bidding on public contracts in other states.

---

(May 8, 2023),
https://www.nj.gov/treasury/administration/pdf/RussiaBelarusEntityList.pdf.
[17] *See* Jacob Poushter et al., *Americans Hold Positive Feelings Toward NATO and Ukraine, See Russia as an Enemy*, Pew Research Center (May 10, 2023), https://www.pewresearch.org/global/2023/05/10/americans-hold-positive-feelings-toward-nato-and-ukraine-see-russia-as-an-enemy/#:~:text=Over%20six%2Din%2Dten%20Americans,the%20Russian%20invasion%20of%20Ukraine

The inability to certify to a clean record will pose a substantial risk that Kyocera America will not retain existing state contracts or secure new ones. (Compl. ¶ 113); *see Odebrecht*, 715 F.3d at 1288 (finding that plaintiff-contractor's inability to bid on public contracts as a result of Florida's unconstitutional Cuba Amendment would cause the plaintiff irreparable harm). The prospect of irreparable injury favors the grant of a temporary restraining order and a preliminary injunction.

### C.  There Will be No Undue Hardship Placed on Defendants if the Court Maintains the Status Quo.

The balancing of the equities also favors relief. A temporary restraining order and preliminary injunction to maintain the status quo imposes no hardship on Defendants and would prevent irreparable and immediate harm to Kyocera America.

If this Court finds that Kyocera America has established a likelihood of success on the merits and irreparable harm, then restraining Defendants Truppa and Davis from enforcing an unconstitutional law cannot constitute a hardship. *See, e.g., Ams. for Prosperity v. Grewal*, No. 19 -14228, 2019 U.S. Dist. LEXIS 170793, at *59 (D.N.J. Oct. 2, 2019). That is because the State "does not have an interest in the enforcement of an unconstitutional law." *New Jersey Retail Merchs. Ass'n*, 669 F.3d at 388–89. In balancing the equities, Defendants would suffer no harm.

In contrast, Kyocera America would suffer severe harm if a temporary restraining order and preliminary injunction were not granted. As already stated, Kyocera America will be barred from contracting with government entities in this

State and likely in other states. The reputational harm caused by placement on the Prohibited Entities List – suggesting nefarious activities on behalf of Russia – will likely cause Kyocera to lose non-public contracts as well. The adverse consequences will reverberate across the Company's business operations, placing hundreds of jobs in jeopardy. Money damages as a form of relief will not be available and, in any event, would not provide a suitable redress.

No harm will befall New Jersey if the current arrangement between the parties is preserved pending the outcome of this litigation. *See Opticians Ass'n of Am.*, 920 F.2d at 197 (holding "one of the goals of the preliminary injunction analysis is to maintain the status quo"). For more than ten months, Defendants have continued to do business with Kyocera America – extending its Contract three times – despite Kyocera America's inability to certify compliance with the Act. (Compl. ¶¶ 96, 99–101.)

Significantly, Kyocera America is in compliance with all federal sanctions and every provision of the New Jersey Act but one – the provision that violates the Federal Constitution. (*Id.* ¶¶ 83, 108.)

### D.    The Issuance of an Injunction is Supported by the Public Interest.

Finally, the public interest supports issuing this injunction. As a rule, "neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003);

*New Jersey Retail Merchs. Ass'n,* 669 F.3d at 389. As discussed, enforcement of the New Jersey Act against Kyocera America violates the Foreign Commerce Clause, impinges on the Federal Government's exclusive role in directing foreign policy, and contravenes the Supremacy Clause. To state the obvious, the public interest would not be offended by enjoining provisions of the New Jersey Act that are unconstitutional as applied to Kyocera America.

Thus, this factor favors the issuance of a preliminary injunction.

### E. Any Requirement For A Bond Should Be Waived.

Federal Rule of Civil Procedure 65(c) generally requires a party moving for a preliminary injunction to post bond. However, as the Third Circuit has recognized, a narrow exception to this bond requirement exists when compliance with the injunction "raises no risk of monetary loss to the defendant." *W S Int'l, LLC v. M. Simon Zook, Co.*, 566 Fed. App'x. 192, 197 (3d Cir. 2014) (quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010)). The court may also waive that requirement after balancing the respective hardships to the parties. *See LCN Enterprises, Inc. v. City of Asbury Park,* 197 F. Supp. 2d 141, 154 (D.N.J. 2002).

Requiring Kyocera America to post a bond would impose substantial hardship. It has been forced to expend significant resources to challenge the application of this law and to vindicate important constitutional interests. Requiring

the posting of a bond would add to Kyocera America's significant financial exposure, while also chilling future parties who might need to vindicate similarly important constitutional rights.

Defendants, in contrast, would suffer no harm or monetary loss in complying with the injunction. Indeed, Kyocera America does not seek monetary damages. This action only seeks to enjoin Defendants' unconstitutional enforcement of the Act by maintaining the status quo. Defendants cannot point to any interest in propping up an unconstitutional provision of the Act, nor can they point to any risk of monetary loss that could justify the posting of a bond.

## CONCLUSION

For the foregoing reasons, this Court should enjoin Defendants Truppa and Davis's enforcement of the New Jersey Act against Kyocera America.

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

Dated:  July 28, 2023

By: /s/ Christopher S. Porrino
Christopher S. Porrino, Esq.
Barry T. Albin, Esq.
Kent D. Anderson, Esq.
Wayne W. Fang, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
Email: CPorrino@lowenstein.com
Email: BAlbin@lowenstein.com
Email: KAnderson@lowenstein.com
Email: WFang@lowenstein.com

*Attorneys for Plaintiff Kyocera*
*Document Solutions America, Inc.*