# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KYOCERA DOCUMENTS SOLUTIONS OF AMERICA, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>DIVISION OF ADMINISTRATION, NEW JERSEY DEPARTMENT OF THE TREASURY; AMANDA TRUPPA, in her Official Capacity as Director of the Division of Administration; DIVISION OF PURCHASE AND PROPERTY, NEW JERSEY, NEW JERSEY DEPARTMENT OF THE TREASURY; and AMY F. DAVIS, in her Official Capacity as Acting Director of the Division of Purchase and Property,<br><br>     Defendants. | Hon. Robert Kirsch, U.S.D.J.<br><br>Hon. Tonianne J. Bongiovanni, U.S.M.J.<br><br>Civil Action No.: 3:23-cv-4044-RK-TJB |

---

## DEFENDANTS' BRIEF IN OPPOSITION AND CROSS-MOTION FOR SUMMARY JUDGMENT

---

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, New Jersey 08625
*Attorney for Defendants*

Rachel Doobrajh
  *Assistant Attorney General*
Amy Chung
Nathaniel I. Levy (NJ Bar No. 386322021)
Shireen Farahani
Alison Keating
  *Deputy Attorneys General*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF FACTS ..................................................................4

    A.  New Jersey Renegotiates Its Printer and Copier Purchasing. .....................4

    B.  Russia Invades Ukraine, and the New Jersey Legislature Responds...........7

    C.  This Dispute. ...................................................................10

STANDARD OF REVIEW ...............................................................12

ARGUMENT .................................................................................13

   I.   NEW JERSEY'S ACT RESTRICTING ITS OWN PURCHASING
COMPORTS WITH THE FEDERAL CONSTITUTION. ..................................13

    A.  Because New Jersey Is Acting As A Pure Market Participant, Neither The
Foreign Commerce Clause Nor The Supremacy Clause Applies. ...................13

    B.  In Any Event, Kyocera America's Preemption Claim Fails......................21

    C.  For Similar Reasons, Kyocera America's Foreign Commerce Clause Claim
Would Fail Regardless of the Market-Participant Exception...........................28

   II.  THE EQUITIES COUNSEL AGAINST ENJOINING THE ACT. ..............31

   III.   IF THIS COURT RULES FOR KYOCERA AMERICA, CARE WILL BE
NEEDED IN CRAFTING ITS INJUNCTION. ....................................................34

    A.  Any Order Should Make Clear That It Is Not Ordering New Jersey To
Enter Into Or Extend A Contract With Kyocera America. ..............................34

    B.  Given The Unique Considerations At Issue, Any Injunction Should Apply
Broadly, Rather Than Just To Kyocera America. ............................................36

CONCLUSION ..............................................................................40

<u>**TABLE OF AUTHORITIES**</u>

<u>**Pages**</u>

<u>**Cases**</u>

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018)..........................................................................................32

*Adams v. Freedom Forge Corp.*,
   204 F.3d 475 (3d Cir. 2000) ..............................................................................31

*Airline Serv. Providers Ass'n v. L.A. World Airports*,
   873 F.3d 1074 (9th Cir. 2017) ...........................................................................17

*Alaska Airlines, Inc. v. Brock*,
   480 U.S. 678 (1987).............................................................................................35

*Allied Constr. Indus. v. City of Cincinnati*,
   879 F.3d 215 (6th Cir. 2018) ..............................................................................18

*Am. Trucking Associations, Inc. v. Michigan Pub. Serv. Comm'n*,
   545 U.S. 429 (2005)..............................................................................................29

*Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty,*
   39 F.4th 95 (3d Cir. 2022)....................................................................................31

*Antilles Cement Corp. v. Fortuno*,
   670 F.3d 310 (1st Cir. 2012)....................................................................... 15, 16

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015).............................................................................................33

*Associated Builders & Contractors Inc. N.J. Chapter v. Jersey City*,
   836 F.3d 412 (3d Cir. 2016) ..................................................................... passim

*Atkin* v. *Kansas*,
   191 U.S. 207 (1903).............................................................................................16

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  140 S. Ct. 2335 (2020) ........................................................................37

*Bennington Foods LLC v. St. Croix Renaissance Group, LLP*,
  528 F.3d 176 (3d Cir. 2008) ................................................................31

*Black United Fund, Inc. v. Kean*,
  763 F.2d 156 (3d Cir. 1985) ................................................................31

*Building & Const. Trades Council of Metro. Dist. v. Associated Builders &*
  *Contractors of Mass./R.I., Inc* ..................................................... passim

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
  142 S. Ct. 1002 (2022)........................................................................32

*Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*,
  520 U.S. 564 (1997)............................................................................19

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford*,
  180 F.3d 686 (5th Cir. 1999) ..............................................................17

*Cent. Iowa Bldg. & Const. Trades Council v. Branstad*,
  No. 11-00202, 2011 WL 4004652 (S.D. Iowa Sept. 7, 2011).............20

*CIBA-Geigy Corp. v. Bolar Pharm. Co.*,
  747 F.2d 844 (3d Cir. 1984) ...............................................................13

*Coll. Sav. Bank* v. *Fla. Prepaid Postsecondary Educ. Expense Bd.*,
  527 U.S. 666 (1999)...................................................................... 15, 16

*Constr. Ass'n of W. Pa. v. Kreps*,
  573 F.2d 811 (3d Cir. 1978) ...............................................................30

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000).................................................................... passim

*Doe v. Hesketh*,
  828 F.3d 159 (3d Cir. 2016) ...............................................................36

*Hagans v. Comm'r of Soc. Sec.*,
  694 F.3d 287 (3d Cir. 2012) .................................................................35

*Haybarger v. Lawrence Cnty. Adult Prob. & Parole*,
  551 F.3d 193 (3d Cir. 2008) .................................................................34

*Hohe v. Casey*,
  868 F.2d 69 (3d Cir. 1989) ...................................................................30

*Hotel Emps. & Rest. Emps. Union, Loc. 57 v. Sage Hosp. Res., LLC*,
  390 F.3d 206 (3d Cir. 2004) ........................................... 18, 19, 20, 21

*Hughes v. Alexandria Scrap Corp.*,
  426 U.S. 794 (1976).............................................................................16

*In re Ayers*,
  123 U.S. 443 (1887).............................................................................35

*In re N.J. State Contract A71188*,
  28 A.3d 816  (N.J. Super. Ct. App. Div. 2011) .....................................4

*In re Philadelphia Newspapers, LLC*,
  599 F.3d 298 (3d Cir. 2010) .................................................................36

*In re Request for Proposals #17DPP00144*,
  186 A.3d 332 (N.J. Super. Ct. App. Div. 2018) ...................................37

*Japan Line, Ltd. v. Los Angeles County*,
  441 U.S. 434 (1979).............................................................................15

*Keyes Martin & Co. v. Dir., Div. of Purchase & Prop., Dep't of Treasury*,
  491 A.2d 1236 (N.J. 1985) .....................................................................4

*Mabey Bridge & Shore, Inc. v. Schoch*,
  666 F.3d 862 (3d Cir. 2012) ......................................................... 15, 16

*Marxe v. Jackson*,
  833 F.2d 1121 (3d Cir. 1987) ...............................................................30

*Maryland v. King*,
    567 U.S. 1301 (2012)......................................................................................32

*Matrix Dev. Grp. v. City of Newark*, No. 20-03166,
    2021 WL 3260854 (D.N.J. July 30, 2021) ...........................................20

*Meadowbrook Carting Co. v. Borough of Island Heights*,
    650 A.2d 748 (N.J. 1994) ...........................................................................38

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)......................................................................................22

*Murphy v. Millennium Radio Grp. LLC*,
    650 F.3d 295 (3d Cir. 2011) .....................................................................36

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018)…………………………………………………………12

*Nat'l Collegiate Athletic Ass'n v. Christie*,
    61 F. Supp. 3d 488 (D.N.J. 2014).........................................................12

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023).....................................................................................28

*New Jersey State Chamber of Com. v. Hughey*,
    774 F.2d 587 (3d Cir. 1985) .....................................................................35

*Nken v. Holder*,
    556 U.S. 418, 435 (2009)............................................................................32

*Pennhurst State School and Hosp. v. Halderman*,
    465 U.S. 89 (1984).......................................................................................34

*Reeves, Inc. v. Stake*,
    447 U.S. 429 (1980)........................................................................... 15, 16

*Robinson v. Ardoin*,
    37 F.4th 208 (5th Cir. 2022)....................................................................32

*Rosenberg v. XM Ventures*,
   274 F.3d 137 (3d Cir. 2001) ...................................................................36

*S.H. v. Lower Merion Sch. Dist.*,
   729 F.3d 248 (3d Cir. 2013) ..................................................................35

*Seacoast Builders Corp. v. Jackson Twp. Bd. of Educ.*,
   833 A.2d 84 (N.J. Super. Ct. App. Div. 2003) .....................................38

*Shields v. Zuccarini*,
   254 F.3d 476 (3d Cir. 2001) ................................................... 13, 29, 31

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) .............................................................30

*Trojan Techs, Inc. v. Pennsylvania*,
   916 F.2d 903 (3d Cir. 1990) ........................................................ passim

*United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of Camden*,
   465 U.S. 208 (1984).................................................................................16

*Va. Off. for Prot. & Advoc. v. Stewart*,
   563 U.S. 247 (2011).................................................................................34

*Wardair Can, Inc. v. Fla. Dep't of Revenue*,
   477 U.S. 1 (1986).....................................................................................14

*Waterfront Comm'n of N.Y. Harbor v. Governor of New Jersey*,
   961 F.3d 234 (3d Cir. 2020) .......................................................... 34, 35

*Wisconsin Department of Industry v. Gould, Inc.*,
   475 U.S. 282 (1986).................................................................................18

## Statutes and Rules of Procedure

International Emergency Economic Powers Act,
   Pub. L. No. 95-223, 91 Stat. 1626 (1977) ..................................23, 24

Russian Oil Act,

Pub. L. No. 117-109, 136 Stat. 1154 (2022) ...............................................23, 25

Suspending Normal Trade Relations with Russia and Belarus Act,
  Pub. L. No. 117-110, 136 Stat. 1159 (2022) ...............................................23, 25

22 U.S.C. § 8909 ........................................................................................39

Fed. R. Civ. P. 56(f) ...................................................................................12

N.J. L. 1996, c. 16, § 1 ................................................................................4

N.J. L. 2022, c. 3 ............................................................................... passim

N.J.S.A. § 18A:18A-49.5 ............................................................................7

N.J.S.A. § 18A:64-85.1 ..............................................................................7

N.J.S.A. § 18A:64A-25.44 ..........................................................................7

N.J.S.A. § 40A:11-2.2 ................................................................................7

N.J.S.A. § 52:18A-89.16 .............................................................................7

N.J.S.A. § 52:32-60.1...................................................................... passim

N.J.S.A. § 52:32-60.4............................................................... 7, 38, 40

N.J.S.A. § 52:34-6.2.................................................................................4, 5

## Regulations and Executive Orders

88 Fed. Reg. 21,457 (Apr. 10, 2023) ......................................................26

31 C.F.R. § 589.201 ...................................................................................24

Exec. Order No. 13,047,
  3 C.F.R. § 202............................................................................................24

Exec. Order No. 14,024,
  86 Fed. Reg. 20,249 (Apr. 15, 2021) .............................................passim

Exec. Order No. 14,039,
    86 Fed. Reg. 47,205 (Aug. 20, 2021) .................................................................24

Exec. Order No. 14,065,
    87 Fed. Reg. 10,293 (Feb. 21, 2022) ................................................................24

Exec. Order No. 14,066,
    87 Fed. Reg. 13,625 (Mar. 8, 2022) ..................................................................24

Exec. Order No. 14,068,
    87 Fed. Reg. 14,381 (Mar. 11, 2022) .........................................................24, 39

Exec. Order No. 14,071,
    87 Fed. Reg. 20,999 (Apr. 6, 2022) ..................................................................24

New Jersey Exec. Order No. 34 (1976) .................................................................8

New Jersey Exec. Order No. 189 (1988) ...............................................................8

## PRELIMINARY STATEMENT

Like other large institutions, New Jersey buys printers and copiers. One vendor in recent years has been Kyocera Document Solutions of America ("Kyocera America"), the Plaintiff here. Over the past seven years, the Executive Branch, through its Division of Purchase and Property ("DPP"), contracted for roughly $1.9 million in printers, copiers, and related goods and services from Kyocera America. In spring 2022, DPP began renegotiating its broader copier-and-printer purchasing through a national organization that helps state procurement officials obtain cooperative, cost-efficient contracts. In the course of doing so, DPP awarded new contracts to several vendors with whom it has historically done more business. DPP also commenced negotiations with two vendors with whom it has historically done less business—one of which was Kyocera America. Those negotiations are ongoing.

In the meantime, in February 2022, Russia illegally invaded the sovereign nation of Ukraine. International outcry ensued, and many companies voluntarily cut their relationships with Russia and affiliated entities.[1] On March 9, 2022, the State of New Jersey did the same, when the New Jersey Legislature ("the Legislature") unanimously enacted L. 2022, c. 3 ("Chapter 3" or "New Jersey Act"), precluding

---

[1] *See generally* Yale Sch. of Mgmt., Chief Exec. Leadership Inst., *Over 1,000 Companies Have Curtailed Operations in Russia—But Some Remain* (Aug. 30, 2023), https://som.yale.edu/story/2022/over-1000-companies-have-curtailed-operations-russia-some-remain.

State entities from contracting with entities engaged in prohibited activities in Russia (or Belarus). In other words, New Jersey, like any other spender, decided it should not spend its money with entities it deemed sufficiently proximate to Russia's illegal war.

In September 2022, Kyocera America informed DPP that its owner, Kyocera Document Solutions Corporation, owns a subsidiary in Europe that, in turn, has a subsidiary in Russia. That, in turn, implicated Chapter 3. After some correspondence, Kyocera America filed this suit against DPP, and other State entities or officers acting in their official capacities (collectively, "State Defendants"). Kyocera America sought a temporary restraining order ("TRO") and preliminary injunction, claiming that Chapter 3 is invalid under the federal Supremacy Clause (via preemption) and the Foreign Commerce Clause. This Court entered a TRO, and the parties subsequently agreed, given the nature of the dispute, to jointly request that this Court convert the preliminary-injunction briefing into summary-judgment briefing. This Court granted that request.

This Court should now grant summary judgment to the State Defendants. Chapter 3 is valid under the U.S. Constitution, as an initial matter, because the State is acting purely as a market participant, which under hornbook law means that neither preemption doctrines nor Commerce Clause doctrines are implicated. *See Building & Const. Trades Council of Metro. Dist. v. Associated Builders &*

*Contractors of Mass./R.I., Inc.* ("*Boston Harbor*"), 507 U.S. 218, 226-27 (1993); *Trojan Techs, Inc. v. Pennsylvania*, 916 F.2d 903, 910 (3d Cir. 1990). Here, the State is acting as a bona fide market participant, because it is choosing not to contract with certain entities whose business, in its judgment, could hurt its own proprietary interests through their connection to Russia and its illegal invasion of Ukraine.

In any event, even if this Court does not rule for New Jersey on the basis of the market-participant exception alone, New Jersey's Act is not preempted, nor does it run afoul of the "dormant" Foreign Commerce Clause. While the U.S. Supreme Court ruled in *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374 (2000), that a different Massachusetts statute restricting state purchasing related to Myanmar was conflict-preempted by a different federal sanctions law, *Crosby* is factually distinguishable—and only *Crosby* reveals the type of clash that justifies implied preemption. Here, by contrast, the relevant federal statutes provide less fine-tuned control to the President, and New Jersey's Act respects the President's control— including, notably, by tethering its termination to the termination of federal sanctions. Furthermore, the Act does not prohibit anything that Congress has expressly allowed, nor does it cause the kinds of significant foreign-policy disruptions that the Supreme Court emphasized in *Crosby*. In short, the State should prevail as a matter of law.

3

## STATEMENT OF FACTS

### A. New Jersey Renegotiates Its Printer and Copier Purchasing.

In general, New Jersey law requires the public advertisement of bids with respect to "[a]ll purchases, contracts, or agreements, the cost or contract price whereof is to be paid with or out of State funds." *Keyes Martin & Co. v. Dir., Div. of Purchase & Prop., Dep't of Treasury*, 491 A.2d 1236, 1240 (N.J. 1985). In 1996, the Legislature expanded the authority of DPP's Director to permit the purchase of goods and services for state entities from the Federal Supply Schedules of the Federal General Services Administration. L. 1996, c. 16, § 1, codified as amended as N.J.S.A. § 52:34-6.1. In 2005, the Legislature expanded the Director's authority again, authorizing the Director "to purchase goods and services through a contract already awarded by other states or cooperative purchasing groups that utilize a competitive bidding process." *In re N.J. State Contract A71188*, 28 A.3d 816, 818 (N.J. Super. Ct. App. Div. 2011) (citing N.J.S.A. § 52:34-6.2(b)(2)). Current contract holders and prospective bidders on upcoming requests for proposals, however, "must have notice that the Director intends to utilize the collective purchasing authority provided by statute." *Id.* at 826.

On January 2, 2016, the Director entered into a set of contracts for copiers and related supplies and services ("the G2075 contracts") with eight vendors, including

Kyocera America.[2] *Id.* The original term for the G2075 contracts was January 12, 2016, through January 11, 2018. The Director subsequently extended G2075 for four successive one-year terms. On January 12, 2022, the Director extended the G2075 contracts a fifth time, this time to run through October 11, 2022.

Around the same time, in light of the State's continuing efforts to fulfill its procurement needs efficiently and cost-effectively, the Director decided to pursue negotiations with vendors who had been awarded contracts through the national cooperative-contracting organization NASPO ValuePoint.[3] Accordingly, the Director posted on DPP's website a special notice of intent to join a cooperative agreement for the copiers and managed print services pursuant to N.J.S.A. § 52:34-6.2. The notice stated, in pertinent part:[4]

> Notice is hereby given that the State of New Jersey intends to enter into a publicly advertised cooperative purchasing agreement for copiers and managed print services.

---

[2] Information regarding the G2075 contracts is accessible through the State's searchable online database, "NJ Start." *See* NJ Start, Search Results, https://www.njstart.gov/bso/view/search/external/advancedSearchContractBlanket.xhtml?q=g2075&currentDocType=contractBlankets (last visited Aug. 30, 2023).

[3] "NASPO Value Point is the cooperative contracting arm of the National Association of State Procurement Officials (NASPO) a non-profit organization formed in 1947." NASPO ValuePoint, https://www.naspovaluepoint.org/ (last visited Aug. 30, 2023).

[4] DPP, Special Notice: Notice of Intent to Join Cooperative Agreement (Jan. 28, 2022), https://www.nj.gov/treasury/purchase/specialnotices/01282022.shtml.

> The State of New Jersey anticipates joining the NASPO
> ValuePoint contract led by [] Colorado in the March 2022
> timeframe. The State of New Jersey expects to award
> contracts to vendors awarded a Master Agreement by the
> Lead State that also meet New Jersey compliance
> requirements and execute a New Jersey Participating
> Addendum.

Negotiations began in spring 2022. Based on overall State expenditures, the Director prioritized negotiations with four vendors: Ricoh, Xerox, Canon, and HP. Meanwhile, as the extensive negotiations continued, the Director again extended the G2075 contracts several more times—ultimately to run through August 11, 2023— to ensure there would be no gap in services.

Once the negotiations with Ricoh, Canon, and HP were completed, the Director awarded new contracts for copiers and related supplies and services ("M2075 contracts").[5] The G2075 contracts finally expired on August 11, 2023, and all G2075 contracts were at that time put into 'pay only' status—a designation that allows authorized purchasers to continue making payments on existing copier leases but precludes new purchases. After all, new purchases for copiers and associated services must, under the State's standard procurement rules, be made utilizing the newly awarded M2075 contracts.

---

[5] The M2075 contracts will expire on July 31, 2024, when the underlying NASPO ValuePoint Master Agreement expires. *See* NASPO ValuePoint, Copiers & Managed Print Services, https://www.naspovaluepoint.org/portfolio/copiers-managed-print-services-2019-2024/ (last visited Aug. 30, 2023).

In mid-August 2023, DPP commenced negotiations with Kyocera America and another vendor, Konica Minolta. This sequencing matched the State's purchasing priorities: New Jersey's spending under the G2075 contract with Kyocera America is, at $1.9 million, the second-lowest vendor in State expenditures of the six current G2075 vendors, and its spending with Konica Minolta is the lowest. In contrast, its spending with Ricoh—the vendor with the highest spend under the G2075 contracts—was over $28.7 million.

**B. Russia Invades Ukraine, and the New Jersey Legislature Responds.**

On February 24, 2022, Russia illegally invaded Ukraine. On February 28, 2022, State Sen. Paul A. Sarlo introduced S. 1889 to prohibit government dealings with businesses associated with Russia or Belarus. The State Senate approved S. 1889 by a vote of 39-0 on March 3, 2022. On March 8, 2022, the Assembly passed A. 3090 by a vote of 70-0. The next day, Governor Murphy signed the bill into law. L. 2022, c. 3.[6] The Legislature set Chapter 3 to terminate automatically "upon the revocation of federal sanctions contained in Executive Order 14024." L. 2022, c. 3, § 10. It likewise made clear that the law would "not apply in circumstances when [its] application would violate federal law or regulation or be inconsistent with the terms and conditions of federal funding." N.J.S.A. § 52:32-60.4.

---

[6] Codified at N.J.S.A. §§ 18A:18A-49.5, 18A:64-85.1, 18A:64A-25.44, 40A:11-2.2, 52:18A-89.16, and 52:32-60.1 to -60.4.

Under the new law, the New Jersey Department of Treasury is charged with developing a list of persons and entities engaged in prohibited activities in Russia or Belarus based on publicly available information. N.J.S.A. § 52:32-60.1(b). The Division of Administration ("DOA") currently administers the function of creating the list for Treasury. The Chapter 3 list must be updated every six months. *See id.*[7]

Chapter 3 defines "engaged in prohibited activities in Russia or Belarus" as:

> (1) companies in which the Government of Russia or Belarus has any direct equity share; (2) having any business operations commencing after the effective date of this act that involve contracts with or the provision of goods or services to the Government of Russia or Belarus; (3) being headquartered in Russia or having its principal place of business in Russia or Belarus, or (4) supporting, assisting or facilitating the Government of Russia or Belarus in their campaigns to invade the sovereign country of Ukraine, either through in-kind support or for profit.

> [N.J.S.A. § 52:32-60.1(e).]

Chapter 3 further defines "person or entity" to include any corporation, along with "[a]ny parent, successor, subunit, direct or indirect subsidiary, or any entity under common ownership or control with" any corporation. *Id.*

Under the law, a person or entity that is identified on the DOA's list shall not:

---

[7] The Chapter 3 list is distinct from the State's debarment list. The State's debarment list, promulgated pursuant to New Jersey Exec. Order No. 34 (1976) and New Jersey Exec. Order No. 189 (1988), is maintained by the Department of Treasury's Division of Revenue and Enterprise Services, not the DOA, and the list of triggers for debarment is longer than (and different from) the language in Chapter 3. *See* New Jersey Exec. Order No. 34(4), https://nj.gov/infobank/circular/eob34.htm.

(1)    enter into or renew a contract with a State agency for the provision of goods or services or the purchase of bonds or other obligations;

(2)    file or renew a Public Works Contractor Registration with the Department of Labor and Workforce Development;

(3)    be approved for or continue to receive an economic development subsidy from the Economic Development Authority in but not of the Department of the Treasury, be awarded a municipal property tax abatement, or make or enter into a payment in lieu of property tax agreement;

(4)    apply for or receive a tax clearance certificate from the Director of the Division of Taxation in the Department of the Treasury;

(5)    be certified by the Department of Community Affairs as an urban renewal entity for purposes of the "Long Term Tax Exemption Law," P.L.1991, c.431 (C.40A:20-1 *et seq.*); and

(6)    be designated as a redeveloper by a public agency for the purpose of planning, replanning, construction, or undertaking of any project or redevelopment work in accordance with the "Local Redevelopment and Housing Law," P.L.1992, c.79 (C.40A:12A-1 *et seq.*).

[N.J.S.A. § 52:32-60.1(a).]

Before the State can award, extend, or otherwise amend a vendor contract, the vendor must submit a certification that such vendor is not identified on the list developed pursuant to N.J.S.A. § 52:32-60.1(a).

### C. This Dispute.

In September 2022, in connection with the extension of its G2075 contract, Kyocera America submitted a certification to the DPP stating in part:

> Kyocera Document Solutions America, Inc, headquartered in Fairfield, NJ, is a wholly owned subsidiary of Kyocera Document Solutions Corporation (KDC). KDC is a Japanese electronics manufacturer headquartered in Osaka, Japan. KDC's principal business is the manufacture and sale of copiers, multifunction printer devices, parts and supplies. KDC has a wholly owned subsidiary in Europe, Kyocera Document Solutions Europe (KDE) that has a subsidiary in Russia (owned 99% by KDE and 1% by KDC.).

Dkt. 1-2. Based on Kyocera America's statements, the DOA issued a preliminary determination advising Kyocera America that the company would be placed on the Chapter 3 list. Dkt. 1-3 at 1-2. On November 9, 2022, Kyocera America responded to the preliminary determination, representing that it was "not actually engaging in any prohibited activities under applicable federal law," that it "opposes the war in Ukraine, and is in compliance with U.S. sanctions and restrictions on business activities related to Russia, Belarus, and Ukraine," and that its "only connection to Russia and Belarus is through a distant affiliate owned by the Company's parent organization," which affiliate was itself "operating in Russia in compliance with applicable U.S. sanctions." Dkt. 1-4.

On December 5, 2022, the DOA requested that Kyocera America clarify or provide more information regarding how and/or why its activities were in

compliance with applicable U.S. sanctions and federal law. *See* Exh. 1. On December 23, 2022, Kyocera America reaffirmed that it does not engage in any prohibited activities under the federal sanctions regime. Dkt. 1-6.

On May 8, 2023, the DOA updated the list of entities engaged in prohibited activities under Chapter 3. Because the DOA was still reviewing the information provided by Kyocera America, DOA did not include Kyocera America on the revised Chapter 3 list at this time. Having been updated on May 8, the Chapter 3 list is next due to be updated on November 8, 2023. *See* N.J.S.A. § 52:32-60.1(b).

On July 28, 2023, Kyocera America filed this lawsuit, seeking declaratory and injunctive relief that would prevent the State from enforcing or relying on Chapter 3 in its contracting decisions with Kyocera America. Dkt. 1 at 27-28.

On August 4, 2023, this Court entered a TRO enjoining the State from enforcing Chapter 3 against Kyocera America. In light of the purely legal nature of the dispute—and, at least in the State's perspective, the unique circumstances of the case (which had temporarily provided Kyocera America with a competitive *advantage* against other bidders)—the State Defendants and Kyocera America ultimately agreed to jointly move for the Court to convert the pending preliminary-injunction briefing into summary-judgment briefing. On August 23, 2023, the Court granted this joint request and converted the motion.

11

## STANDARD OF REVIEW

Although Kyocera America initially sought a preliminary injunction, the question before the Court is now whether it should grant summary judgment and enter a permanent injunction and declaration. *See* Fed. R. Civ. P. 56(f); *Nat'l Collegiate Athletic Ass'n v. Christie*, 61 F. Supp. 3d 488, 491 (D.N.J. 2014), *rev'd sub nom. on other grounds*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). The parties, of course, already agree that there are no disputed facts. *See* Fed. R. Civ. P. 56(a). "In deciding whether to grant a permanent injunction," however, this Court must still "consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest." *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001).[8] In other words, this Court must decide whether Kyocera America "has *actually* succeeded on the merits," and, if so, it "must then consider the appropriate remedy." *CIBA-Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 850 (3d Cir. 1984) (emphasis added).

---

[8] The last two factors—harm to the opposing party and the public interest—"merge when the Government is the opposing party." *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (reciting standard in preliminary injunction context).

## ARGUMENT

## I.   NEW JERSEY'S ACT RESTRICTING ITS OWN PURCHASING COMPORTS WITH THE FEDERAL CONSTITUTION.

Plaintiff levels both preemption and Foreign Commerce Clause Claims, but because the State is acting solely as a market participant under Chapter 3, neither the Supremacy Clause nor the Foreign Commerce Clause comes into play. To the extent Chapter 3 implicates preemption principles, the law is not actually preempted.

### A. Because New Jersey Is Acting As A Pure Market Participant, Neither The Foreign Commerce Clause Nor The Supremacy Clause Applies.

Kyocera America's preemption and Foreign Commerce Clause claims fail at the threshold, because they hinge on legal doctrines that do not apply to this specific fact pattern. To be sure, when a State exercises its own sovereign powers to *regulate*, preemption may apply. *See Boston Harbor*, 507 U.S. at 226-27. And likewise, state regulation must comply with the dictates of the Foreign Commerce Clause. *E.g.*, *Wardair Can, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 7 (1986). But neither of those constitutional doctrines applies when a state acts solely as a market participant—as New Jersey does here.

Begin with preemption, a set of doctrines grounded in the Supremacy Clause. As the Supreme Court has unanimously made clear, those doctrines have no applicability "when the State acts as a market participant with no interest in setting policy." *Id.* at 229. After all, "when a State owns and manages property," by

necessity, it "must interact with private participants in the marketplace." *Id.* at 227. In those circumstances, the State may place its own conditions on those interactions without offending federal law, just as any private contracting party would. *Associated Builders & Contractors Inc. N.J. Chapter v. Jersey City* ("*Associated Builders*"), 836 F.3d 412, 417–18 (3d Cir. 2016). In other words, preemption can apply only when the government engages in "regulation or policymaking," *Boston Harbor*, 507 U.S. at 229 (cleaned up), and not when it seeks "efficient procurement," "just like any other party participating in an economic market," *Associated Builders*, 836 F.3d at 418; *see id.* at 418 n.7.[9]

Similarly, although the dormant aspect of the Commerce Clause polices discrimination against out-of-state or foreign economic interests, it does not apply when the State simply acts as a participant in the economic market. *See Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 872 (3d Cir. 2012); *Trojan Techs*, 916 F.2d at 910. Indeed, as the Supreme Court has observed, "there is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in

_____

[9] Of course, for preemption to in fact apply, the relevant federal law "must represent the exercise of a power conferred on Congress by the Constitution" and "must best be read as one that regulates private actors." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1479 (2018). But the State is not disputing here that those tests *could* be satisfied by a federal law that effectively barred everyone in the United States (public and private entities alike) from refusing to contract with companies because of their ties to a particular country—its argument (developed below) is simply that no such law exists.

the free market." *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980). In that situation, unlike when the State acts as a "sovereign regulat[or]," the State is "unchained from the shackles of the Commerce Clause." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 327 (1st Cir. 2012). That means that "where a State acts as a participant in the private market, it may prefer the goods or services of its own citizens, even though it could not do so while acting as a market regulator" by imposing "custom duties," promulgating "exclusionary trade regulations," or otherwise exercising traditional "governmental power." *Coll. Sav. Bank* v. *Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 685 (1999).[10]

Applying the market-participant exception in this context fits with well-worn doctrine and the policy reasoning behind it. More than a century ago, the U.S. Supreme Court recognized that "it belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf." *Atkin* v. *Kansas*, 191 U.S. 207, 222-23 (1903) (upholding eight-hour workday limitation for workers employed on public contracts); *see also, e.g.*, *Boston Harbor*, 507 U.S. at 220, 232 (rejecting

---

[10] In the Third Circuit, that is true under the Interstate and Foreign Commerce Clauses alike—even though state action affecting foreign rather than interstate commerce, as a general matter, is "subject to a more searching review." *See Trojan Techs*, 916 F.3d at 912 (but holding that Pennsylvania law requiring public-works contractors to buy only American-made steel nevertheless survived such review); *see also Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 451 (1979).

NLRA preemption challenge to state-owned construction project's bid specification requiring adherence to labor agreement); *United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of Camden*, 465 U.S. 208, 221 (1984) (holding residence requirement for municipal construction projects did not violate Commerce Clause); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 806-09 (1976) (rejecting Commerce Clause challenge to scheme that paid in-state processors of in-state abandoned vehicles higher rates). Indeed, as the Court has since explained in the Commerce Clause context, the market-participant exception "makes sense" given that "evil[s]" of "exclusionary trade regulations" and other protectionist "exercises of governmental power" are "entirely absent where the States are buying and selling in the market. *See Fla. Prepaid*, 527 U.S. at 685.[11] Many of the same reasons animate the exception in the Supremacy Clause context. After all, when a state "acts as a regulator, it performs a role that is characteristically governmental rather than … private," and wields greater power. *Boston Harbor*, 507 U.S. at 229. By contrast, when it simply "acts as a market participant with no interest in setting policy," its differentiation from the run of private parties is "far less significant." *Id.*

---

[11] The Court also noted that "the competing considerations in cases involving state proprietary action often will be subtle, complex, politically charged, and difficult to assess under traditional Commerce Clause analysis," underscoring that the "adjustment of" such interests "is a task better suited for Congress." *Reeves*, 447 U.S. at 439.

Nor is there any reason to depart from this default distinction in this specific case; the analysis once again should simply turn on whether "the allegedly unlawful act by the state or local government" is "*regulatory* in nature," or if, instead, the State is simply "acting as a market participant pursuant to a proprietary interest." *Associated Builders*, 836 F.3d at 417 (emphasis in original). To be sure, exceptions are conceivable—as when Congress *clearly expresses* an intent to cover even proprietary acts. *See, e.g.*, *Airline Serv. Providers Ass'n v. L.A. World Airports*, 873 F.3d 1074, 1079-80 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 2740 (2019) (discussing Airline Deregulation Act of 1978); *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 695 (5th Cir. 1999) (discussing Employee Retirement Income Security Act of 1974); *cf. Boston Harbor*, 507 U.S. at 228-30 (discussing National Labor Relations Act); *cf. also supra* note 9 (explaining that such a law would still have to comport with other barriers to preemption). But Kyocera America has identified no such clear statement in any federal statute, regulation, or executive action, and State Defendants are aware of none. Similarly, a state cannot avoid scrutiny simply by invoking its spending power—it must actually be *acting* as a market participant rather than as a sub silentio regulator. *See, e.g.*, *Crosby*, 530 U.S. at 374 n.7; *Wisconsin Department of Industry v. Gould, Inc.*, 475 U.S. 282, 288-89 (1986). But again, that simply reaffirms that the underlying question of what type of

action a state is undertaking—"governmental" or ordinary spender, policymaking or proprietary—is the key question here. *See Boston Harbor*, 507 U.S. at 229.[12]

The answer to that question in the context of Kyocera America's challenge, meanwhile, is that New Jersey *is* acting as a bona fide market participant—which means that Kyocera America's preemption and Foreign Commerce Clause claims must be rejected. The Third Circuit applies a two-part test to identify whether a government is acting as a "market participant." *Associated Builders*, 836 F.3d at 418. First, it asks "whether 'the challenged funding condition' ... 'serve[s] to advance or preserve the state's proprietary interest in a project or transaction, as an investor, owner, or financier.'" *Id.* (quoting *Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206, 216 (*Sage*) (3d Cir. 2004)). Second, it asks

---

[12] To the extent footnote 7 of *Crosby* is ambiguous, context and precedent make clear that the Court—in dictum, given that Massachusetts had not argued the point— meant that a state cannot escape preemption simply by using its spending power *to regulate*. After all, the *Crosby* footnote relied on *Gould*, 475 U.S. 282, which itself had made clear that the decisive point was not that the State was using its spending power, but rather that it was using its spending power "as a means of" making labor policy. *Id.* at 287; *see also id.* at 289 ("It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern." (citation omitted)). Indeed, seven years after *Gould*, Justice Blackmun (who had also authored *Gould*) wrote for another unanimous Court (in *Boston Harbor*) that *Gould* had not erased this distinction, emphasizing that preemption applies only when what a state is doing qualifies as "*regulation*." *Boston Harbor*, 507 U.S. at 227; *see id.* at 228-230. All of which explains why the market-participant exception remains alive and well in preemption cases. *E.g.*, *Associated Builders*, 836 F.3d at 417-18 & n.7; *Sage* , 390 F.3d at 216; *see also, e.g.*, *Allied Constr. Indus. v. City of Cincinnati*, 879 F.3d 215, 219-20, 224 (6th Cir. 2018).

"whether 'the scope of the funding condition [is] specifically tailored to the proprietary interest,' or, put another way, whether the action is so broad as to be considered, in effect, regulatory." *Id.* (quoting *Sage*, 390 F.3d at 216) (internal quotation marks omitted)). The test is identical whether applied in the context of preemption or under the Commerce Clause. *Id.* at 418 n.7. Accordingly, if the State (here, through DPP) is acting as a market participant and not as a regulator, then Kyocera America's preemption and Foreign Commerce Clause claims both fail.

The State is acting as a proprietor and market participant under this test. Among other things, and as relevant here, Chapter 3 prohibits persons or entities based in Russia or Belarus, or their corporate affiliates, from entering into a new (or renewed) contract with the State "for the provision of good or services." N.J.S.A. § 52:32-60.1(a)(1); *see* N.J.S.A. § 52:32-60.1(e). That is a quintessential example of the State's proprietary interest in "purchas[ing] or sell[ing] goods or services." *Associated Builders*, 836 F.3d at 418 (citing *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U.S. 564, 592 (1997)). And indeed, it involves a field "traditionally occupied by the States"—"state procurement policy"—where Congress must speak with particular clarity to displace the State's proprietary interests. *Trojan Techs.*, 916 F.2d at 906, 912.[13] Nothing in Kyocera America's

---

[13] Because *Crosby* expressly left undecided the applicability of the presumption against preemption, 530 U.S. at 374 n.8, this Court remains bound to apply it under *Trojan Techs*, 916 F.2d at 912.

submissions suggests otherwise.

Furthermore, the Act's restrictions are appropriately tailored to the State's proprietary interests at issue in this contract, and all government contracts, and are not so overbroad as to be deemed regulatory in nature. For one thing, the Act does not regulate both government contracts and purely private contracting activity within New Jersey—it is limited solely to the former. *See, e.g.*, *Sage*, 390 F.3d at 217 (reasoning similarly); *Matrix Dev. Grp. v. City of Newark*, No. 20-03166, 2021 WL 3260854, at *15 (D.N.J. July 30, 2021) (same); *Cent. Iowa Bldg. & Const. Trades Council v. Branstad*, No. 11-00202, 2011 WL 4004652, at *9 (S.D. Iowa Sept. 7, 2011) (same). For another, in prohibiting the State from contracting with certain entities with links to Russia or Belarus, the restrictions in N.J.S.A. § 52:32-60.1(a)(1), (b) prevent the State from entering into contracts that *could* be perceived to express *the State's* support for—or indifference toward—the "inva[sion] [of] the sovereign country of Ukraine." N.J.S.A. § 52:32-60.1(e). The Act's eligibility requirements for state contractors thus aim to protect the State's reputation as a buyer in the marketplace, by avoiding the taint that could flow from contracting with entities linked to Russia or Belarus by virtue of their business activities or corporate ownership. Such links could create a risk that other private parties might choose not to associate or contract with the State—either out of principled opposition to the

20

State's Russia-linked contracts or out of concern that their own bottom-line might suffer due to their association with a State that contracts with Russia-linked entities.

In other words, New Jersey is not trying to shape the behavior of other actors, but rather trying to protect its *own* bottom line. Consequently, the Act falls on the market-participant side of the line, *cf. Boston Harbor*, 507 U.S. at 227-30; *Sage*, 390 F.3d at 217, and Kyocera America's preemption and Foreign Commerce Clause challenges to Chapter 3 should accordingly be rejected.

**B. In Any Event, Kyocera America's Preemption Claim Fails.**

If this Court rejects the State's reliance on the market-participant exception, that tees up a second question: whether New Jersey's Act is preempted under standard preemption principles. *See Crosby*, 530 U.S. at 372-73. In contrast to the facts in *Crosby*, the answer here is no.[14]

To understand why New Jersey's Act does not create the kind of conflict that doomed the Massachusetts statute in *Crosby*, it is important to understand the details

---

[14] To be sure, this Court could theoretically take Kyocera America's claims in any order. But Kyocera America's preemption theory is more modest, because even accepting that theory would nevertheless allow Congress to easily alter that new status quo and leave open the possibility of governmental action in the absence of preemption. *See Trojan Techs.*, 916 F.2d at 909 (explaining that the Commerce Clause "may sometimes prohibit state regulatory activity, even absent preemptive federal legislation"). Perhaps for that reason (though the opinion does not say), the Court in *Crosby* decided that case based on preemption without reaching the foreign-affairs power and Foreign Commerce Clause issues presented there. *See* 530 U.S. at 374 n.8. If this Court were to accept Kyocera America's preemption theory, therefore, the same approach would be appropriate here.

of that case. In *Crosby*, Massachusetts had enacted a statute (the "Massachusetts Act") that barred state entities from purchasing goods or services from companies "identified on a 'restricted purchase list' of those doing business with Burma." *Id.* at 367. That statute, the challengers argued (with the Federal Government's agreement as an amicus), was preempted by a federal statute imposing sanctions on Burma (the "Burma Act"). *Id.* at 370-71. The clash between the laws was stark. Whereas the Burma Act had given the President substantial flexibility, tasked him with developing a "comprehensive, multilateral strategy" to improve the situation in Myanmar, and sought to "steer a middle path," Massachusetts's law was a blunt tool that allowed for no such fine-tuning or presidential control. *Id.* at 374-78. And it ran headlong into the federal law, specifically "targeting" certain types of contracts that were "explicitly exempted" by the Burma Act. *Id.* at 378. Thus, while *Crosby* confirms that state procurement decisions *may* be preempted by federal statutes in some circumstances, it teaches that they *are* preempted specifically when the state's law is brazenly at loggerheads with the federal plan. That is not the case here.

Preemption analysis turns on the actual language of the federal statute at issue. That makes sense, because "the purpose of Congress is the ultimate touch-stone in every pre-emption case," and courts discern that purpose "from the language of the pre-emption statute and the statutory framework surrounding it," as well as from "the structure and purpose of the statute as a whole." *Medtronic, Inc. v. Lohr*,

518 U.S. 470, 485-86 (1996) (cleaned up). Thus, different statutes beget different results. *See also Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1274 (11th Cir. 2013) (conducting a "searching inquiry into the provisions of both the federal and state laws at issue" with regard to Cuba).

Here, Kyocera America essentially relies on two statutes: (1) the Ending Importation of Russian Oil Act, Pub. L. No. 117-109, 136 Stat. 1154 (2022) (the "Oil Ban"); and (2) the Suspending Normal Trade Relations with Russia and Belarus Act, Pub. L. No. 117-110, 136 Stat. 1159 (2022) (the "Increased Tariffs Act") (collectively, the "Russia Acts"). *See* Dkt. 3 at 6, 21-22. Kyocera America mentions these federal statutes as part of "a series of escalating sanctions against Russia and Belarus," *id.* at 1, but this does not prove that it "was the clear and manifest purpose of Congress" to preempt all or even any State action (which disposes of Kyocera America's field-preemption argument, *see Kansas v. Garcia*, 140 S. Ct. 791, 804 (2020)), let alone to preempt in-house procurement decisions (here, spending on copiers and printers that has totaled roughly $1.9 million through the G2075 contracts).[15] Rather, in contrast to the facts of *Crosby*, New Jersey's Act poses no

---

[15] Kyocera America also identifies the International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat. 1626 (1977) ("IEEPA") as a federal statute that carries preemptive effect. Dkt. 1 at 21. But Kyocera America provides no support for this claim. Congress enacted IEEPA nearly 23 years prior to the Supreme Court's decision in *Crosby*. And although the IEEPA provided a statutory basis for an executive order prohibiting Burmese investment raised in *Crosby*, *see* 530 U.S. at

obstacle to the federal sanctions regime.[16]

Indeed, the relationship between New Jersey's Act and the Russia Acts is markedly different from the relationship between the Massachusetts Act and the Burma Act in at least four key ways. *First*, the President has much less control over sanctions against Russia under the Russia Acts than he did under the Burma Act. The Russia Acts provide that their respective sanctions can be terminated only if the President certifies to Congress that all of the following have occurred:

- Russia "has reached an agreement to withdraw Russian forces [from Ukraine] and for the cessation of military hostilities that is accepted by the free and independent government of Ukraine";

- Russia "poses no immediate military threat of aggression to any North Atlantic Treaty Organization member"; and

- Russia "recognizes the right of the people of Ukraine to independently and freely choose their own government."

---

370 (citing Exec. Order No. 13,047, 3 C.F.R. § 202 (1997)), neither the Supreme Court nor lower courts considering the constitutionality of the Massachusetts Act at issue in *Crosby* identified or even addressed the IEEPA as a possible source of preemption.

[16] Kyocera America briefly references various executive and administrative regulations as well. *See* Dkt. 3 at 22. These additional authorities do not meaningfully change the analysis, but rather underscore the breadth of the existing federal regime—thus confirming that New Jersey's Act does not conflict with that regime, but rather largely overlaps with it and otherwise adds only internal government procurement decisions that do not hamstring any federal objective. *See generally* 31 C.F.R. § 589.201; Exec. Order 14,024, 86 Fed. Reg. 20,249 (Apr. 15, 2021); Exec. Order 14,039, 86 Fed. Reg. 47,205 (Aug. 20, 2021); Exec. Order 14,065, 87 Fed. Reg. 10,293 (Feb. 21, 2022); Exec. Order 14,066, 87 Fed. Reg. 13,625 (Mar. 8, 2022); Exec. Order 14,068, 87 Fed. Reg. 14,381 (Mar. 11, 2022); Exec. Order 14,071, 87 Fed. Reg. 20,999 (Apr. 6, 2022).

Oil Ban §§ 3(a) & (c)(2); *see* Increased Tariffs Act §§ 4(b)(1) & (c)(2). These triggers depend on concrete actions by Russia and Ukraine that the President cannot ultimately control.

The Burma Act, by contrast, "placed the President in a position with as much discretion to exercise economic leverage against Burma, with an eye toward national security, as our law will admit." *Crosby*, 530 U.S. at 375-76. It gave the President, for instance, "flexible and effective authority over economic sanctions against Burma," including the ability to lift sanctions if in the United States' national interest and the ability to offer the lifting of sanctions to Burma as an inducement to improve democratic governance. *Id.* at 373-74. Yet by "imposing a different, state system of economic pressure against the Burmese political regime" that could continue in effect independently, the Massachusetts Act "reduce[d] the value of the [bargaining] chips" that the Burma Act granted the President. *Id.* at 376-77. The Russia Acts do not grant the President such flexibility, and thus New Jersey's Act does not pose the same obstacle that the Massachusetts Act did.

*Second*, and relatedly, whereas the Massachusetts Act further weakened the President's "bargaining chips" by providing for no "waiver or termination of its ban," *see Crosby*, 530 U.S. at 367, 376-77—which meant the ban would continue even if the President chose to suspend federal sanctions against Burma—New Jersey's Act terminates in lockstep with the federal regime. Indeed, Chapter 3's

25

termination is expressly tethered to the termination of federal sanctions (specifically, Executive Order 14024, which declared a national emergency due to Russia's "harmful foreign activities"). *See* Ch. 3, § 10 (act "shall expire upon the revocation of federal sanctions contained in Executive Order 14024"); 88 Fed. Reg. 21,457, 21,457 (Apr. 10, 2023) (continuing national emergency declared in Executive Order 14024 until April 2024). In other words, rather than going its own way on termination, New Jersey's Act puts the Federal Government in the driver's seat.

*Third*, Chapter 3 does not prohibit anything that the Russia Acts expressly allow. This too is a distinction from *Crosby*: there, while the Burma Act expressly allowed "contract[s] to sell or purchase goods, services, or technology," the Massachusetts Act barred goods or services contracts with persons that did business with Burma. 530 U.S. at 367, 369. It was this clash between what the Burma Act permitted and what the Massachusetts Act prohibited that interfered with the system of penalties and incentives imposed by the President. *See id.* at 378. No direct clash of that sort exists here.

*Fourth*, New Jersey's Act does not interfere with diplomacy or Congress's foreign-policy goals the way that the Massachusetts Act did. *Crosby* emphasized a number of diplomatic imbroglios emanating from the Massachusetts Act, including (1) the filing of formal protests by Japan, the European Union, and the Association of Southeast Asian Nations with the U.S. government; (2) formal complaints by

26

Japan and the European Union in the World Trade Organization ("WTO"); and (3) representations by the Executive Branch that the Massachusetts Act "complicated its dealings with foreign sovereigns and prove[d] an impediment to accomplishing objectives assigned it by Congress." 530 U.S. at 382-84. And these clashes were especially rankling because, with respect to Myanmar, Congress had specified that the President should "develop a comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma." *Id.* at 369. Yet to achieve that obligation, the President would have to work with other countries—an undertaking that ran headlong into the significant foreign-policy headaches generated by the Massachusetts Act. *See id.* at 385. Here, by contrast, Kyocera identifies no such interference caused by New Jersey's Act. *Compare, e.g.*, *Crosby*, 530 U.S. at 376, 378, 382-84; *see also id.* at 376 (Massachusetts Act "impos[ed] a ... state system of economic pressure against the Burmese political regime" and "pull[ed] levers of influence that the federal Act does not reach").[17]

In short, because Kyocera America has failed to show that Chapter 3 poses any "threat of frustrating" the Federal Government's "objectives"—let alone

---

[17] And indeed, it is not even clear that the Russia Acts envision the type of multilateral approach that the Burma Act prescribed—though assuming for argument's sake that they do, there is no indication that the New Jersey Act could hamper such an approach.

27

intruded upon a field that the Federal Government has occupied—it is not preempted. *Compare, e.g.*, *Crosby*, 530 U.S. at 366.

### C. For Similar Reasons, Kyocera America's Foreign Commerce Clause Claim Would Fail Regardless of the Market-Participant Exception.

If this Court were to reject application of the market-participant exception, that likewise would not end the analysis of Kyocera America's Foreign Commerce Clause claim. Instead, it would lead "only to the next step of commerce clause inquiry, *i.e.* determining whether the statute serves a legitimate state purpose that cannot be equally well served by non-discriminatory means." *Trojan Techs.*, 916 F.2d at 910 n.12 (citing the same test that governs dormant Interstate Commerce Clause disputes); *see also supra* note 10. Under the Supreme Court's most recent formulation of the relevant test (in the interstate-commerce context), that would require Kyocera America to show either discrimination, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023), or else a "substantial burden on [foreign] commerce," *cf. id.* at 393 (Sotomayor, J., concurring); *accord id.* at 383-85 (opinion of Gorsuch, J.). And while Foreign Commerce Clause disputes are subject to a "more searching review," *Trojan Techs*, 916 F.2d at 912, this case does not implicate the concerns that heightened scrutiny is meant to address. Regardless of the framing (or stringency of the review), Kyocera America's claim would fail as a matter of law.

To begin with, the Act clearly does not itself discriminate against foreign commerce. Kyocera America briefly claims that it does, but only by relying on half-

hearted suppositions (with no evidentiary support) that the regulation has a disparate impact on companies with certain types of multinational ownership corporate structures *See* Dkt. 3 at 29-31. That is far out-of-step with other Commerce Clause case law, which requires much more than the possibility of different burdens falling on differently structured businesses to establish unlawful discrimination or an otherwise unconstitutional burden. *See, e.g.*, *Am. Trucking Associations, Inc. v. Michigan Pub. Serv. Comm'n*, 545 U.S. 429, 438 (2005) (no dormant Commerce Clause problem with Michigan's $100 intrastate-hauling fee, even though such policies could lead to interstate haulers facing higher costs).

Kyocera America's claim does not fare any better under the test articulated in *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137 (1970). As the Supreme Court recently explained, that test considers a law's "practical effects" to detect "the presence of a discriminatory purpose" that may not be apparent on the face of the statute. *Nat'l Pork Producers*, 598 U.S. at 377. And while a fractured Supreme Court in *Pork Producers* disagreed on the specific form that the *Pike* analysis should take, Kyocera America's theory fails under any possible formulation. After all, a plaintiff asserting a claim under a *Pike* theory must first establish that the challenged state law imposes a "substantial burden" on commerce. *Id.* at 377 (majority opinion); *id.* at 393 (Sotomayor, J.); *id.* at 394-95 (Roberts, J., concurring in relevant part).  Kyocera America fails to make that threshold showing because the Act—which applies

evenhandedly, whether the would-be vendor is from New Jersey or elsewhere—
"threaten[s] only to shift market share from one set of … firms to another": that is,
away from businesses that have direct or indirect links with Russia, and to those that
do not. *Id.* at 384-85 (Gorsuch, J.); *see id.* at 393 (Sotomayor, J.). The Commerce
Clause, however, does not protect "particular firms" or "particular structures or
methods of operation." *Id.* at 384 (Gorsuch, J.) (cleaned up). And even if Kyocera
America could somehow show that the Act creates a substantial burden on foreign
commerce, Kyocera America's claim would still lack merit, because the burden
imposed on companies like Kyocera America is outweighed by the State's interest
in maintaining the integrity of the procurement process and protecting its reputation
and goodwill. *See supra* 20.

In addition, the two concerns that call for heightened scrutiny in the foreign-
commerce context are absent here. As in *Trojan Technologies*, there is no danger of
"multiple taxation." 916 F.2d at 912 (citing *Japan Line*, 441 U.S. at 446). Nor does
the Act threaten to "impair federal uniformity in an area where federal uniformity is
essential." *Japan Line*, 441 U.S. at 448. As the Third Circuit has recognized, "[s]tate
procurement practices present no problems of reconciling conflicting policy among
multiple national sovereigns." *Trojan Techs.*, 916 F.2d at 912.

As for Kyocera America's claim that New Jersey's Act interferes with the
Federal Government's conduct of foreign affairs, Dkt. 3 at 31-32, that claim fails for

the same reasons that Kyocera America's preemption claim fails. New Jersey's Act simply does not impact foreign affairs enough to raise any genuine concern about non-uniformity in foreign policy, let alone a "substantial burden on [foreign] commerce." *See Nat'l Pork Producers*, 598 U.S. at 393 (Sotomayor, J., concurring); *Japan Line,* 441 U.S. at 448-49. Indeed, though *Crosby* (as noted) declined to reach the Foreign Commerce Clause issue in that case, *see* 530 U.S. at 374 n.8; *supra* note 14, the stark contrast between the foreign-policy muddles occasioned by the Massachusetts Act and the lack of any such kerfuffle here, *see id.* at 382-384, confirms that New Jersey's Act—and its in-house procurement decisions, whether denominated as market participation or not—do not offend any Foreign Commerce Clause principles.

## II.   THE EQUITIES COUNSEL AGAINST ENJOINING THE ACT.

Because Kyocera America seeks injunctive relief, it must—in addition to prevailing on the merits—demonstrate that it has suffered an irreparable injury, *Shields*, 254 F.3d at 482, and it must do so with "affirmative evidence," *Marxe v. Jackson*, 833 F.2d 1121, 1127 (3d Cir. 1987). It fails to meet that burden.

First, Kyocera America identifies constitutional harm, but "[c]onstitutional harm is not necessarily synonymous with [] irreparable harm." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989). Indeed, in the nearly half century since *Elrod v. Burns*, 427 U.S. 347 (1976), neither the Supreme Court nor the Third Circuit has presumed

irreparable harm in cases involving non-First Amendment challenges. *See, e.g.*, *Constr. Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 820 n.33 (3d Cir. 1978) (declining to extend *Elrod* to equal protection claims); *see also Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000) (rejecting contention "that a violation of constitutional rights always constitutes irreparable harm"). Further, while Kyocera America argues that Chapter 3 jeopardizes its contracts with other governments and with private parties, these harms are indirect and purely speculative—Kyocera America identifies no specifics. Dkt. 3 at 3, 36-37. Yet "the dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (internal quotations and citation omitted); *see also Bennington Foods LLC v. St. Croix Renaissance Group, LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (finding plaintiff had failed to demonstrate irreparable harm to its reputation from termination of business agreement where plaintiff had not identified any third-party contracts that it had been unable to perform, nor "any third parties with whom it ha[d] suffered a loss of reputation"). Nor is Kyocera America's prospect of continued contracting with the State guaranteed: completely apart from Chapter 3, negotiations would have to continue based on the State's *other* business needs and interests. Moreover, "[t]hat the Eleventh Amendment may pose an obstacle to recovery of damages in the federal

court does not transform money loss into irreparable injury for equitable purposes." *Black United Fund of New Jersey, Inc. v. Kean*, 763 F.2d 156, 161 (3d Cir. 1985).

Even if Kyocera America prevails on the merits *and* has suffered irreparable harm, the remaining permanent injunction factors cut strongly in favor of denying relief. *See Shields*, 254 F.3d at 482; *cf. Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty*, 39 F.4th 95, 103 (3d Cir. 2022) (explaining that if the first two preliminary-injunction factors are met, "the court then determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief" (internal quotation marks and citation omitted)). As noted, because the State Defendants are all governmental entities or actors operating in their official capacities, the last two factors—harm to the opposing party and public interest—merge. *Cf. Nken*, 556 U.S. at 435 (making this observation in the preliminary-injunction context).

Initially, the State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). That is because the State "suffers … irreparable injury" whenever it is barred "from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also Cameron v. EMW Women's Surgical Ctr.*, *P.S.C.*, 142 S. Ct. 1002, 1011 (2022) (noting the State "has a legitimate interest in the continued enforceability of its own statutes"); *Robinson v.*

*Ardoin*, 37 F.4th 208, 227 (5th Cir. 2022) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."). Further, the State's fundamental ability not only to effectuate its statutes, but also to choose with whom to do business, is at stake. Chapter 3 represents a bipartisan (indeed, unanimous) decision by New Jersey lawmakers that New Jersey's interests lie in solidarity with the people of Ukraine and removed from commerce that, in the State's view, is sufficiently proximate to Russia and its unlawful invasion of Ukraine. *See* L. 2022, c. 3.

Against these weighty interests, Plaintiff asserts only monetary damages and hypothetical speculation about its reputation and contracts with third parties. That is insufficient to overcome the public interest. Accordingly, the balance of harms and the public interest weigh heavily in favor of the State Defendants.

## III.   IF THIS COURT RULES FOR KYOCERA AMERICA, CARE WILL BE NEEDED IN CRAFTING ITS INJUNCTION.

### A. Any Order Should Make Clear That It Is Not Ordering New Jersey To Enter Into Or Extend A Contract With Kyocera America.

In the event this Court rules for Kyocera America, the State Defendants nevertheless ask this Court to make clear that it is *not* ordering specific performance of the G2075 contract—or ordering New Jersey to enter into any contract—as a remedy. While it is not clear that Kyocera America even seeks this relief, *but cf.* Dkt. 1 at 27 (fifth prayer for relief), this Court's authority is to enjoin any unconstitutional

*actions*, *e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), not to direct the State to enter into specific contracts. In other words, any adverse order should make clear that while it is prohibiting the State from relying on Chapter 3 in its contracting process, it is *not* ordering the State to buy from Kyocera America.

The distinction is an important principle of state sovereignty. Specifically, the Eleventh Amendment precludes federal jurisdiction over a State absent the State's consent to suit. U.S. Const., Amend. XI; *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). This immunity from suit extends to agencies, departments, and state defendants in their official capacities. *See, e.g.*, *Pennhurst*, 465 U.S. at 100-02; *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 551 F.3d 193, 197-98 (3d Cir. 2008). And the State is considered the real party in interest—and is thus immune from suit—whenever "the judgment sought would expend itself on the public treasury or domain, or interfere with public administration or if relief consists of an injunction requiring the payment of funds from the State's treasury, *or an order for specific performance of a State's contract*." *Waterfront Comm'n of N.Y. Harbor v. Governor of New Jersey*, 961 F.3d 234, 239 (3d Cir. 2020), *cert. denied*, 142 S. Ct. 561 (2021) (emphasis added) (cleaned up).

Here, the State Defendants are entities or agents of New Jersey acting in their capacity as state officials. While the State Defendants are of course subject as a general matter to a federal suit seeking injunctive relief under *Ex Parte Young* and

its progeny, that line of cases does not abrogate sovereign immunity where a plaintiff seeks specific performance of a state contract. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 256–57 (2011) ("*Ex parte Young* cannot be used to obtain an injunction requiring ... an order for specific performance of a State's contract."); *see also In re Ayers*, 123 U.S. 443, 504 (1887); *Waterfront Comm'n*, 961 F.3d at 239-42. Because a judgment requiring New Jersey to extend its G2075 contract with Kyocera America (or to enter into another, future contract) would be an order for specific performance of a state contract, sovereign immunity bars this Court from granting Kyocera America such relief. If Kyocera America prevails, relief should be expressly limited to preventing the State from relying on Chapter 3 in determining *whether* to enter into (or to extend) a contract with Kyocera America.

### B. Given The Unique Considerations At Issue, Any Injunction Should Apply Broadly, Rather Than Just To Kyocera America.

If this Court rules for Kyocera America, it will also have to consider the proper scope of relief. While more limited relief is in most cases the proper approach, this case is unique—not just because of Chapter 3's specific text, but also because of the nature of state procurement and the backstop federal regime that already bars much commerce with Russia-affiliated entities. Consequently, if this Court accepts one of Kyocera America's legal theories—which, to be clear, it should not—it should apply its ruling equally to everyone potentially covered by Chapter 3, and not just to Kyocera America or just to these particular facts.

36

Begin with the text, which is crucial to any severability analysis. The "goal when interpreting a statute is to effectuate [the Legislature's] intent," *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 257 (3d Cir. 2013) (quoting *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 295 (3d Cir. 2012)), and that applies particularly to severability and scope of relief in the context of this preemption dispute involving New Jersey law, *see, e.g.*, *New Jersey State Chamber of Commerce v. Hughey*, 774 F.2d 587, 596 (3d Cir. 1985) ("Under New Jersey law, severability is a question of legislative intent."); *cf. Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987) (key question for federal severability "is whether the statute will function in a *manner* consistent with the intent of Congress") (emphasis in original). "[E]very exercise of statutory interpretation," meanwhile, "begins with an examination of the plain language of the statute." *Doe v. Hesketh*, 828 F.3d 159, 167 (3d Cir. 2016) (quoting *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001); *see also Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 302 (3d Cir. 2011) ("Generally, where the text of a statute is unambiguous, the statute should be enforced as written and only the most extraordinary showing of contrary intentions in the legislative history will justify a departure from that language." (citation omitted)).

Here, the plain language of Chapter 3 indicates unambiguously that the Legislature intended it to be consistent with federal law, by stating expressly that Chapter 3 "shall not apply in circumstances when [its] application would violate

federal law or regulation or be inconsistent with the terms and conditions of federal funding." N.J.S.A. § 52:32-60.4. Further, Chapter 3 *also* states it "shall expire upon the revocation of federal sanctions contained in Executive Order 14024." L. 2022, c. 3, § 10. The combination of these two provisions—a kind of belt-and-suspenders deference to federal supremacy—is notable. Consequently, if this Court were to base a ruling against the State Defendants on a theory of federal law that would apply equally to other potential parties, these two pieces of text together offer evidence that, in this specific context, the Legislature would likely prefer for that federal-law theory to be applied uniformly to all potential parties (and thus to the statute as a whole), and not just to the one that brought this lawsuit.

Adding to that textual evidence are two sources of powerful contextual evidence. First, consider the federal backstop that will nevertheless apply. Often, the danger of a wholesale invalidation is that *no* law will remain on the books whatsoever—a thumb on the scale in favor of assuming that a legislative body would have preferred a more tailored approach. *Cf., e.g.*, *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2350 (2020) (discussing federal presumption of severability); *Hughey*, 774 F.2d at 596 (noting New Jersey law's statutory presumption of severability, which "does not mandate a holding of severability if that is not in keeping with legislative intent"). Here, however, the existing federal sanctions regime—which, it bears emphasizing, largely overlaps with and does not

38

conflict with New Jersey's internal procurement choices—provides a substantial backstop, ensuring that even if Chapter 3 is wholly invalidated, contracts with many if not most Russia-affiliated entities will remain barred. *See* 22 U.S.C. § 8909(a)-(c); Exec. Order 14,024, 86 Fed. Reg. 20,249, §§ 1-2; Exec. Order 14,068, 87 Fed. Reg. 14,381, § 1(a)(iv), 1(b); Exec. Order 14,701, 87 Fed. Reg. 20,999, § 1(a)(ii)-(iii).

The second piece of powerful contextual evidence is the unique backdrop of state procurement, in which the State's overriding goal is to create a level playing field. *See Barrick v. State*, 94 A.3d 895, 901-02 (N.J. 2014); *In re Request for Proposals #17DPP00144*, 186 A.3d 332, 354 (N.J. Super. Ct. App. Div. 2018). Were this Court to enjoin N.J.S.A. § 52:32-6.01 only as applied to Kyocera America, however, it would put the State Defendants in the untenable position of having to continue enforcing Chapter 3 against other bidders just because they had not yet raised an identical legal challenge. "[P]lacing a bidder in a position of advantage over other bidders or [] otherwise undermining the necessary common standard of competition," *Barrick*, 94 A.3d at 903, would thwart a centerpiece of New Jersey's public bidding scheme, which depends on "encouraging free and open competition on a level playing field," *Seacoast Builders Corp. v. Jackson Twp. Bd. of Educ.*, 833 A.2d 84, 88 (N.J. Super. Ct. App. Div. 2003); *see also, e.g.*, *Meadowbrook Carting Co. v. Borough of Island Heights*, 650 A.2d 748, 751 (N.J. 1994). Put simply, enjoining enforcement of Chapter 3 only in part and only as applied to Kyocera

America risks creating an unlevel playing field because it would, in effect, put Kyocera America (and perhaps other bidders who happened to be very similar to Kyocera America) at an advantage over their competitors.

Under these particular circumstances, then, while Kyocera America's claims should be rejected as a matter of law, if this Court were to accept one of Kyocera America's theories of law, the combination of these distinct pieces of textual and contextual evidence—(1) N.J.S.A. § 52:32-60.4; (2) Chapter 3's federal-lockstep provision for termination; (3) the federal-law backstop; and (4) the nature of government procurement—would weigh in favor of enjoining Chapter 3 as to everyone, rather than just as to Kyocera or just on the specific facts here. Therefore, in the event that this Court does agree with one of Kyocera America's legal theories (which, for all the reasons above, it should not), the remedy more consistent with fairness and legislative text would be to simply invalidate Chapter 3 as a whole.

## <u>CONCLUSION</u>

This Court should deny Plaintiff's motion and grant the State Defendants' cross-motion for summary judgment.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

*/s/ Nathaniel I. Levy*
Nathaniel I. Levy
Deputy Attorney General
25 Market Street
Trenton, NJ 08625
Tel: (609) 376-2678
*Attorneys for Defendants*

Dated: September 1, 2023

## CERTIFICATE OF SERVICE

I certify that on September 1, 2023, I electronically filed the foregoing Brief

in Opposition and Cross-Motion for Summary Judgment with the Clerk of the U.S.

District Court for the District of New Jersey. Counsel for all parties will be served

via CM/ECF.

*/s/ Nathaniel I. Levy*
Nathaniel I. Levy
Deputy Attorney General

Dated: September 1, 2023