# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KYOCERA DOCUMENT SOLUTIONS AMERICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> DIVISION OF ADMINISTRATION, NEW JERSEY DEPARTMENT OF THE TREASURY, AMANDA TRUPPA, in her Official Capacity as Director of the Division of Administration, DIVISION OF PURCHASE AND PROPERTY, NEW JERSEY DEPARTMENT OF THE TREASURY, and AMY F. DAVIS, in her Official Capacity as Acting Director of the Division of Purchase and Property, <br><br> Defendants. | Civil Action No. 23-4044 (RK) (TJB) <br><br> **OPINION** |

**KIRSCH, District Judge**

Beginning in 2014 and carrying through to literally the date of this Opinion,[1] Congress has enacted and the President has promulgated and enforced a network of targeted sanctions against Russia in response to Russia's efforts to undermine the government of Ukraine, culminating more recently in the February 2022 invasion and attempt to annex its territory. Shortly after Russia invaded Ukraine, New Jersey enacted a procurement statute (the "Russia Act") that prohibits New

---

[1] *See* Press Release, The White House, FACT SHEET: Biden Administration Expands U.S. Sanctions Authorities to Target Financial Facilitators of Russia's War Machine (Dec. 22, 2023), https://www.whitehouse.gov/briefing-room/presidential-actions/2023/12/22/executive-order-on-taking-additional-steps-with-respect-to-the-russian-federations-harmful-activities/ (announcing a new Executive Order that "provides additional tools to root out Russia's procurement networks" by expanding authority to sanction institutions that facilitate financial transactions for entities operating in the economic sectors that support Russia's military-industrial base).

Jersey political subdivisions from doing business with entities that the state determines are carrying out "prohibited activities" in Russia or Belarus. *See* N.J. Stat. Ann. § 52:32-60.1–60.4.

Kyocera Document Solutions America, Inc. ("Plaintiff") is a United States corporation that has been headquartered in New Jersey for forty years. Plaintiff, which has over 200 employees in New Jersey, does significant business in this state, including providing office equipment and supplies to New Jersey agencies for more than a decade. Plaintiff does not conduct, and Defendants do not suggest that it ever has conducted, business of any kind in Russia or Belarus, or with any Russian or Belarussian company. While Plaintiff complies with the federal sanctions regime against Russia, it violates the expansive scope of New Jersey's Russia Act because a distant Russian company, with which Plaintiff does no business, is nonetheless owned by the same Japanese parent company.

After receiving notification that its contract with New Jersey would not be renewed and that it would be imminently added to a list of entities conducting "prohibited activities" with Russia, Plaintiff filed this case against two New Jersey agencies and their directors responsible for enforcing the Russia Act.[2] Plaintiff seeks declaratory and injunctive relief on the grounds that New Jersey's Russia Act is unconstitutional as applied to Plaintiff because it is preempted by federal law and violates the Foreign Commerce Clause. Currently before the Court are the parties' cross-motions for summary judgment. (ECF Nos. 3, 21.)

New Jersey's Russia Act emerged at a time of shared national horror at Russia's "military advances and the brutalities against Ukraine" documented and condemned by the federal

---

[2] Defendants are (1) the Division of Administration of New Jersey Department of the Treasury; (2) Amanda Truppa, in her official capacity as its Director; (3) the Division of Purchase and Property of the New Jersey Department of the Treasury; and (4) Amy F. Davis, in her official capacity as its Acting Director.

government.[3] However, whatever the earnest motive, the Russia Act intrudes on the exclusive province of the federal government to speak for the country in foreign affairs in seeking to influence Russia's conduct. Accordingly, for the reasons set forth below, the Court **GRANTS** Plaintiff's motion for summary judgment, (ECF No. 3), **DENIES** Defendants' cross-motion for summary judgment, (ECF No. 21), declares the Russia Act unconstitutional as applied to Plaintiff, and permanently enjoins New Jersey from designating Plaintiff as an entity conducting "prohibited activities" under the Russia Act.

## I.   BACKGROUND

### A.   FEDERAL SANCTIONS REGIME

Through the International Emergency Economic Powers Act of 1977 ("IEEPA"), Congress conferred the President with broad authority to regulate an array of economic transactions upon the President's declaration of a foreign-based "unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States . . . ." 50 U.S.C. § 1701(a). Under IEEPA, the President may impose economic-based sanctions on foreign states, governments, and individuals. *See id.* § 1702(a)(1)(B).[4]

Over the past decade, Congress has repeatedly charged the President with enforcing, and three presidential administrations have enforced, a regime of economic sanctions against specific

---

[3] *See* Press Release, The White House, Remarks By President Biden Providing an Update on Russia and Ukraine (Apr. 21, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/21/remarks-by-president-biden-providing-an-update-on-russia-and-ukraine-3/; *see also* Anton Troianovski, *Atrocities in Ukraine War Have Deep Roots in Russian Military*, N.Y. Times (Apr. 17, 2022), https://www.nytimes.com/2022/04/17/world/europe/ukraine-war-russia-atrocities.html.

[4] Under IEEPA, the President may "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B). Violation of federal sanctions promulgated under IEEPA can result in significant civil fines and criminal penalties. *Id.* § 1705(b)–(c).

Russian government actors, entities, and transactions tied to Russia's actions on the international stage. Shortly after Russia's February and March 2014 invasion and annexation of Crimea, Congress passed the Support for the Sovereignty, Integrity, Democracy, and Economic Stability of Ukraine Act of 2014, which set out a national policy for the United States' interaction with Russia and instructed the President how to execute it. *See* Pub. L. No. 113-95, 128 Stat. 1088 (2014) (codified as amended at 22 U.S.C. §§ 8901–10). Specifically, Congress condemned Russia's "political, economic, or military aggression against Ukraine" and declared the United States' intent:

> to work with United States partners in the European Union, the North Atlantic Treaty Organization, and at the United Nations to ensure that all nations recognize and not undermine, nor seek to undermine, the independence, sovereignty, or territorial or economic integrity of Ukraine; [and]
>
> to use all appropriate economic elements of United States national power, in coordination with United States allies, to protect the independence, sovereignty, and territorial and economic integrity of Ukraine.

22 U.S.C. § 8902(1), (3)–(4). In setting out these priorities, Congress directed the President to use his authority under IEEPA to "block and prohibit all transactions in all [United States] property and interests in property" of any person the President determines "has perpetrated, or is responsible for ordering, controlling, or otherwise directing, significant acts that are intended to undermine the peace, security, stability, sovereignty, or territorial integrity of Ukraine." *Id.* § 8907(a)(2), (b)(1)(A).

On March 6, 2014, President Obama declared a national emergency under IEEPA in response to the assertion of "governmental authority in the Crimean region without the authorization of the Government of Ukraine." Exec. Order No. 13,660, 79 Fed. Reg. 13,493 (Mar. 6, 2014). The Executive Order authorized sanctions against the United States property of, *inter*

*alia*, persons "responsible for or complicit in" the political and territorial interference with Ukraine. 79 Fed. Reg. at 13,493. Throughout 2014, the President repeatedly relied on IEEPA to expand the scope of the national emergency declared in Executive Order 13,660 and apply economic sanctions to an expanded group of individuals and entities associated with the Russian leadership, military, and invasion efforts in Crimea. *See* Exec. Order No. 13,661, 79 Fed. Reg. 15,535 (Mar. 16, 2014) (the Russian government and "arms or related material sector" in Russia); Exec. Order No. 13,662, 79 Fed. Reg. 16,169 (Mar. 20, 2014) (war-related economic sectors designated by the Secretary of the Treasury, including "financial services, energy, metals and mining, engineering, and defense and related materiel")[5]; Exec. Order 13,685, 79 Fed. Reg. 77,357 (Dec. 19, 2014) ("new investment" in or transfer of goods and services to or from Crimea).

Three years later, Congress passed and President Trump signed into law the Countering Russian Influence in Europe and Eurasia Act of 2017, Pub. L. 115-44, Tit. II, §§ 201 *et seq.*, 131 Stat. 886, 898–940 (2017) (codified at 22 U.S.C. §§ 9501 *et seq.*). In addition to reiterating its intent for the President to work with other governments to "vigorously enforce" sanctions against Russia "in response to the crisis in eastern Ukraine," 22 U.S.C. § 9502,[6] Congress codified the sanctions President Obama imposed pursuant to IEEPA through the 2014 Executive Orders targeting Russia, *id.* § 9522. Congress also directed the President to impose sanctions pursuant to his IEEPA authority on foreign persons the President determined were responsible for "serious human rights abuses in any territory forcibly occupied or otherwise controlled by [Russia]." *Id.*

---

[5] The Secretary of the Treasury subsequently designated the financial services, energy, and defense and related material sectors pursuant to this Executive Order. 79 Fed. Reg. 63,021, 63,024 (Oct. 21, 2014).

[6] The Act states that the President "continue to uphold and seek unity with European and other key partners on sanctions implemented against the Russian Federation, . . . engage to the fullest extent possible with partner governments with regard to closing [sanctions] loopholes, . . . [and] increase efforts to vigorously enforce compliance with sanctions in place as of the date of the enactment of this Act with respect to the Russian Federation in response to the crisis in eastern Ukraine, cyber intrusions and attacks, and human rights violators in the Russian Federation." 22 U.S.C. § 9502.

§ 8910. Under both the 2014 and 2017 laws, Congress authorized the President to waive or terminate the sanctions upon certifying that certain conditions have been met. 22 U.S.C. § 9522(b), (d); *id.* § 8907(c)–(d); *id.* § 8910(e).

In April 2021, President Biden issued another Executive Order declaring a national emergency in response to further Russian acts of aggression and interference against the United States and its allies. Exec. Order No. 14,024, 86 Fed. Reg. 20,249 (Apr. 15, 2021). The 2021 Order prevented all United States property belonging to any "political subdivision, agency, or instrumentality of the Government of the Russian Federation" or "owned or controlled by . . . the Government of the Russian Federation" from being "transferred, paid, exported, withdrawn, or otherwise dealt in[.]" 86 Fed. Reg. at 20,249–50.

The federal government escalated its sanctions after Russia invaded Ukraine on February 24, 2022. On March 8, 2022, the President issued an Executive Order condemning Russia's war against Ukraine and expanding the national emergency under IEEPA declared in Executive Order 14,024. Exec. Order 14,066, 87 Fed. Reg. 13,625 (Mar. 8, 2022). The Executive Order prohibited the importation into the United States of energy products from Russia and "new investment in the energy sector in the Russian Federation by a United States person, wherever located." 87 Fed. Reg. at 13,625. The President issued other Executive Orders in 2022 extending sanctions against economic transactions related to specific Russian entities, economic sectors, or occupied territories.[7] In announcing the 2022 restrictions, the President stated that the United States'

---

[7] *See* Exec. Order 14,065, 87 Fed. Reg. 10,293 (Feb. 21, 2022) (Donetsk and Luhansk regions of Ukraine); Exec. Order 14,068, 87 Fed. Reg. 14,381 (Mar. 11, 2022) (luxury goods); Exec. Order 14,071, 87 Fed. Reg. 20,999 (Apr. 6, 2022) ("new investment" and transactions in "any category of services as may be determined by the Secretary of the Treasury"); Press Release, The White House, Executive Order on Taking Additional Steps With Respect to the Russian Federation's Harmful Activities (Dec. 22, 2023), https://www.whitehouse.gov/briefing-room/presidential-actions/2023/12/22/executive-order-on-taking-additional-steps-with-respect-to-the-russian-federations-harmful-activities/ (financial institutions that

sanctions were part of a multi-state regime implemented by "a coalition of partners representing well more than half of the global economy."[8]

Shortly after the invasion, Congress also enacted two additional sanctions laws targeting specific sectors of the Russian economy. The first banned the import of Russian oil into the United States while authorizing the President to terminate or modify the ban upon certification to Congress that Russia had taken certain discrete steps with respect to Ukraine. Ending Importation Of Russian Oil Act, Pub. L. No. 117-109, 136 Stat. 1154 (2022). The second suspended Russia's "most favored nation" trade status. Suspending Normal Trade Relations With Russia and Belarus Act, Pub. L. No. 117-110, 136 Stat. 1159 (2022).[9]

Following instruction from the President, the Office of Foreign Assets Control ("OFAC"), housed within the United States Department of the Treasury, has implemented this network of sanctions targeting specific Russian individuals, industries, and transactions. *See* 31 C.F.R. pts. 587, 589 (2022).[10] Following Congress's instruction and the President's delegation, OFAC has repeatedly re-calibrated its sanctions regime since 2014, adding entities to the list of sanctioned entities and removing others through to the present.[11]

---

facilitate transactions for entities operating in Russian defense-adjacent sectors or in a sector "as may be determined to support Russia's military-industrial base by the Secretary of the Treasury").

[8] *See* Press Release, The White House, Remarks by President Biden on Russia's Unprovoked and Unjustified Attack on Ukraine (Feb. 24, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/02/24/remarks-by-president-biden-on-russias-unprovoked-and-unjustified-attack-on-ukraine/.

[9] In suspending Russia's most favored nation status, Congress recognized that sanctions were part of how the "United States, along with its allies and partners, has responded to recent aggression by the Russian Federation in Ukraine by imposing sweeping financial sanctions and stringent export controls." 136 Stat. at 1160.

[10] Indeed, OFAC publishes detailed guidance on the federal government's Russian-specific sanctions. *See* Office of Foreign Assets Control, Ukraine-/Russia-Related Sanctions, https://ofac.treasury.gov/sanctions-programs-and-country-information/ukraine-russia-related-sanctions.

[11] *See, e.g.*, Office of Foreign Assets Control, Russia-related Designations, Updates and Removal; Counter Terrorism Designation Update; Issuance of Russia-related General Licenses (Nov. 2, 2023),

## B.    NEW JERSEY PROCUREMENT STATUTE

On March 9, 2022—one day after the Biden Administration declared a national emergency and issued an Executive Order condemning Russia's invasion of Ukraine—New Jersey, through the Russia Act, enacted its own restrictions on Russian-affiliated entities far broader than those imposed by the federal government.

New Jersey's Russia Act requires the New Jersey Department of the Treasury ("Treasury Department") to "develop[] a list of persons it determines engage in prohibited activities in Russia or Belarus" (the "Prohibited List"). N.J. Stat. Ann. § 52:32-60.1(b). A "person" is defined to include a corporation or company as well as "[a]ny parent, successor, subunit, direct or indirect subsidiary, or any entity under common ownership or control" with any company engaged in "prohibited activities." *Id.* § 52:32-60.1(e). A company engages in "prohibited activities" when, *inter alia*, it is "headquartered in Russia or [has] its principal place of business in Russia or Belarus." *Id.* A company determined to engage in "prohibited activities"—or found to be under common ownership with a company that engages in "prohibited activities"—is added to the Prohibited List and may not "enter into or renew a contract with a [New Jersey] agency for the provision of goods or services or the purchase of bonds or other obligations." *Id.* § 52:32-60.1(a)(1).[12]

The Russia Act requires the Treasury Department to notify a company of its intent to include the company on the Prohibited List and permit the target company an opportunity to

---

https://ofac.treasury.gov/recent-actions/20231102 (announcing updates to OFAC's Specially Designated Nationals and Blocked Persons List).

[12] The Russia Act also prohibits a designated company from engaging in a range of other economic activity with New Jersey, including, among other activities, receiving an economic development subsidy from, receiving a tax clearance certificate from, or being designated as a developer by certain New Jersey state agencies. *Id.* § 52:32-60.1(a)(2)–(6).

demonstrate it is not engaged in prohibited activities. *Id.* § 52:32-60.1(b). A company seeking to enter into or renew a contract with a New Jersey agency is required to certify that it is not on the Prohibited List or, alternatively, provide a "detailed and precise description" of the prohibited activities. *Id.* § 52:32-60.1(c). The certification must be made publicly available. *Id.*

Responsibility for enforcement of the Russia Act is delegated to Defendant Division of Administration ("DDA"), which determines which entities should be placed on the Prohibited List and maintains and publishes it. (Compl. ¶¶ 17–18, 58.) The Russia Act expires "upon the revocation of federal sanctions contained in Executive Order 14,024." N.J. Stat. Ann. § 52:32-60.1 note (Expiration Date).

### C.   KYOCERA AMERICA

Plaintiff is a United States corporation offering customers office printing equipment and services. (*Id.* ¶¶ 13–15.) The company has been headquartered in New Jersey for over forty (40) years and employs over 200 employees in New Jersey out of 1,000 employed throughout the United States. (*Id.* ¶¶ 62–63.) Plaintiff is wholly owned by Kyocera Document Solutions Inc., a Japanese multinational electronics manufacturing company that also, directly or indirectly, owns 100% of a Russia-based subsidiary ("Kyocera Russia"). (*Id.* ¶¶ 74–78.)[13] Plaintiff has "no interest in or business relationships" with its corporate parent's Russian subsidiary and only conducts business within the western hemisphere. (*Id.* ¶¶ 61, 81–82.) Plaintiff is fully compliant with all federal laws and federal sanctions against Russia and Belarus. (*Id.* ¶ 83.)

Plaintiff conducts "a significant amount of business with government entities throughout the United States," including twelve (12) direct contracts with government entities and eighteen

---

[13] Specifically, the Japanese parent company ("Kyocera Japan") owns 100% of Plaintiff. (*Id.* ¶ 75.) Kyocera Japan also owns 100% of its European subsidiary ("Kyocera Europe"). (*Id.* ¶ 77.) The Russian subsidiary is owned 99% by Kyocera Europe and 1% by Kyocera Japan. (*Id.* ¶ 78.)

(18) indirect agreements through its contract with the National Association of State Procurement Officials. (*Id.* ¶¶ 64–65.) Plaintiff has held contracts with New Jersey for at least the past twelve (12) years. (*Id.* ¶ 65.) Since at least February 2016, Plaintiff has held a Master Blanket Purchase Order contract (identified by contract number G2075), which permits New Jersey state agencies and political subdivisions to purchase office devices, supplies, and services from Plaintiff. (*Id.* ¶¶ 68–70.) Through the G2075 contract, Plaintiff does business with local governments across New Jersey. (*Id.* ¶ 73.) Since originally entering into this agreement with Plaintiff, New Jersey has extended Plaintiff's contract eight (8) times, most recently through August 11, 2023. (*Id.* ¶¶ 71–72.)[14]

      To comply with the Russia Act, Plaintiff was required to certify in the contracting process that it was not engaged in "prohibited activities." N.J. Stat. Ann. § 52:32-60.1(c); (Compl. ¶ 85.) However, Plaintiff was unable to do so, given its connection to an otherwise-unrelated Russian company through a shared Japanese corporate parent, and fully disclosed this "distant relationship" to Defendants. (Compl. ¶¶ 88–90; *see also* Ex. A to Compl., ECF No. 1-2.) On October 19, 2022, the DDA notified Plaintiff that it had made a preliminary determination that Plaintiff was engaged in "prohibited activities" based on Plaintiff's common parent company with a Russian company. (Compl. ¶¶ 91–92; Ex. B to Compl., ECF No. 1-3.) Plaintiff and Defendants engaged in extensive communications regarding Plaintiff's status under the Russia Act until mid-2023, during which time the DPP repeatedly extended Plaintiff's New Jersey contract. (Compl. ¶¶ 94–104.) However, on July 21, 2023, Defendants notified Plaintiff that it would be imminently placed on the

---

[14] Defendant Division of Purchase and Property (the "DPP") is an agency within New Jersey's Treasury Department responsible for procuring, negotiating, and renewing state contracts with private entities. (*Id.* ¶ 22.)

Prohibited List and that Plaintiff's contract would not be extended past its August 11, 2023

termination date. (*Id.* ¶¶ 107–108.)

### D.   PROCEDURAL HISTORY

Plaintiff filed suit in this Court on July 28, 2023, alleging that the Russia Act violates the

Supremacy Clause, as it is preempted by federal sanctions promulgated pursuant to congressional

authorization, and discriminates against foreign commerce in violation of the Foreign Commerce

Clause. (*See generally* Compl.) Plaintiff sought declaratory relief that the state law is

unconstitutional as applied to it and injunctive relief preventing Defendants from adding Plaintiff

to the Prohibited List and refusing to extend or renew Plaintiff's contract with New Jersey on the

basis of the Russia Act. (*Id.* ¶¶ 158–63.) Plaintiff simultaneously filed a Motion for a Temporary

Restraining Order ("TRO"). (ECF No. 3.) The Court held an in-person conference with the parties

on August 3, 2023 and heard oral argument on the TRO on the same day. (ECF No. 14.) The Court

granted the TRO on the record and subsequently entered a proposed order agreed upon by Plaintiff

and Defendants. (ECF Nos. 11, 12.)

On August 22, 2023, the parties submitted a joint letter to the Court in which they requested

the following:

> By way of this Letter, the parties jointly request the Court to convert
> Plaintiff's pending Motion for Preliminary Injunction to a motion
> for summary judgment. The parties agree that there are no disputed
> material facts and that Plaintiff's Motion presents purely legal issues
> that are subject to resolution under Fed. R. Civ. P. 56.

(ECF No. 18.) Neither party requested the Court an opportunity to present witness testimony or

oral argument, and both parties consented for the Court to rule based on the written submissions.

(ECF Nos. 18, 20, 22.)[15]

---

[15] After the Court indicated that it would grant Plaintiff a TRO, Defendants consented to continue the
temporary restraints past Federal Rule of Civil Procedure 65(b)(2)'s default fourteen (14)-day period until

Plaintiff designated its brief in support of its Motion for Preliminary Injunction filed July 28, 2023, ("Pl.'s Br.", ECF No. 3), as its moving brief for the pending Motion for Summary Judgment. (ECF No. 18.) Defendants filed their opposition brief on September 1, 2023, in which Defendants additionally cross-moved for summary judgment on Plaintiff's claims. ("Defs.' Br." ECF No. 21.) Plaintiff filed a reply brief on September 21, 2023, ("Pl.'s Reply", ECF No. 23-1.)[16]

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 65 permits a court to convert a decision on a preliminary injunction motion into a final decision on the merits of a case under certain, limited circumstances. Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the [preliminary injunction] hearing."). A court may also enter summary judgment on the merits of a claim "[a]fter giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f)(3).

Before converting a motion for preliminary injunction into a final decision on the merits, a court will normally give "clear and unambiguous notice" of its intent "at a time which will still

---

the Court rendered a decision on Plaintiff's Motion. (Transcript, ECF No. 23-2 at 17:20–18:18; Letter, ECF No. 15.)

[16] On September 22, 2023, Razom Inc., a non-profit organization whose purpose is to "create a more democratic and prosperous Ukraine," filed a motion, (ECF No. 24-1), seeking leave to file an *amicus curiae* brief, (ECF No. 24-2), in opposition to Plaintiff's motion for summary judgment. Plaintiff filed a brief opposing the proposed *amicus* brief. (ECF No. 26.)

In deciding whether to permit the filing of a proposed *amicus* brief, a district court considers whether: "(1) the amicus curiae has a 'special interest' in the particular case; (2) the amicus curiae's interest is not represented competently or at all in the case; (3) the proffered information is timely and useful; and (4) the petitioner is not partial to a particular outcome in the case." *Granillo v. FCA US, LLC*, No. 16-153, 2018 WL 4676057, at *4 (D.N.J. Sept. 28, 2018). "Whether to grant amicus status is within the broad discretion of the district court." *Id.* at *4 (citation and quotations omitted).

Although, as noted below, the Court does not ultimately credit each of *amicus curiae*'s assertions or adopt its reasoning, the *amicus curiae*'s record of robust advocacy against Russia's aggression on behalf of the Ukrainian people constitutes a "special interest" and its forceful description of Russia's aggression in Ukraine is not presented by the parties to the matter. Thus, the Court grants Razom Inc.'s request to file an *amicus curiae* brief.

12

afford the parties a full opportunity to present their respective cases." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (quoting *Pughsley v. 3750 Lake Shore Drive Cooperative Bldg.*, 463 F.2d 1055, 1057 (7th Cir. 1972)); *see also Anderson v. Davila*, 125 F.3d 148, 157 (3d Cir. 1997). Consolidation is most appropriate when the relevant issues are solely legal, not factual, and the parties agree that they have had a full opportunity to introduce evidence in support of and argue their case. *See, e.g.*, *Franklin Univ. v. CGFNS Int'l, Inc.*, 534 F. Supp. 3d 457, 458 (E.D. Pa. 2021); *Morrill v. Weaver*, 224 F. Supp. 2d 882, 885 (E.D. Pa. 2002).

In this case, the relevant question is purely legal and the parties have requested and consented to the Court entering a decision on the merits of the claim at summary judgment. (ECF No. 18.) The declaratory and injunctive relief Plaintiff seeks through its motion is identical to the relief sought in the Complaint. The parties have had a full and fair opportunity to argue the relevant constitutional issues in their comprehensive written submissions. Thus, in accordance with the parties' request and the Court's determination, the Court construes Plaintiff's Motion for Preliminary Injunction as a Motion for Summary Judgment, accepts Defendants' opposition brief as its cross-motion for summary judgment, and will proceed to the merits of the Complaint in deciding whether to issue a permanent injunction against enforcement of New Jersey's Russia Act against Plaintiff pursuant to Rule 56(f).

Before entering permanent injunctive relief in Plaintiff's favor against enforcement of the Russia Act, the Court considers the four traditional injunction factors. This four-factor test requires demonstrating: (1) irreparable injury; (2) inadequacy of remedies at law to compensate for said injury; (3) that a balance of the hardships favors the party seeking the injunction; and (4) that a permanent injunction would serve the public interest. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*,

975 F.3d 300, 317 (3d Cir. 2020). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Id.*

## III.    DISCUSSION

### A.    THE FOREIGN AFFAIRS DOCTRINE AND PREEMPTION

Plaintiff argues that New Jersey's Russia Act is preempted by the federal sanctions regime put in place against Russia, both by intruding on a field of international relations exclusively reserved to the federal government and by directly conflicting with the federal sanctions regime. Plaintiff's preemption arguments rely on a pair of Supreme Court cases in which a state law yielded to the federal interest in foreign affairs: *Zschernig v. Miller*, 389 U.S. 429 (1968) and *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). In considering the parties arguments, the Court's analysis is informed by two facts asserted by Plaintiff that Defendants do not dispute. First, Plaintiff is carrying out "prohibited activities" under New Jerseys' Russia Act *solely* by virtue of the fact that Plaintiff and a Russian company share a common corporate parent. Second, Plaintiff fully complies with the federal sanctions against Russia developed in the years since 2014. Therefore, the key question is whether the Russia Act's broad sweep runs afoul of the federal government's purview over foreign affairs, even though Plaintiff is fully compliant with the federal government's sanctions regime. The Court finds that it does.[17]

---

[17] Plaintiff also argues the applicability of effect of the Foreign Commerce Clause on the Russia Act, contending that the Russia Act discriminates against foreign commerce by purporting to target Russian-affiliated companies and prevents the federal government from speaking with one voice on matters of foreign commerce. (Pl.'s Br. at 27–32.) Because a decision on Plaintiff's conflict preemption argument is sufficient to resolve its claims, the Court need not reach this alternative argument. *See Crosby*, 530 U.S. at 374 (declining to reach Foreign Commerce Clause argument because challenge to state law was sustained on conflict preemption grounds).

1.     **Constitutional Framework**

The Constitution vests the federal government with exclusive authority over the United States' conduct in its foreign affairs. *See United States v. Pink*, 315 U.S. 203, 233 (1942) ("No State can rewrite our foreign policy to conform to its own domestic policies. Power over external affairs is not shared by the States; it is vested in the national government exclusively."). "[T]he interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941). As the Supreme Court reaffirmed more recently:

> There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the "concern for uniformity in this country's dealings with foreign nations" that animated the Constitution's allocation of the foreign relations power to the National Government in the first place.

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964)). This constitutional principle is embodied in several doctrines under which the Supreme Court has struck down state laws that intrude on the federal government's administration of foreign affairs.

Under one branch of the doctrine—foreign affairs field preemption—a state law may be unconstitutional even absent a specific federal law on the same subject or any finding of conflict between the state and federal laws. In *Zschernig*, the Supreme Court recognized the dominance of the federal interest in the field of foreign affairs, striking down an Oregon probate statute that prohibited inheritance by heirs living in a foreign country unless certain conditions regarding the rights of foreign heirs and the reciprocal rights of United States citizens under the foreign country's laws were met. *Zschernig*, 389 U.S. at 430–31. The Oregon law invited state courts to conduct

searching inquiries into the political and legal systems of foreign nations, which the Court held led to a "kind of state involvement in foreign affairs and intentional relations" which "the Constitution entrusts solely to the Federal Government." *Id.* at 436. The Supreme Court arrived at this conclusion despite states "traditionally regulat[ing] the descent and distribution of estates" and the absence of evidence of actual conflict between the state and federal action—statute, executive order, treaty, or even objection. *Id.* at 440–41. Writing thirty-five years after *Zschernig*, the Supreme Court in *Garamendi* noted that *Zschernig* stands for the proposition that a state statute "with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state law, and hence without any showing of conflict." 539 U.S. at 418.[18]

A separate doctrine, under which state laws intruding on the federal government's conduct in foreign affairs are vulnerable, is the doctrine of conflict preemption. The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, the Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough Cnty., Fla. v. Automated Med.*

---

[18] The Court notes some tension in characterizing *Zschernig* as a field preemption case. "Field preemption" as commonly discussed turns on the question of congressional intent discerned through federal statute. *Crosby*, 530 U.S. at 372 ("When Congress intends federal law to 'occupy the field,' state law in that area is preempted." (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989))). Notably, the Court in *Zschernig* reached its result without reliance on any act of Congress or attempt to discern congressional intent. *Zschernig*, 389 U.S. at 441. Nonetheless, the Court in *Garamendi* characterizes the doctrine based on *Zschernig* as a "theor[y] of field . . . preemption." *Garamendi*, 539 U.S. at 419–20.

Plaintiff here does not distinguish between field preemption of a state law analyzed through congressional action in the field, *see, e.g., Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 717–19 (1985), and intrusion by a state law on the foreign affairs power of the federal government even absent federal law that occupies the field, *see Zschernig*, 389 U.S. at 441. (Pl.'s Br. at 18–19.) As discussed below, given the clear conflict between federal law and the challenged New Jersey law here, the Court need not decide under which branch of field preemption Plaintiff's challenge should be viewed.

*Lab'ys, Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824)). Absent an express statement of Congress's preemptive intent, a state law may be "naturally preempted to the extent of any conflict with a federal statute." *Crosby*, 530 U.S. at 372 (citations omitted). Under this strain of preemption—called conflict preemption—federal law may preempt state law when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines*, 312 U.S. at 67). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . ." *Crosby*, 530 U.S. at 373. As the Supreme Court explained:

> For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.

*Id.* (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)); *see also Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 239–40 (3d Cir. 2009) (deciding obstacle preemption "requires an examination of the 'whole law, and [] its object and policy'" (*quoting Gade v. Nat'l Solid Wastes Mgmt. Assn.*, 505 U.S. 88, 98 (1992))), *aff'd sub nom. Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011).

The Supreme Court has addressed when it is appropriate to address a claim under each doctrine. "It is a fair question whether respect for the executive foreign relations power requires a categorical choice between the contrasting theories of field and conflict preemption evident in the *Zschernig* opinions, but the question requires no answer here." *Garamendi*, 539 U.S. at 419–20. The Court continued that the two theories are "complementary," noting that field preemption may be more applicable if a state "take[s] a position on a matter of foreign policy with no serious claim

to be addressing a traditional state responsibility" even absent conflicting federal action in the same field, whereas requiring a showing of "conflict, of a clarity or substantiality that would vary with the strength or the traditional importance of the state concern asserted," makes more sense when a state acts within "its traditional competence but in a way that affects foreign relations." *Garamendi*, 539 U.S. at 419 n.11 (citation omitted) (cleaned up). Decisions from the Circuit Courts have recognized *Zschernig*'s continued vitality. *See Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067 (9th Cir. 2012) (en banc) (holding that California statute granting state courts jurisdiction over insurance claims by "Armenian Genocide victims" violated the rule of *Zschernig* because the statute's purpose to give "a friendly forum for those who suffered from certain foreign events" was not an area of traditional state responsibility and the statute "impose[d] the politically charged label of 'genocide' on the actions" of a foreign power in violation of the federal government's exclusive role in foreign affairs); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 70 (1st Cir. 1999), *aff'd sub nom. Crosby*, 530 U.S. 363 (2000) (holding that a Massachusetts statute restricting the state's ability to purchase goods or services from companies that do business with Burma failed under *Zschernig* because it had more than an "incidental or indirect effect in foreign countries"); *cf. Trojan Techs., Inc. v. Com. of Pa.*, 916 F.2d 903, 913 (3d Cir. 1990) (holding that a Pennsylvania statute requiring state suppliers to provide American-made products violated the rule laid out in *Zschernig* where there was no "indication from the record that the statute [had] been selectively applied according to the foreign policy attitudes of [the state]").

Here, this Court follows the approach taken in *Garamendi* and *Crosby* in deciding the case on conflict preemption grounds without reliance on *Zschernig* and need not determine whether the Russia Act unconstitutionally intrudes on the federal government's foreign affairs power absent conflict with federal law because here, as in *Crosby*, the conflict is clear. *See also Trojan*

*Technologies, Inc.*, 916 F.2d at 905–06 (restating "the principle that statutory questions should be considered first in order to avoid possibly needless constitutional inquiry"); *C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co.*, 386 F.3d 263, 269 (3d Cir. 2004) ("But because conflict preemption is the narrower and, we believe, clearer path, we do not decide whether Congress has sought to occupy the field of federal flood insurance.").[19]

### 2. New Jersey's Russia Act

The Court now turns to Plaintiff's conflict preemption argument. Plaintiff contends that even though its relationship with Kyocera Russia is highly attenuated, New Jersey's Russia Act is written so expansively to target and prohibit conduct that the federal sanctions allow, in violation of and in conflict with the federal sanctions regime against Russia in place since 2014. Plaintiff relies on *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000), in which a unanimous Supreme Court struck down a Massachusetts law prohibiting state entities from contracting with companies associated with the government of Burma. In opposition, Defendants argue that *Crosby* is distinguishable based on the level of detail in the federal sanctions regime and the explicitness

---

[19] In a footnote, New Jersey argues that the Court must apply a presumption against preemption in favor of the Russia Act. (Defs.' Br. at 19 n.13.) Whether the presumption applies depends on the state or federal nature of the regulated area. *Compare Rice*, 331 U.S. at 230 (presumption against preemption when the state regulates "in field which the States have traditionally occupied") *with United States v. Locke*, 529 U.S. 89, 108 (2000) (no presumption against preemption "when the State regulates in an area where there has been a history of significant federal presence"). In *Crosby*, the Supreme Court declined to consider whether to apply the presumption, finding it unnecessary to resolve given its finding that the state law "presents a sufficient obstacle to the full accomplishment of Congress's objectives under the federal Act." *Crosby*, 530 U.S. at 373 n.8.

Like the Supreme Court in *Crosby*, the Court here finds the state-federal conflict sufficient to render New Jersey's Russia Act preempted without consideration of any presumption. If the result did turn on the question of the presumption's application, the Court would be unlikely to find it applied to New Jersey's procurement law that renders a foreign nation a third rail that any company seeking to do business with the state cannot touch. *See Natsios*, 181 F.3d at 70–71 ("The Supreme Court has recognized a number of disparate topics and fields of law as traditional areas of state concern, but has not suggested that moral concerns regarding human rights conditions abroad—though effectuated via state procurement policy—are such an area.").

of Congress's instruction to the President to bring about a specific change in a foreign country. (Defs.' Br. at 22–27.) Analogizing New Jersey to a private company voluntarily choosing with whom to do business, Defendants further argue that "New Jersey, like any other spender, decided it should not spend its money with entities it deemed sufficiently proximate to Russia's illegal war." (*Id.* at 2.)

*Crosby* involved a Massachusetts law (the "Burma Law") that barred Massachusetts entities from buying goods or services from entities that the state had placed on a "restricted purchase list" for "doing business" with Burma. *Crosby*, 530 U.S. at 366. The Burma Law defined "doing business" broadly and contained several exceptions for narrow categories of goods and services and also for situations in which contracting with an entity on the "restricted purchase list" was in Massachusetts's proprietary interest, as defined by statute. *Id.* at 367–68.

Shortly after passage of the Burma Law, Congress imposed federal sanctions on Burma, to remain in effect until the President certified to Congress that Burma had improved its record on human rights. *Id.* at 368. With certain limited carveouts, the federal sanctions banned all aid to the government of Burma, instructed United States representatives to international financial institutions to vote against granting assistance to Burma, and ordered that no United States entry visa be issued to any Burmese official. *Id.* The federal sanctions law also authorized the President to prohibit "United States persons" from making "new investment" in Burma upon the President's certification that the conditions of human rights in Burma were deteriorating. *Id.* at 369. Congress directed the President to coordinate with United States allies to improve human rights in Burma. *Id.* at 369. In a subsequently issued Executive Order, the President declared that the Burmese government's actions constituted "an unusual and extraordinary threat," prohibited new

investment in Burma by "United States persons," and ordered the Executive Branch to implement sanctions regime. *Id.* at 370, 370 n.3.[20]

Justice Souter, writing for a unanimous Supreme Court, held that Massachusetts's Burma Law was conflict preempted by the federal sanctions regime.[21] *First*, the Court described Congress's expansive delegation of authority to the President to set sanctions as he saw fit, concluding that "[w]ithin the sphere defined by Congress, then, the statute has placed the President in a position with as much discretion to exercise economic leverage against Burma, with an eye toward national security, as our law will admit." *Id.* at 375–76. The Court drew from this a congressional intent for the President to be able "to achieve a political result" by carefully calibrating the sanctions. *Id.* at 376. *Second*, the Court focused on specific differences between the state and federal laws, noting how the Burma Law conflicted with federal law by "penalizing individuals and conduct that Congress has explicitly exempted or excluded from sanctions." *Id.* at 378. The Court recognized that Congress's policy choice to leave certain entities unaffected by the federal sanctions regime was a deliberate decision that was undermined by Massachusetts' broad-brush approach. *Finally*, the Court pointed to "the President's intended authority to speak for the United States among the world's nations" to develop a multilateral strategy to improve Burma's record on democracy and human rights. *Id.* at 380. "This clear mandate and invocation of exclusively national power belies any suggestion that Congress intended the President's effective voice to be obscured by state or local action." *Id.* at 381.

---

[20] The Executive Order invoked the President's authority pursuant to the federal Burma Law as well as the IEEPA and the NEA. *See Crosby*, 530 U.S. at 370; *see also* Exec. Order No. 13,047, 62 Fed. Reg. 28,301 (May 20, 1997).

[21] Justices Scalia and Thomas wrote a separate concurrence that Congress's intent, and thus the preemptive effect, was evident on the face of the federal law without discussion of the legislative history considered by the majority. *Crosby*, 530 U.S. at 390.

More recently, the Eleventh Circuit applied *Crosby* in affirming the grant of a preliminary injunction against enforcement of a state sanctions provision (the "Cuba Amendment") couched as a procurement statute akin to New Jersey's Russia Act in the case at bar. *See Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268 (11th Cir. 2013). There, the Eleventh Circuit applied *Crosby* to a Florida statute that "prevent[ed] any company that does business in Cuba—or that is in any way related to a company that does business in Cuba—from bidding on state or local public contracts in the State of Florida." *Id.* at 1272. The Court cataloged the history of "complex and interlocking network of statutes, regulations, and executive orders" setting sanctions against Cuba, beginning with Congress's 1917 decision to "empower[] the President to regulate and embargo trade with foreign nations" pursuant to the predecessor statute to IEEPA. *Id.* at 1275. The President in turn "repeatedly exercised" his authority to create an "extensive and highly calibrated regime of sanctions against Cuba." *Id.* at 1272, 1275–76. The Eleventh Circuit concluded that the conflict between the state and federal laws was "obvious, direct, and apparent," recognizing that the state procurement law "sweeps more broadly than the federal regime does, punishing companies like [the plaintiff] that do not run afoul of the federal Cuban sanctions and penalizing economic conduct that the federal law expressly permits." *Id.* at 1281.

As in *Crosby*, however well-intentioned, and notwithstanding the obvious shared goals of both Congress and the State of New Jersey, New Jersey's Russia Act impermissibly undermines the federal sanctions regime against Russia, established by Congress and articulated by the Executive. Congress wrote IEEPA, which provides the statutory foundation for the multiple Executive Orders related to Russia issued over the past decade, to grant the President broad authority to impose sanctions in the event of a national emergency. 50 U.S.C. §§ 1701 *et seq.* Moreover, Congress has specifically and repeatedly charged the President with implementing

targeted sanctions related to Russia in 2014, 2017, and, most recently, 2022. *See* Pub. L. No. 113-95, 128 Stat. 1088 (2014); Pub. L. 115-44, Tit. II, 131 Stat. 886 (2017); Pub. L. No. 117-109, 136 Stat. 1154 (2022); Pub. L. No. 117-110, 136 Stat. 1159 (2022). The federal sanctions at issue here are significantly more detailed than those given preemptive effect in *Crosby*, which emerged from a single federal statute enacted after passage of the state's Burma Law. Congress vested the President with authority to determine which entities met the statutory criteria for violating sanctions, 22 U.S.C. § 8907(a), *id.* § 8908(a), *id.* § 8909(a), and to terminate the sanctions once the President certifies that certain steps have been achieved, 22 U.S.C. § 8907(c), *id.* § 8908(c), *id.* § 8909(c). Over the past decade, three successive Presidents have relied on their authority under IEEPA to construct a web of sanctions against specific Russian entities. *See* 31 C.F.R. pts. 587, 589.[22] Therefore, Congress has signaled that it "clearly intended" the President to exercise, and the President has repeatedly exercised, "flexible and effective authority over economic sanctions" against Russia. *Crosby*, 530 U.S. at 374.

Conflict between the regimes is evident by comparing the narrow, considered federal sanctions with New Jersey's far-reaching Russia Act. *See Crosby*, 530 U.S. at 377 ("Congress manifestly intended to limit economic pressure against the [foreign] Government to a specific

---

[22] Defendants argue that there is no support for treating IEEPA as a statute "that carries preemptive effect." (Defs.' Br. at 23 n.15.) Defendants note that even though both IEEPA and the Burma-specific federal law were the statutory authority for the federal sanctions at issue in *Crosby*, the *Crosby* Court did not rely on IEEPA in striking down the state law. (*Id.*)

While Defendants accurately summarize *Crosby*, their conclusion about IEEPA's preemptive force does not follow. The fact that discussing IEEPA was not necessary to *Crosby*'s result in light of a more recent country-specific law does not deprive IEEPA of preemptive weight. In short, *Crosby*'s silence on IEEPA does not signify what Defendants contend. A federal statute need not have been previously relied on in a preemption decision before a subsequent court may find that state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" expressed in the federal statute. *See Arizona*, 567 U.S. at 399 (citation omitted). Finally, although the Court finds that IEEPA's authorization for the President to impose economic sanctions during national emergencies is sufficient to preempt the Russia Act, Congress here has also spoken, repeatedly and recently, to instruct the President to impose sanctions on Russia. IEEPA, while supporting the result here, is not necessary to it.

range."). For example, the federal sanctions target specific industries the Secretary of the Treasury determines are culpable in Russia's extraterritorial aggression, such as the financial services, energy, metals and mining, engineering, and defense sectors. 31 C.F.R. § 589.202–05. Other federal sanctions target specific geographic regions in which the federal government disapproves of Russian activity. *Id.* § 589.206. The federal sanctions also reach individuals and entities the Secretary of the Treasury determines are responsible for "[a]ctions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine." *Id.* § 589.201. In other words, the federal sanctions are tailored to those actors whose ability to operate internationally supports Russia's ability to sustain its invasion.

Such nuance is absent from New Jersey's Russia Law, which paints broadly to sweep in any entity "headquartered in Russia or having its principal place of business in Russia or Belarus," and includes in its expansive reach attenuated business relationships, such as here, of a distant corporate entity whose only commonality and nexus is a shared foreign parent company. N.J. Stat. Ann. § 52:32-60.1(e). New Jersey thus "penalize[es] individuals and conduct" that fall outside of the federal sanctions regime. *Crosby*, 530 U.S. at 378. While the federal regime does not *explicitly* exempt a company with a distant corporate relationship with a Russian company from federal sanctions, it does not have to in order to invoke *Crosby*'s logic. "Sanctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions here undermines the congressional calibration of force." *Id.* at 380. This Court finds the Eleventh Circuit's reasoning, on facts identical to those here, instructive:

> The Cuba Amendment plainly sweeps further than the federal regime because it imposes a penalty on a U.S. corporation like Odebrecht that does not itself do business with Cuba, but has a foreign parent company that does business with Cuba through an unrelated foreign subsidiary. Or, in simpler terms, the Cuba Amendment penalizes U.S. companies for the business activities of

24

> their foreign parents or their foreign affiliates, no matter how remote
> the connection. This squarely conflicts with the federal regime,
> which only sanctions U.S. companies for their own actions or the
> actions of their own subsidiaries.

*Odebrecht Const., Inc.*, 715 F.3d at 1282. As in *Odebrecht* and *Crosby*, New Jersey's Russia Act's

"generality stands at odds with the federal discreteness." *Crosby*, 530 U.S. at 379. Furthermore,

the Russia Act also imposes different penalties than those required by federal sanctions, *compare*

N.J. Stat. Ann. § 52:32-60.1(d) (civil penalty of up to $1 million or twice the bid amount and

inability to bid on state contracts for three years) *with* 22 U.S.C. § 8907(b)(2) (civil penalties of

twice the amount of the violative transaction and criminal penalties of up to twenty years'

imprisonment and $1 million), which further illustrates the gap between the federal and state

regimes. *See Odebrecht Const., Inc.*, 715 F.3d at 1283 (finding conflict where the state law

"imposes additional penalties on those companies that are subject to the federal sanctions").

Defendants dispute preemption by arguing that the Russia Act aligns with the means and

ends of federal law. Defendants contend that the "breadth" of the federal sanctions "confirm[s]

that New Jersey's Act does not conflict with that regime, but rather *largely* overlaps with it . . . ."

(Defs.' Br. at 24 n.16 (emphasis added).)[23] Defendants also point to the fact that the Russia Act

"terminates in lockstep with the federal regime," *i.e.* that the Russia Act would end upon the on

termination of a 2021 Executive Order, to argue that the state and federal laws do not conflict. (*Id.*

at 25–26.) However, the federal regime is significantly narrower and more constrained than New

Jersey's Russia Act, notwithstanding Defendants' contentions otherwise. The federal sanctions are

carefully limited to targeting specific actors and industries that bear responsibility for Russia's

aggression towards Ukraine. Whatever the reach of the federal sanctions, they do not stretch

---

[23] Defendants' own language, "largely," is a subtle acknowledgement that the two sanctions regimes are
not in complete harmony and thus in conflict. *See Crosby*, 530 U.S. at 379–80.

remotely as far and wide as New Jersey's Russia Act. Moreover, to the extent that Defendants

contend the state and federal laws overlap, the *Crosby* Court dismissed that argument twenty years

ago:

> The conflicts are not rendered irrelevant by the State's argument that
> there is no real conflict between the statutes because they share the
> same goals and because some companies may comply with both sets
> of restrictions. The fact of a common end hardly neutralizes
> conflicting means, and the fact that some companies may be able to
> comply with both sets of sanctions does not mean that the state Act
> is not at odds with achievement of the federal decision about the
> right degree of pressure to employ.

*Crosby*, 530 U.S. at 379–80 (citations omitted) (citing *Gade v. Nat'l Solid Wastes Mgmt. Assn.*,

505 U.S. 88 (1992)). Even a state law that, in some way *furthers* the aim of the federal law, is not

shielded. *Id.* at 379 n.14. "Conflict is imminent when two separate remedies are brought to bear

on the same activity." *Id.* at 380 (quoting *Wisconsin Dep't of Industry v. Gould, Inc.*, 475 U.S. 282,

286 (1986)).

Defendants minimize the preemptive effect of the expansive web of federal regulations that

circumscribe the boundaries of the federal government's sanctions as "various executive and

administrative regulations" that "do not meaningfully change" the preemption analysis. (Defs.' Br.

at 24 n.16.) The President's most recent Executive Order re-calibrating sanctions against financial

institutions that facilitate transactions for entities operating in defense-adjacent sectors of the

Russian economy demonstrates the need for an unhampered federal hand in setting sanctions.[24]

The President's activity in this realm, carried out pursuant to congressional directive, is strong

evidence of Congress's intent. *See Crosby*, 530 U.S. at 370 (discussing presidential action in

---

[24] Press Release, The White House, Executive Order on Taking Additional Steps With Respect to the
Russian Federation's Harmful Activities (Dec. 22, 2023), https://www.whitehouse.gov/briefing-
room/presidential-actions/2023/12/22/executive-order-on-taking-additional-steps-with-respect-to-the-
russian-federations-harmful-activities/.

response to the federal sanctions law on Burma). The Supreme Court has "held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes." *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985) (collecting cases).

The Eleventh Circuit recognized the preemptive effect of federal regulations on facts similar to those here. *Odebrecht*, 715 F.3d at 1272. The Eleventh Circuit's analysis began by chronicling the fifty-year history of federal sanctions against Cuba, which included Congress "active[ly] legislating with respect to Cuba" and the Department of the Treasury promulgating the Cuban Assets Control Regulations ("CACR"). *Id.* at 1275–76. The Eleventh Circuit discussed the agency regulations, writing:

> There is nothing in this record to suggest that [the plaintiff] has run afoul of the CACR, because neither it nor any of its subsidiaries does any business with Cuba. Significantly, the CACR do not sanction a U.S. company like [the plaintiff] for the business activities of its foreign parent company or of a distant foreign affiliate that shares a common parent company.

*Id.* at 1276. Identically here, the extensive sanctions against Russia were built both through executive action and congressional enactment. The fact that the sanctions regime against Russia is not, as in *Crosby*, contained within a single act of Congress does not lessen the conflict.[25]

Finally, New Jersey's Russia Act interferes with the President's ability to achieve the federal government's goal of discouraging Russian interventionism in Ukraine. As Congress stated in 2014, the policy of the United States is "to work with United States partners in the European Union, the North Atlantic Treaty Organization, and at the United Nations to ensure that all nations recognize and not undermine, nor seek to undermine, the independence, sovereignty, or territorial

---

[25] At oral argument on the TRO, Defendants attempted to distinguish *Crosby* by noting that the federal sanctions against Burma were "a succinct and clear law all in one place," and that by comparison the federal law governing sanctions against Russia are "diffuse." (ECF No. 23-2 at 6:16–21.) The Court finds, and Defendants have provided, no support for the idea that congressional intent must be derived solely from a single act of Congress, rather than several statutes and their implementing regulations over time.

or economic integrity of Ukraine." § 3, 128 Stat. at 1089; *see also* § 212, 131 Stat. at 900 (directing the President to work with other governments to "vigorously enforce compliance with sanctions" against Russia); § 2, 136 Stat. at 1160 (recognizing that sanctions were part of how the "United States, along with its allies and partners, has responded to recent aggression by the Russian Federation in Ukraine"). The *Crosby* Court recognized Congress's intent that the President have authority to speak for the United States with one voice in order to pressure the Burmese government to democratize and improve its human rights record. *Id.* at 380. The Supreme Court was cognizant of the harmony between this congressional pronouncement and the President's own constitutional powers. *Id.* at 381 (citing U.S. Const. Art. II, § 2, cl. 2 and U.S. Const., Art. II, § 3). Accordingly, the Court held that the Massachusetts law "compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" *Id.* at 381.[26]

Here, the country's ability to speak with one voice—both in cooperating with like-minded allies and in pressuring Russia to end its aggression and occupation—is undercut when one state, let alone fifty different states, is able to set its own foreign policy by citing its procurement statutes. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (reasoning that allowing one state to implement its own monitoring system "would allow other States to do the same . . . easily lead[ing] to a patchwork of state . . . laws, rules, and regulations"). As the Supreme Court wrote in *Hines*, "[t]he Federal Government, representing as it does the collective interests of the forty-eight states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties. For local interests the several states of the Union exist, but for national

---

[26] The Court went further, noting that it "need not get into any general consideration of limits of state action affecting foreign affairs to realize that the President's maximum power to persuade rests on his capacity to bargain for the benefits of access to the entire national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics." *Crosby*, 530 U.S. at 381.

purposes, embracing our relations with foreign nations, we are but one people, one nation, one power." *Hines*, 312 U.S. at 63 (citation omitted).[27] This rationale applies here.

Therefore, the Court concludes that there is a conflict between the Russia Act and the federal sanctions regime, and thus, the state law must give way to the federal regulations.

### 3.  Market Participant Exception

New Jersey separately argues that the Russia Act does not violate the Supremacy Clause because New Jersey was acting solely as a market participant, and not as a regulator, in enacting the law. (Defs.' Br. at 13.) Defendants argue that it is well-established that the state may "prescribe the conditions upon which it will permit public work to be done on its behalf." (Defs.' Br. at 15 (quoting *Atkin v. Kansas*, 191 U.S. 207, 222–23 (1903)).) Because New Jersey's Russia Act prohibits contracts "for the provision of goods or services," N.J. Stat. Ann. § 52:32-60.1(a)(1), Defendants argue that is the "quintessential example" of the state protecting its proprietary interest in purchasing goods or services. (Defs.' Br. at 19.)

It is well-established that "pre-emption doctrines apply only to state *regulation*." *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.* (*Boston Harbor*), 507 U.S. 218, 227 (1993) (emphasis in original). When a state enacts a law "as a market participant with no interest in setting policy," i.e. is driven by "a profit motive" rather than for policy concerns, the preemptive effect of federal law is less compelling. *Id.* at 229. "The market participant exception to these doctrines is rooted in the principle that a government, just like any other party participating in an economic market, is free to engage in the efficient procurement and sale of goods and services." *Associated Builders &*

---

[27] Although *Hines* is often understood as a field preemption case, *see Hillsborough Cnty., Fla.*, 471 U.S. at 713, its rationale is equally applicable here. The Supreme Court observed in *Crosby* that "the categories of preemption are not 'rigidly distinct'" and that "field pre-emption may be understood as a species of conflict pre-emption." *Crosby*, 530 U.S. at 373 (quoting *English v. General Elec. Co.*, 496 U.S. 72, 79 n.5 (1990)).

*Contractors Inc. New Jersey Chapter v. City of Jersey City, New Jersey*, 836 F.3d 412, 417–18 (3d

Cir. 2016) (citations omitted). The Third Circuit instructs that a Court when called upon to apply

the market participant exception should ask *first* whether the state law "'serve[s] to advance or

preserve the state's proprietary interest in a project or transaction, as an investor, owner, or

financier'" and *second* whether "whether the action is so broad as to be considered, in effect,

regulatory." *Id.* at 418 (quoting *Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage Hosp. Res.,

LLC*, 390 F.3d 206, 216 (3d Cir. 2004)) (citations omitted).

Before turning to the Third Circuit's general test, the Court notes that the *Crosby* Court

considered and rejected Massachusetts's market participant argument, identical to Defendants:

> We add that we have already rejected the argument that a State's
> "statutory scheme . . . escapes pre-emption because it is an exercise
> of the State's spending power rather than its regulatory power." In
> *Gould*, we found that a Wisconsin statute debarring repeat violators
> of the National Labor Relations Act, 29 U.S.C. § 151 et seq., from
> contracting with the State was preempted because the state statute's
> additional enforcement mechanism conflicted with the federal Act.
> The fact that the State "ha[d] chosen to use its spending power"
> rather than its police power did not reduce the potential for conflict
> with the federal statute.

*Crosby*, 530 U.S. at 373 n.7 (quoting *Wisconsin Dept. of Industry*, 475 U.S. at 287–89). The

Eleventh Circuit, considering identical objections based on the state's propriety spending power

to try to protect a sanctions law disguised as a spending statute, reached the same result. *See

Odebrecht Const., Inc.*, 715 F.3d at 1287 ("The Cuba Amendment absolutely is intended to

'prohibit' or 'obstruct' domestic and foreign companies' trade with Cuba.").[28]

---

[28] The cases Defendants cite to argue that the Russia Act is appropriately tailored are distinguishable. *See Hotel Emps. & Rest. Emps. Union, Loc. 57*, 390 F.3d at 217 (city was acting as market participant in requiring hospitality employees to sign no-strike agreements based on the city's "interest in ensuring that labor strife does not damage the development"); *Matrix Dev. Grp. v. City of Newark, New Jersey*, No. 20-3166, 2021 WL 3260854, at *15 (D.N.J. July 30, 2021) (city was acting as market participant in requiring laborers on certain city projects to sign collective bargaining agreements under certain limited circumstances designed to "always advance [the city's] interests").

Even had the Supreme Court not directly rejected an identical argument on an identical statute, application of the Third Circuit's two-step test would yield the same result. Defendants point to no credible proprietary interest served by a statute that broadly bars any economic relationship with any entity even tangentially related to Russia or Belarus. *See Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley*, 37 F.3d 945, 955 (3d Cir. 1994) (noting in dicta that "[i]t would be difficult for the state to claim it is acting as a private market participant when it is making rules that raise the cost of its contracts").

Defendants argue in support of their "market participant" argument that the Russia Act's proprietary purpose is to "protect the State's reputation as a buyer in the marketplace" given the danger that "private parties might choose not to associate or contract with the State . . . due to their association with a State that contracts with Russia-linked entities." (Defs.' Br. at 20–21.) First, it strains credulity to claim that a private party contracting with the state would view Plaintiff, a company compliant with federal sanctions but with a distant corporate tie to a Russian company, as a "Russia-linked entity" such that New Jersey's reputation would be harmed by association. Any such reputational harm is remote and speculative. Second, the legislative history reveals that the law's passage was in fact an attempt to set foreign policy. Statements from the Russia Act's primary sponsors in the legislature made clear that the law's purpose was to punish Russia, influence Russia's actions, and push companies to cease doing business with Russia.[29] These

---

[29] *See* Press Release, Governor Phil Murphy, Governor Murphy Signs Legislation Prohibiting Government Dealings With Businesses Associated with Russia or Belarus (Mar. 9, 2022) (containing statements of the Russia Act's sponsoring legislators), https://www.nj.gov/governor/news/news/562022/20220309b.shtml; Statement of Senator Paul A. Sarlo ("This is an international crisis we can influence here in New Jersey by supporting the courageous people of Ukraine. . . . [W]e can make [Russia] pay an increasingly heavy price for their actions."); Statement of Senator Declan J. O'Scanlon ("These unified actions [of governments across the world] are not intended to hurt peaceful Russian citizens, but to send a strong message to the oligarchs and others in positions of power that their leader has crossed a line with his war in Ukraine that the international community will not tolerate."); Statement of Assemblymember Gary S. Schaer ("Through this legislation, New Jersey joins the international community in fighting for Ukrainian freedom.");

statements lay bare what is suggested by the text of the law itself: that the Russia Act is an attempt to punish the Russian regime and force change.

The scope of New Jersey's Russia Act is so expansive that its provisions must be considered regulatory. The plain language of the statute does not limit the entities New Jersey includes on its list to those contracting with the state. Rather, the statute directs the Treasury Department to publish "a list of persons it determines engage in prohibited activities in Russia or Belarus." N.J. Stat. Ann. 52:32-60.1(b). As Plaintiff notes, New Jersey's interpretation of this broad language places those responsible for the war in Ukraine—such as Russian leaders, oligarchs, and arms companies, (Compl. ¶¶ 58–59)—alongside companies that have only the most threadbare, attenuated relationship with Russia, like Plaintiff. The fact that the Prohibited Entities list casts such a wide net well beyond New Jersey's potential contracting partners undermines Defendant's claim that the Russia Act purely serves New Jersey's financial interests. Finally, an act is more likely regulatory when the state relies on its "coercive power" to enforce the act with "'tools . . . that no private actor could wield, such as the threat of civil fines.'" *See Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 425–26 (3d Cir. 2011) (quoting *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 157 (2d Cir. 2006), *aff'd*, 550 U.S. 330 (2007)). Submitting a false certification under the Russia Act exposes a party to significant civil penalties, N.J. Stat. Ann. § 52:32-60.1(d), distinguishing New Jersey from a market participant that would only be able to enforce its agreements through contract.

---

Statement of Assemblymember Craig J. Coughlin ("Putin's values and those of his sympathizers are antithetical to the principles of democracy and independence for which we as a country stand. . . . Cutting ties as this legislation does sends not only a clear message by eliminating opportunities for trade and investment by aggressors but is a decisive action that will intensify the economic pressures imposed on and felt by Russia."); Statement of Assemblymember John DiMaio ("It's time to put our money where our mouth is and punish Russia and Belarus for refusing a peaceful resolution that recognizes the independent borders of Ukraine.").

Thus, it cannot seriously be disputed that New Jersey's Russia Act was enacted to punish Russia and bring about a specific political and economic result.

<p style="text-align:center">* * *</p>

As the Supreme Court observed in holding preempted a state law attempting to "vindicate the claims of Holocaust survivors," although the state's interest may be a "powerful one," the state's "very same objective dignifies the interest of the National Government in devising its chosen mechanism" to reach the same result. *Garamendi*, 539 U.S. at 426. The Supreme Court further articulated the court's role in mediating between the conflicting state and federal laws:

> But our thoughts on the efficacy of the one approach versus the other are beside the point, since our business is not to judge the wisdom of the National Government's policy; dissatisfaction should be addressed to the President or, perhaps, Congress. The question relevant to preemption in this case is conflict . . . .

*Id.* at 427 (quoting *Crosby*, 530 U.S. at 386). It may well be that a state government expressing an opinion on foreign affairs creates no constitutional conundrum. *See Natsios*, 181 F.3d at 61 n.18 ("We do not consider here whether Massachusetts would be authorized to pass a resolution condemning Burma's human rights record but taking no other action with regard to Burma."); *Gingery v. City of Glendale*, 831 F.3d 1222, 1229 (9th Cir. 2016) (holding that the a local government's ability to express a viewpoint on a matter of foreign affairs through erecting a public monument was not preempted by federal law).

New Jersey's desire to denounce Russian aggression may have been addressed through a legislative resolution condemning its invasion of Ukraine or through the state legislative and executive branches lobbying their federal counterparts to act. However, when a state enacts a law targeting a specific country in condemnation of international acts carried out by that country, the state goes beyond taking a position and into the realm reserved to the federal government.

<p style="text-align:center">33</p>

Although the Court does not question New Jersey's clear motive in enacting and enforcing the Russia Act in an attempt to support the Ukrainian people and condemn Russian aggression in Ukraine, the decision how to calibrate sanctions against Russia must be made by the federal government speaking for the country with one voice—not by any individual state or by this Court. The fact that Plaintiff—a company with a corporate tie to a Russian company that the federal government has not deemed worthy of sanction—can be branded as "doing business" with Russia while fully compliant with federal sanctions illustrates the conflict between the regimes and the constitutional mandate that the Russia Act yield to federal law. For these reasons, the Court finds that the Russia Act is preempted by the federal sanctions regime against Russia.

## B.   PERMANENT INJUNCTION FACTORS

Having concluded that the Russia Act is unconstitutional as applied to Plaintiff, the Court turns to the remaining permanent injunction factors, as previously set forth above.[30] Defendants argue that even if Plaintiff is successful on its constitutional claims, Plaintiff's claim that inclusion on New Jersey's Prohibited List will cause irreparable harm to Plaintiff is "indirect and purely speculative." (Defs.' Br. at 31–32.) Defendants continue that instead, New Jersey itself would be

---

[30] Defendants assert that Plaintiff must establish each of the four preliminary injunction factors in order to secure a permanent injunction. (Defs.' Br. at 31.) Defendants cite the Court only to cases involving the entry of a permanent injunction *not* involving constitutional claims, *see Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001), or cases involving entry of a preliminary rather than a permanent injunction, *see Marxe v. Jackson*, 833 F.2d 1121, 1125–28 (3d Cir. 1987). *See Port Drivers Fed'n 18, Inc. v. All Saints Exp., Inc.*, 757 F. Supp. 2d 443, 461 (D.N.J. 2010) ("Differing tests are employed in the preliminary injunction and permanent injunction contexts."). As noted by the Honorable Michael A. Shipp, "it is debatable whether a separate showing for a permanent injunction is necessary where New Jersey is in clear violation of a valid federal statute." *Nat'l Collegiate Athletic Ass'n v. Christie*, 926 F. Supp. 2d 551, 577 (D.N.J.), *aff'd sub nom.*, *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013), *rev'd on other grounds*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). Plaintiff responds to Defendants' assertion by stating that no showing on the permanent injunction factors is necessary on its claim seeking declaratory, rather than injunctive, relief. (Pl.'s Reply at 14.) However, it is unclear whether declaring the Russia Act unconstitutional, without also entering a permanent injunction, would afford Plaintiff the relief it seeks. Therefore, out of an abundance of caution, the Court will consider the four injunction factors. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

harmed if unable to enforce its own laws or make its own contracting decisions. (*Id.* at 33–34.) Plaintiff responds that its stated harm rises beyond speculation—based on the foregone value of its future contracts with New Jersey and the reputational harm from inclusion on Defendants' Prohibited List—and that New Jersey can have no interest in enforcing an unconstitutional law. (Pl.'s Reply Br. at 15.)

The Court finds that Plaintiff has established irreparable harm here to support entry of a permanent injunction. At the outset, the Court notes that by writing to the Court that they agreed resolving the case involved "no disputed material facts," (ECF No. 18), Defendants in effect agreed that they did not contest the factual assertions contained in Plaintiff's Complaint, on which the Court now relies. Plaintiff has held a Master Blanket Purchase Order contract with New Jersey since at least February 2016, through which New Jersey agencies have been able to purchase goods and services from Plaintiff. (Compl. ¶¶ 68–70, 112.) Defendants informed Plaintiff that it would be placed on the Prohibited List, which would prevent Plaintiff from contracting with the DPP in the future, with no end in sight. While Defendants are correct that there is no guarantee that New Jersey will renew its contract absent the Russia Act, (Defs.' Br. at 32), this does not render the harm speculative. If the law remained enforceable against Plaintiff, the company is precluded to contract with New Jersey and all its subdivisions simply because Plaintiff and a Russian company are both subsidiaries of a foreign parent company, notwithstanding that Plaintiff does not do business in Russia or Belarus. *See Odebrecht Const., Inc.*, 715 F.3d at 1288–89 (finding that plaintiff challenging state law preventing businesses doing business with Cuba from contracting with the state had established irreparable injury based on its "inability to compete on an equal footing in the bidding process, not the loss of a contract" (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993))). Further, Plaintiff has

no available remedy at law because Defendants cannot be forced to pay retroactive money damages pursuant to the Eleventh Amendment. *See Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991) ("As to the inadequacy of legal remedies, the Eleventh Amendment bar to an award of retroactive damages against [a state] clearly establishes that any legal remedy is unavailable and that the only relief available is equitable in nature." (citations omitted)).

The other harm Plaintiff identifies stems from its inclusion on New Jersey's Prohibited List. Other entities on the Prohibited List include companies "actively supportive of or engaged in the Russian war effort or tied to known Russian oligarchs." (Compl. ¶ 59.) Including Plaintiff on this list will publicly brand Plaintiff as one and the same with companies and individuals actively supportive of the Russian war effort. Inclusion on the list may also impede Plaintiff from renewing or securing new contracts with other state governments or the federal government, which require Plaintiff to certify that it is not barred from doing business in another jurisdiction. (Compl. ¶¶ 110– 17.) As Defendants aptly recognize in their opposition papers, there is a danger of associational taint to "contracting with entities linked to Russia or Belarus." (Defs.' Br. at 20–21.)[31]

No hardship will fall to Defendants if they are enjoined from enforcing the law against Plaintiff. A permanent injunction would merely require New Jersey to comply with federal law. *See Coach Inc. v. Fashion Paradise, LLC*, No. 10-4888, 2012 WL 194092, at *9 (D.N.J. Jan. 20, 2012) ("The only hardship imposed upon the Defendants is that they obey the law.").[32] The public

---

[31] Furthermore, enforcement of an unconstitutional statute against Plaintiff supports the finding of irreparable harm requiring the issuance of a permanent injunction. *See Am. Exp. Travel Related Servs. Co., Inc. v. Sidamon–Eristoff*, 755 F. Supp. 2d 556, 614 (D.N.J. 2010) (finding of irreparable harm "buttressed" by finding that a statute is unconstitutional) (citing *Ass'n for Fairness in Bus., Inc. v. New Jersey*, 82 F. Supp. 2d 353, 359 (D.N.J. 2000), *aff'd sub nom.*, *New Jersey Retail Merchants Ass'n v. Sidamon–Eristoff*, 669 F.3d 374 (3d Cir. 2012).

[32] Plaintiff also contends that Defendant's alleged interest in enforcing the Russia Act is undercut by voluntary choosing not to enforce the law against Plaintiff and others. (Pl.'s Reply at 15.) The Court does not agree. Accepting this argument would punish New Jersey for its attempt to work with Plaintiff in implementing the law before subjecting Plaintiff to the full enforcement powers granted by the Russia Act.

interest is likewise served by protecting the federal sanctions regime from state intrusion and giving the President a free hand to tailor and calibrate sanctions appropriately. *See Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003), *aff'd and remanded*, 542 U.S. 656 (2004). The *amici curiae* in this matter points to statements by the federal government describing the abuses and atrocities Russia has committed in Ukraine since its February 2022 invasion, contending that the strong evidence of Russian wrongdoing and Ukrainian suffering requires enforcing New Jersey's Russia Act in support of "critical humanitarian interests" and the United States' "national security." (ECF No. 24-2 at 6–7.) However, given the unquestionably federal nature of the foreign relationships and interest the *amicus curiae* highlights, undermining the President's ability to speak in a unified manner against Russia may well prove a greater disservice to the public—one the United States Constitution forbids.

Accordingly, the Court has found that the Russia Act is invalid as applied against Plaintiff and finds that Plaintiff has demonstrated its entitlement to a permanent injunction against enforcement of the Russia Act against it.

### C.     SCOPE OF RELIEF

Plaintiff seeks declaratory and injunctive relief on the constitutionality of the Russia Act as applied to Plaintiff. (*See generally* Compl.) In the Temporary Restraining Order entered on August 4, 2023, the Court enjoined Defendants from enforcing the Russia Act against Plaintiff alone, rather than broadly enjoining its enforcement. (ECF No. 12.) While Defendants argue that the Russia Act is constitutional, they contend that if the Court agrees with Plaintiff's preemption argument, "it should apply its ruling equally to everyone potentially covered by [the Russia Act], and not just to Kyocera America or just to these particular facts." (Defs.' Br. at 36.) In short, Plaintiff brings an as-applied challenge to the Russia Act, which Defendants ask the Court to

construe as a facial challenge. Defendants rely on language in the Russia Act that they contend evidences the New Jersey legislature's intent that the Russia Act would not be enforced if inconsistent with federal law. (*Id.* at 37–38.) Defendants also point to the "backstop" of federal sanctions and the state's interest in uniform application of its procurement rules to all parties as "powerful contextual evidence" supporting their request. (*Id.* at 38–39.) Plaintiff takes no position on this argument. (Pl.'s Reply at 15 n.9.)

As an initial matter, the Court notes that Defendants' arguments invoking the concept of "severability" and citing cases discussing "severability" are inapposite. The doctrine of severability addresses the question of whether, when one section of a statute is deemed unconstitutional, the remainder of the statute can survive. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2349 (2020) (defining a "severability clause" as one in which the legislature "mak[es] clear that the unconstitutionality of one provision does not affect the rest of the law"); *see also Rappa v. New Castle Cnty.*, 18 F.3d 1043, 1072 (3d Cir. 1994) ("When a federal court is called upon to invalidate a state statute, the severability of the constitutional *portions* of the statute are governed by state law . . . ." (emphasis added)). Defendants' arguments here turn not on which *portions* of the statute should be struck down but rather on which *parties* against whom the Court's ruling should apply. The doctrine of severability, therefore, does not guide the Court's analysis.

Thus, the Court turns to whether there is any additional basis for the Court to construe Plaintiff's as-applied challenge as a facial challenge. Defendants have offered no authority for the Court to enjoin wholesale enforcement of the law based only on its determination that the law is unconstitutional as applied to Plaintiff, and this Court is aware of none.

Indeed, the Supreme Court has counseled that, when confronting a constitutional flaw in a statute, courts should "try to limit the solution to the problem." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006). The Court explained that it "tr[ies] not to nullify more of the legislature's work than is necessary," as it is "axiomatic that a 'statute may be invalid as applied to one state of facts and yet valid as applied to another.'" *Id.* (quoting *Dahnke–Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)). Thus, the "normal rule" is that "partial, rather than facial, invalidation is the required course." *Id.* (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). It follows that facial challenges are "disfavored" both because they are often speculative and because they violate this "fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (internal quotation marks and citations omitted).

The Court acknowledges the unusual posture in this case—that it is the state itself that is asking the Court to, if it finds the law unconstitutional as applied to Plaintiff, find the law facially unconstitutional. However, the Court declines to stray from the Supreme Court's normal rule of judicial restraint to grant a relief that Plaintiff does not even seek in the absence of authority that would allow broader relief.[33]

---

[33] This Court's decision is bolstered by other doctrines in which the federal courts exercise restraint and decline to award relief beyond the scope of the issues presented, such as the general rule that courts may not issue advisory opinions. *See, e.g.*, *Westport Ins. Corp. v. Bayer*, 284 F.3d 489 (3d Cir. 2002) (explaining that a decision that is not responsive to the pleadings and issues presented by the parties constitutes an advisory opinion and citing *Penthouse Int'l, Ltd. v. Barnes*, 792 F.2d 943, 950 (9th Cir. 1986) (holding that the district court abused its discretion in awarding to declaratory judgment defendant relief beyond the scope of the issues presented in the action)).

Moreover, the Court notes that facial challenges are "the most difficult challenge to mount," *United States v. Salerno*, 481 U.S. 739, 745 (1987), and the Court cannot be assured at this stage that there is no set of circumstances under which the Russia Act could be constitutionally enforced. Indeed, the Court's decision in this case hinges on the tenuous connection between Plaintiff and Russia's conduct in its invasion of Ukraine. While, indeed, the expansive scope of New Jersey's Russia Act may render it unlikely to survive constitutional scrutiny when subjected to a facial challenge, on this posture it is theoretically conceivable that some application of the Russia Act—perhaps to a company targeted by federal sanctions, rather than one that falls far outside the outer bound of what the federal regime proscribes—might not create the same constitutional conflict as the law's application here. Therefore, it is not clear that enforcement of the Russia Act in all "circumstances . . . would violate federal law or regulation." N.J. Stat. Ann. § 52:32-60.4.

Accordingly, the Court declines the enjoin the Russia Act's enforcement against all potential plaintiffs. As requested in Plaintiff's suit, the Court's ruling is limited to enforcement of the Russia Act only as against Plaintiff.[34]

---

[34] Defendants also exhort the Court to carefully craft its injunction order to make clear that it is "*not* ordering specific performance of the G2075 contract—or ordering New Jersey to enter into any contract." (Defs.' Br. at 34–35.) The Complaint seeks the Court to:

> enjoin[] Defendant Davis from refusing to extend the Contract; refusing to otherwise contract with Kyocera America in the future; or taking any other adverse action against Kyocera America based on the provisions of N.J.S.A. 52:32-60.1 that violate the foregoing constitutional provisions as applied to Kyocera America.

(Compl. at *27.) Defendants admit that it is not clear whether Plaintiff even seeks specific performance, (Defs.' Br. at 34), which Plaintiff disclaims, (Pl.'s Reply at 15 n.9). The Court does not read the Complaint's language to require specific performance, but rather to bar Defendants from relying on the Russia Act in making its contracting decision with respect to Plaintiff. In any event, Defendants are correct that ordering specific performance would be improper. *See Waterfront Comm'n of New York Harbor v. Governor of New Jersey*, 961 F.3d 234, 239 (3d Cir. 2020) (citing *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256–57 (2011)). Therefore, the Court's order will be appropriately limited.

## IV. CONCLUSION

The Court **GRANTS** Plaintiff's Motion for Summary Judgment (ECF No. 3), **DENIES** Defendants' Cross-Motion for Summary Judgment (ECF No. 21), declares the Russia Act unconstitutional as applied against Plaintiff, and enjoins Defendants from enforcing Russia Act against Plaintiff. An appropriate Order accompanies this Opinion.

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: December 22, 2023